# REGENTS OF THE UNIVERSITY OF CALIFORNIA *v.* BAKKE

No. 76–811.   Argued October 12, 1977—Decided June 28, 1978

266

Powell, J., announced the Court's judgment and filed an opinion expressing his views of the case, in Parts I, III–A, and V–C of which White, J., joined; and in Parts I and V–C of which Brennan, Marshall, and Blackmun, JJ., joined. Brennan, White, Marshall, and Black-

MUN, JJ., filed an opinion concurring in the judgment in part and dissenting in part, *post,* p. 324. WHITE, J., *post,* p. 379, MARSHALL, J., *post,* p. 387, and BLACKMUN, J., *post,* p. 402, filed separate opinions. STEVENS, J., filed an opinion concurring in the judgment in part and dissenting in part, in which BURGER, C. J., and STEWART and REHNQUIST, JJ., joined, *post,* p. 408.

*Archibald Cox* argued the cause for petitioner. With him on the briefs were *Paul J. Mishkin, Jack B. Owens,* and *Donald L. Reidhaar.*

*Reynold H. Colvin* argued the cause and filed briefs for respondent.

*Solicitor General McCree* argued the cause for the United States as *amicus curiae.* With him on the briefs were *Attorney General Bell, Assistant Attorney General Days, Deputy Solicitor General Wallace, Brian K. Landsberg, Jessica Dunsay Silver, Miriam R. Eisenstein,* and *Vincent F. O'Rourke.**

---

*Briefs of *amici curiae* urging reversal were filed by *Slade Gorton,* Attorney General, and *James B. Wilson,* Senior Assistant Attorney General, for the State of Washington et al.; by *E. Richard Larson, Joel M. Gora, Charles C. Marson, Sanford Jay Rosen, Fred Okrand, Norman Dorsen, Ruth Bader Ginsburg,* and *Frank Askin* for the American Civil Liberties Union et al.; by *Edgar S. Cahn, Jean Camper Cahn,* and *Robert S. Catz* for the Antioch School of Law; by *William Jack Chow* for the Asian American Bar Assn. of the Greater Bay Area; by *A. Kenneth Pye, Robert B. McKay, David E. Feller,* and *Ernest Gellhorn* for the Association of American Law Schools; by *John Holt Myers* for the Association of American Medical Colleges; by *Jerome B. Falk* and *Peter Roos* for the Bar Assn. of San Francisco et al.; by *Ephraim Margolin* for the Black Law Students Assn. at the University of California, Berkeley School of Law; by *John T. Baker* for the Black Law Students Union of Yale University Law School; by *Annamay T. Sheppard* and *Jonathan M. Hyman* for the Board of Governors of Rutgers, State University of New Jersey, et al.; by *Robert J. Willey* for the Cleveland State University Chapter of the Black American Law Students Assn.; by *John Mason Harding, Albert J. Rosenthal, Daniel Steiner, Iris Brest, James V. Siena, Louis H. Pollak,* and *Michael I. Sovern* for Columbia University et al.; by *Herbert O. Reid* for Howard University; by *Harry B. Reese* and *L. Orin Slagle* for the Law School Admission Council; by *Albert E. Jenner, Jr., Stephen J. Pollak, Burke Marshall,*

MR. JUSTICE POWELL announced the judgment of the Court.

This case presents a challenge to the special admissions program of the petitioner, the Medical School of the University of California at Davis, which is designed to assure the admis-

*Norman Redlich, Robert A. Murphy,* and *William E. Caldwell* for the Lawyers' Committee for Civil Rights Under Law; by *Alice Daniel* and *James E. Coleman, Jr.,* for the Legal Services Corp.; by *Nathaniel R. Jones, Nathaniel S. Colley,* and *Stanley Goodman* for the National Assn. for the Advancement of Colored People; by *Jack Greenberg, James M. Nabrit III, Charles S. Ralston, Eric Schnapper,* and *David E. Kendall* for the NAACP Legal Defense and Educational Fund, Inc.; by *Stephen V. Bomse* for the National Assn. of Minority Contractors et al.; by *Richard B. Sobol, Marian Wright Edelman, Stephen P. Berzon,* and *Joseph L. Rauh, Jr.,* for the National Council of Churches of Christ in the United States et al.; by *Barbara A. Morris, Joan Bertin Lowy,* and *Diana H. Greene* for the National Employment Law Project, Inc.; by *Herbert O. Reid* and *J. Clay Smith, Jr.,* for the National Medical Assn., Inc., et al.; by *Robert Hermann* for the Puerto Rican Legal Defense and Education Fund et al.; by *Robert Allen Sedler, Howard Lesnick,* and *Arval A. Morris* for the Society of American Law Teachers; for the American Medical Student Assn.; and for the Council on Legal Education Opportunity.

Briefs of *amici curiae* urging affirmance were filed by *Lawrence A. Poltrock* and *Wayne B. Giampietro* for the American Federation of Teachers; by *Abraham S. Goldstein, Nathan Z. Dershowitz, Arthur J. Gajarsa, Thaddeus L. Kowalski, Anthony J. Fornelli, Howard L. Greenberger, Samuel Rabinove, Themis N. Anastos, Julian E. Kulas,* and *Alan M. Dershowitz* for the American Jewish Committee et al.; by *McNeill Stokes* and *Ira J. Smotherman, Jr.,* for the American Subcontractors Assn.; by *Philip B. Kurland, Daniel D. Polsby, Larry M. Lavinsky, Arnold Forster, Dennis Rapps, Anthony J. Fornelli, Leonard Greenwald,* and *David I. Ashe* for the Anti-Defamation League of B'nai B'rith et al.; by *Charles G. Bakaly* and *Lawrence B. Kraus* for the Chamber of Commerce of the United States; by *Roger A. Clark, Jerome K. Tankel,* and *Glen R. Murphy* for the Fraternal Order of Police et al.; by *Judith R. Cohn* for the Order Sons of Italy in America; by *Ronald A. Zumbrun, John H. Findley,* and *William F. Harvey* for the Pacific Legal Foundation; by *Benjamin Vinar* and *David I. Caplan* for the Queens Jewish Community Council et al.; and by *Jennings P. Felix* for Young Americans for Freedom.

Briefs of *amici curiae* were filed by *Matthew W. Finkin* for the American Assn. of University Professors; by *John W. Finley, Jr., Michael*

sion of a specified number of students from certain minority groups. The Superior Court of California sustained respondent's challenge, holding that petitioner's program violated the California Constitution, Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment. The court enjoined petitioner from considering respondent's race or the race of any other applicant in making admissions decisions. It refused, however, to order respondent's admission to the Medical School, holding that he had not carried his burden of proving that he would have been admitted but for the constitutional and statutory violations. The Supreme Court of California affirmed those portions of the trial court's judgment declaring the special admissions program unlawful and enjoining petitioner from considering the race of any appli-

*Blinick, John Cannon, Leonard J. Theberge,* and *Edward H. Dowd* for the Committee on Academic Nondiscrimination and Integrity et al.; by *Kenneth C. McGuiness, Robert E. Williams, Douglas S. McDowell,* and *Ronald M. Green* for the Equal Employment Advisory Council; by *Charles E. Wilson* for the Fair Employment Practice Comm'n of California; by *Mario G. Obledo* for Jerome A. Lackner, Director of the Department of Health of California, et al.; by *Vilma S. Martinez, Peter D. Roos,* and *Ralph Santiago Abascal* for the Mexican American Legal Defense and Educational Fund et al.; by *Eva S. Goodwin* for the National Assn. of Affirmative Action Officers; by *Lennox S. Hinds* for the National Conference of Black Lawyers; by *David Ginsburg* for the National Fund for Minority Engineering Students; by *A. John Wabaunsee, Walter R. Echo-Hawk,* and *Thomas W. Fredericks* for the Native American Law Students of the University of California at Davis et al.; by *Joseph A. Broderick, Calvin Brown, LeMarquis DeJarmon, James E. Ferguson II, Harry E. Groves, John H. Harmon, William A. Marsh, Jr.,* and *James W. Smith* for the North Carolina Assn. of Black Lawyers; by *Leonard F. Walentynowicz* for the Polish American Congress et al.; by *Daniel M. Luevano* and *John E. McDermott* for the UCLA Black Law Students Assn. et al.; by *Henry A. Waxman pro se;* by *Leo Branton, Jr., Ann Fagan Ginger, Sam Rosenwein,* and *Laurence R. Sperber* for Price M. Cobbs, M. D., et al.; by *John S. Nolan* for Ralph J. Galliano; and by *Daniel T. Spitler* for Timothy J. Hoy.

cant.† It modified that portion of the judgment denying respondent's requested injunction and directed the trial court to order his admission.

For the reasons stated in the following opinion, I believe that so much of the judgment of the California court as holds petitioner's special admissions program unlawful and directs that respondent be admitted to the Medical School must be affirmed. For the reasons expressed in a separate opinion, my Brothers THE CHIEF JUSTICE, MR. JUSTICE STEWART, MR. JUSTICE REHNQUIST, and MR. JUSTICE STEVENS concur in this judgment.

---

†MR. JUSTICE STEVENS views the judgment of the California court as limited to prohibiting the consideration of race only in passing upon Bakke's application. *Post,* at 408–411. It must be remembered, however, that petitioner here cross-complained in the trial court for a declaratory judgment that its special program was constitutional and it lost. The trial court's judgment that the special program was unlawful was affirmed by the California Supreme Court in an opinion which left no doubt that the reason for its holding was petitioner's use of race in consideration of *any candidate's* application. Moreover, in explaining the scope of its holding, the court quite clearly stated that petitioner was prohibited from taking race into account in any way in making admissions decisions:

"In addition, the University may properly as it in fact does, consider other factors in evaluating an applicant, such as the personal interview, recommendations, character, and matters relating to the needs of the profession and society, such as an applicant's professional goals. In short, the standards for admission employed by the University are not constitutionally infirm except to the extent that they are utilized in a racially discriminatory manner. Disadvantaged applicants of all races must be eligible for sympathetic consideration, and no applicant may be rejected because of his race, in favor of another who is less qualified, as measured by standards applied without regard to race. We reiterate, in view of the dissent's misinterpretation, that we do not compel the University to utilize only 'the highest objective academic credentials' as the criterion for admission." 18 Cal. 3d 34, 54–55, 553 P. 2d 1152, 1166 (1976) (footnote omitted).

This explicit statement makes it unreasonable to assume that the reach of the California court's judgment can be limited in the manner suggested by MR. JUSTICE STEVENS.

I also conclude for the reasons stated in the following opinion that the portion of the court's judgment enjoining petitioner from according any consideration to race in its admissions process must be reversed. For reasons expressed in separate opinions, my Brothers MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, MR. JUSTICE MARSHALL, and MR. JUSTICE BLACKMUN concur in this judgment.

*Affirmed in part and reversed in part.*

I‡

The Medical School of the University of California at Davis opened in 1968 with an entering class of 50 students. In 1971, the size of the entering class was increased to 100 students, a level at which it remains. No admissions program for disadvantaged or minority students existed when the school opened, and the first class contained three Asians but no blacks, no Mexican-Americans, and no American Indians. Over the next two years, the faculty devised a special admissions program to increase the representation of "disadvantaged" students in each Medical School class.[1] The special program consisted of

---

‡MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, MR. JUSTICE MARSHALL, and MR. JUSTICE BLACKMUN join Parts I and V–C of this opinion. MR. JUSTICE WHITE also joins Part III–A of this opinion.

[1] Material distributed to applicants for the class entering in 1973 described the special admissions program as follows:

"A special subcommittee of the Admissions Committee, made up of faculty and medical students from minority groups, evaluates applications from economically and/or educationally disadvantaged backgrounds. The applicant may designate on the application form that he or she requests such an evaluation. Ethnic minorities are not categorically considered under the Task Force Program unless they are from disadvantaged backgrounds. Our goals are: 1) A short range goal in the identification and recruitment of potential candidates for admission to medical school in the near future, and 2) Our long-range goal is to stimulate career interest in health professions among junior high and high school students.

"After receiving all pertinent information selected applicants will receive

a separate admissions system operating in coordination with the regular admissions process.

Under the regular admissions procedure, a candidate could submit his application to the Medical School beginning in July of the year preceding the academic year for which admission was sought. Record 149. Because of the large number of applications,[2] the admissions committee screened each one to select candidates for further consideration. Candidates whose overall undergraduate grade point averages fell below 2.5 on a scale of 4.0 were summarily rejected. *Id.*, at 63. About

a letter inviting them to our School of Medicine in Davis for an interview. The interviews are conducted by at least one faculty member and one student member of the Task Force Committee. Recommendations are then made to the Admissions Committee of the medical school. Some of the Task Force Faculty are also members of the Admissions Committee.

"Long-range goals will be approached by meeting with counselors and students of schools with large minority populations, as well as with local youth and adult community groups.

"Applications for financial aid are available only *after* the applicant has been accepted and can only be awarded after registration. Financial aid is available to students in the form of scholarships and loans. In addition to the Regents' Scholarships and President's Scholarship programs, the medical school participates in the Health Professions Scholarship Program, which makes funds available to students who otherwise might not be able to pursue a medical education. Other scholarships and awards are available to students who meet special eligibility qualifications. Medical students are also eligible to participate in the Federally Insured Student Loan Program and the American Medical Association Education and Research Foundation Loan Program.

"Applications for Admission are available from:

"Admissions Office
School of Medicine
University of California
Davis, California 95616"

Record 195. The letter distributed the following year was virtually identical, except that the third paragraph was omitted.

[2] For the 1973 entering class of 100 seats, the Davis Medical School received 2,464 applications. *Id.*, at 117. For the 1974 entering class, 3,737 applications were submitted. *Id.*, at 289.

one out of six applicants was invited for a personal interview. *Ibid.* Following the interviews, each candidate was rated on a scale of 1 to 100 by his interviewers and four other members of the admissions committee. The rating embraced the interviewers' summaries, the candidate's overall grade point average, grade point average in science courses, scores on the Medical College Admissions Test (MCAT), letters of recommendation, extracurricular activities, and other biographical data. *Id.,* at 62. The ratings were added together to arrive at each candidate's "benchmark" score. Since five committee members rated each candidate in 1973, a perfect score was 500; in 1974, six members rated each candidate, so that a perfect score was 600. The full committee then reviewed the file and scores of each applicant and made offers of admission on a "rolling" basis.[3] The chairman was responsible for placing names on the waiting list. They were not placed in strict numerical order; instead, the chairman had discretion to include persons with "special skills." *Id.,* at 63–64.

The special admissions program operated with a separate committee, a majority of whom were members of minority groups. *Id.,* at 163. On the 1973 application form, candidates were asked to indicate whether they wished to be considered as "economically and/or educationally disadvantaged" applicants; on the 1974 form the question was whether they wished to be considered as members of a "minority group," which the Medical School apparently viewed as "Blacks," "Chicanos," "Asians," and "American Indians." *Id.,* at 65–66, 146, 197, 203–205, 216–218. If these questions were answered affirmatively, the application was forwarded to the special admissions committee. No formal definition of "disad-

---

[3] That is, applications were considered and acted upon as they were received, so that the process of filling the class took place over a period of months, with later applications being considered against those still on file from earlier in the year. *Id.,* at 64.

vantaged" was ever produced, *id.*, at 163–164, but the chairman of the special committee screened each application to see whether it reflected economic or educational deprivation.[4] Having passed this initial hurdle, the applications then were rated by the special committee in a fashion similar to that used by the general admissions committee, except that special candidates did not have to meet the 2.5 grade point average cutoff applied to regular applicants. About one-fifth of the total number of special applicants were invited for interviews in 1973 and 1974.[5] Following each interview, the special committee assigned each special applicant a benchmark score. The special committee then presented its top choices to the general admissions committee. The latter did not rate or compare the special candidates against the general applicants, *id.*, at 388, but could reject recommended special candidates for failure to meet course requirements or other specific deficiencies. *Id.*, at 171–172. The special committee continued to recommend special applicants until a number prescribed by faculty vote were admitted. While the overall class size was still 50, the prescribed number was 8; in 1973 and 1974, when the class size had doubled to 100, the prescribed number of special admissions also doubled, to 16. *Id.*, at 164, 166.

From the year of the increase in class size—1971—through 1974, the special program resulted in the admission of 21 black students, 30 Mexican-Americans, and 12 Asians, for a total of 63 minority students. Over the same period, the regular admissions program produced 1 black, 6 Mexican-Americans,

---

[4] The chairman normally checked to see if, among other things, the applicant had been granted a waiver of the school's application fee, which required a means test; whether the applicant had worked during college or interrupted his education to support himself or his family; and whether the applicant was a member of a minority group. *Id.*, at 65–66.

[5] For the class entering in 1973, the total number of special applicants was 297, of whom 73 were white. In 1974, 628 persons applied to the special committee, of whom 172 were white. *Id.*, at 133–134.

and 37 Asians, for a total of 44 minority students.[6]  Although disadvantaged whites applied to the special program in large numbers, see n. 5, *supra,* none received an offer of admission through that process.  Indeed, in 1974, at least, the special committee explicitly considered only "disadvantaged" special applicants who were members of one of the designated minority groups.  Record 171.

Allan Bakke is a white male who applied to the Davis Medical School in both 1973 and 1974.  In both years Bakke's application was considered under the general admissions program, and he received an interview.  His 1973 interview was with Dr. Theodore C. West, who considered Bakke "a very desirable applicant to [the] medical school."  *Id.,* at 225. Despite a strong benchmark score of 468 out of 500, Bakke was rejected.  His application had come late in the year, and no applicants in the general admissions process with scores below 470 were accepted after Bakke's application was completed. *Id.,* at 69.  There were four special admissions slots unfilled at that time, however, for which Bakke was not considered.  *Id.,* at 70.  After his 1973 rejection, Bakke wrote to Dr. George H. Lowrey, Associate Dean and Chairman of the Admissions Committee, protesting that the special admissions program operated as a racial and ethnic quota.  *Id.,* at 259.

---

[6] The following table provides a year-by-year comparison of minority admissions at the Davis Medical School:

| | Special Admissions Program | | | | General Admissions | | | | Total |
|------|--------|----------|--------|-------|--------|----------|--------|-------|-------|
| | Blacks | Chicanos | Asians | Total | Blacks | Chicanos | Asians | Total | |
| 1970 | 5 | 3 | 0 | 8 | 0 | 0 | 4 | 4 | 12 |
| 1971 | 4 | 9 | 2 | 15 | 1 | 0 | 8 | 9 | 24 |
| 1972 | 5 | 6 | 5 | 16 | 0 | 0 | 11 | 11 | 27 |
| 1973 | 6 | 8 | 2 | 16 | 0 | 2 | 13 | 15 | 31 |
| 1974 | 6 | 7 | 3 | 16 | 0 | 4 | 5 | 9 | 25 |

*Id.,* at 216–218.  Sixteen persons were admitted under the special program in 1974, *ibid.,* but one Asian withdrew before the start of classes, and the vacancy was filled by a candidate from the general admissions waiting list. Brief for Petitioner 4 n. 5.

Bakke's 1974 application was completed early in the year. *Id.*, at 70. His student interviewer gave him an overall rating of 94, finding him "friendly, well tempered, conscientious and delightful to speak with." *Id.*, at 229. His faculty interviewer was, by coincidence, the same Dr. Lowrey to whom he had written in protest of the special admissions program. Dr. Lowrey found Bakke "rather limited in his approach" to the problems of the medical profession and found disturbing Bakke's "very definite opinions which were based more on his personal viewpoints than upon a study of the total problem." *Id.*, at 226. Dr. Lowrey gave Bakke the lowest of his six ratings, an 86; his total was 549 out of 600. *Id.*, at 230. Again, Bakke's application was rejected. In neither year did the chairman of the admissions committee, Dr. Lowrey, exercise his discretion to place Bakke on the waiting list. *Id.*, at 64. In both years, applicants were admitted under the special program with grade point averages, MCAT scores, and benchmark scores significantly lower than Bakke's.[7]

After the second rejection, Bakke filed the instant suit in the Superior Court of California.[8] He sought mandatory, injunctive, and declaratory relief compelling his admission to the Medical School. He alleged that the Medical School's special admissions program operated to exclude him from the

---

[7] The following table compares Bakke's science grade point average, overall grade point average, and MCAT scores with the average scores of regular admittees and of special admittees in both 1973 and 1974. Record 210, 223, 231, 234:

Class Entering in 1973

|  | SGPA | OGPA | MCAT (Percentiles) | | | |
|  |  |  | Verbal | Quantitative | Science | Gen. Infor. |
| Bakke | 3.44 | 3.46 | 96 | 94 | 97 | 72 |
| Average of regular admittees | 3.51 | 3.49 | 81 | 76 | 83 | 69 |
| Average of special admittees | 2.62 | 2.88 | 46 | 24 | 35 | 33 |

school on the basis of his race, in violation of his rights under the Equal Protection Clause of the Fourteenth Amendment,[9] Art. I, § 21, of the California Constitution,[10] and § 601 of Title VI of the Civil Rights Act of 1964, 78 Stat. 252, 42 U. S. C. § 2000d.[11] The University cross-complained for a declaration that its special admissions program was lawful. The trial

Class Entering in 1974

| | SGPA | OGPA | Verbal | MCAT (Percentiles) Quantitative | Science | Gen. Infor. |
|---|---|---|---|---|---|---|
| Bakke | 3.44 | 3.46 | 96 | 94 | 97 | 72 |
| Average of regular admittees | 3.36 | 3.29 | 69 | 67 | 82 | 72 |
| Average of special admittees | 2.42 | 2.62 | 34 | 30 | 37 | 18 |

Applicants admitted under the special program also had benchmark scores significantly lower than many students, including Bakke, rejected under the general admissions program, even though the special rating system apparently gave credit for overcoming "disadvantage." *Id.*, at 181, 388.

[8] Prior to the actual filing of the suit, Bakke discussed his intentions with Peter C. Storandt, Assistant to the Dean of Admissions at the Davis Medical School. *Id.*, at 259–269. Storandt expressed sympathy for Bakke's position and offered advice on litigation strategy. Several *amici* imply that these discussions render Bakke's suit "collusive." There is no indication, however, that Storandt's views were those of the Medical School or that anyone else at the school even was aware of Storandt's correspondence and conversations with Bakke. Storandt is no longer with the University.

[9] "[N]or shall any State . . . deny to any person within its jurisdiction the equal protection of the laws."

[10] "No special privileges or immunities shall ever be granted which may not be altered, revoked, or repealed by the Legislature; nor shall any citizen, or class of citizens, be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens."

This section was recently repealed and its provisions added to Art. I, § 7, of the State Constitution.

[11] Section 601 of Title VI, 78 Stat. 252, provides as follows:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

court found that the special program operated as a racial quota, because minority applicants in the special program were rated only against one another, Record 388, and 16 places in the class of 100 were reserved for them. *Id.*, at 295–296. Declaring that the University could not take race into account in making admissions decisions, the trial court held the challenged program violative of the Federal Constitution, the State Constitution, and Title VI. The court refused to order Bakke's admission, however, holding that he had failed to carry his burden of proving that he would have been admitted but for the existence of the special program.

Bakke appealed from the portion of the trial court judgment denying him admission, and the University appealed from the decision that its special admissions program was unlawful and the order enjoining it from considering race in the processing of applications. The Supreme Court of California transferred the case directly from the trial court, "because of the importance of the issues involved." 18 Cal. 3d 34, 39, 553 P. 2d 1152, 1156 (1976). The California court accepted the findings of the trial court with respect to the University's program.[12] Because the special admissions program involved a .racial classification, the Supreme Court held itself bound to apply strict scrutiny. *Id.*, at 49, 553 P. 2d, at 1162–1163. It then turned to the goals the University presented as justifying the special program. Although the court agreed that the goals of integrating the medical profession and increasing the number of physicians willing to serve members of minority groups were compelling state interests, *id.*, at 53, 553 P. 2d, at 1165, it concluded that the special admissions program was not the least intrusive means of achieving those goals. Without passing on the state constitutional or the federal statutory grounds cited in the trial court's judgment, the California court held

---

[12] Indeed, the University did not challenge the finding that applicants who were not members of a minority group were excluded from consideration in the special admissions process. 18 Cal. 3d, at 44, 553 P. 2d, at 1159.

that the Equal Protection Clause of the Fourteenth Amendment required that "no applicant may be rejected because of his race, in favor of another who is less qualified, as measured by standards applied without regard to race." *Id.*, at 55, 553 P. 2d, at 1166.

Turning to Bakke's appeal, the court ruled that since Bakke had established that the University had discriminated against him on the basis of his race, the burden of proof shifted to the University to demonstrate that he would not have been admitted even in the absence of the special admissions program.[13] *Id.*, at 63–64, 553 P. 2d, at 1172. The court analogized Bakke's situation to that of a plaintiff under Title VII of the Civil Rights Act of 1964, 42 U. S. C. §§ 2000e–17 (1970 ed., Supp. V), see, *e. g., Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 772 (1976). 18 Cal. 3d, at 63–64, 553 P. 2d, at 1172. On this basis, the court initially ordered a remand for the purpose of determining whether, under the newly allocated burden of proof, Bakke would have been admitted to either the 1973 or the 1974 entering class in the absence of the special admissions program. App. A to Application for Stay 48. In its petition for rehearing below, however, the University conceded its inability to carry that burden. App. B to Application for Stay A19–A20.[14] The

---

[13] Petitioner has not challenged this aspect of the decision. The issue of the proper placement of the burden of proof, then, is not before us.

[14] Several *amici* suggest that Bakke lacks standing, arguing that he never showed that his injury—exclusion from the Medical School—will be redressed by a favorable decision, and that the petitioner "fabricated" jurisdiction by conceding its inability to meet its burden of proof. Petitioner does not object to Bakke's standing, but inasmuch as this charge concerns our jurisdiction under Art. III, it must be considered and rejected. First, there appears to be no reason to question the petitioner's concession. It was not an attempt to stipulate to a conclusion of law or to disguise actual facts of record. Cf. *Swift & Co.* v. *Hocking Valley R. Co.*, 243 U. S. 281 (1917).

Second, even if Bakke had been unable to prove that he would have been admitted in the absence of the special program, it would not follow that he

California court thereupon amended its opinion to direct that the trial court enter judgment ordering Bakke's admission to the Medical School. 18 Cal. 3d, at 64, 553 P. 2d, at 1172. That order was stayed pending review in this Court. 429 U. S. 953 (1976). We granted certiorari to consider the important constitutional issue. 429 U. S. 1090 (1977).

## II

In this Court the parties neither briefed nor argued the applicability of Title VI of the Civil Rights Act of 1964. Rather, as had the California court, they focused exclusively upon the validity of the special admissions program under the Equal Protection Clause. Because it was possible, however, that a decision on Title VI might obviate resort to constitutional interpretation, see *Ashwander* v. *TVA*, 297 U. S. 288, 346–348 (1936) (concurring opinion), we requested supplementary briefing on the statutory issue. 434 U. S. 900 (1977).

## A

At the outset we face the question whether a right of action for private parties exists under Title VI. Respondent argues that there is a private right of action, invoking the test set forth in *Cort* v. *Ash,* 422 U. S. 66, 78 (1975). He contends

---

lacked standing. The constitutional element of standing is plaintiff's demonstration of any injury to himself that is likely to be redressed by favorable decision of his claim. *Warth* v. *Seldin,* 422 U. S. 490, 498 (1975). The trial court found such an injury, apart from failure to be admitted, in the University's decision not to permit Bakke to compete for all 100 places in the class, simply because of his race. Record 323. Hence the constitutional requirements of Art. III were met. The question of Bakke's admission *vel non* is merely one of relief.

Nor is it fatal to Bakke's standing that he was not a "disadvantaged" applicant. Despite the program's purported emphasis on disadvantage, it was a minority enrollment program with a secondary disadvantage element. White disadvantaged students were never considered under the special program, and the University acknowledges that its goal in devising the program was to increase minority enrollment.

that the statute creates a federal right in his favor, that legislative history reveals an intent to permit private actions,[15] that such actions would further the remedial purposes of the statute, and that enforcement of federal rights under the Civil Rights Act generally is not relegated to the States. In addition, he cites several lower court decisions which have recognized or assumed the existence of a private right of action.[16] Petitioner denies the existence of a private right of action, arguing that the sole function of § 601, see n. 11, *supra*, was to establish a predicate for administrative action under § 602, 78 Stat. 252, 42 U. S. C. § 2000d–1.[17] In its view, administrative curtailment of federal funds under that section was the only sanction to be imposed upon recipients that

---

[15] See, *e. g.*, 110 Cong. Rec. 5255 (1964) (remarks of Sen. Case).

[16] *E. g., Bossier Parish School Board* v. *Lemon*, 370 F. 2d 847, 851–852 (CA5), cert. denied, 388 U. S. 911 (1967); *Natonabah* v. *Board of Education*, 355 F. Supp. 716, 724 (NM 1973); cf. *Lloyd* v. *Regional Transportation Authority*, 548 F. 2d 1277, 1284–1287 (CA7 1977) (Title V of Rehabilitation Act of 1973, 29 U. S. C. § 790 *et seq.* (1976 ed.)); *Piascik* v. *Cleveland Museum of Art*, 426 F. Supp. 779, 780 n. 1 (ND Ohio 1976) (Title IX of Education Amendments of 1972, 20 U. S. C. § 1681 *et seq.* (1976 ed.)).

[17] Section 602, as set forth in 42 U. S. C. § 2000d–1, reads as follows:

"Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be

violated § 601. Petitioner also points out that Title VI contains no explicit grant of a private right of action, in contrast to Titles II, III, IV, and VII, of the same statute, 42 U. S. C. §§ 2000a–3 (a), 2000b–2, 2000c–8, and 2000e–5 (f) (1970 ed. and Supp. V).[18]

We find it unnecessary to resolve this question in the instant case. The question of respondent's right to bring an action under Title VI was neither argued nor decided in either of the courts below, and this Court has been hesitant to review questions not addressed below. *McGoldrick* v. *Compagnie Generale Transatlantique,* 309 U. S. 430, 434–435 (1940). See also *Massachusetts* v. *Westcott,* 431 U. S. 322 (1977); *Cardinale* v. *Louisiana,* 394 U. S. 437, 439 (1969). Cf. *Singleton,* v. *Wulff,* 428 U. S. 106, 121 (1976). We therefore do not address this difficult issue. Similarly, we need not pass

---

limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report."

[18] Several comments in the debates cast doubt on the existence of any intent to create a private right of action. For example, Representative Gill stated that no private right of action was contemplated:

"Nowhere in this section do you find a comparable right of legal action for a person who feels he has been denied his rights to participate in the benefits of Federal funds. Nowhere. Only those who have been cut off can go to court and present their claim." 110 Cong. Rec. 2467 (1964).

Accord, *id.,* at 7065 (remarks of Sen. Keating); 6562 (remarks of Sen. Kuchel).

upon petitioner's claim that private plaintiffs under Title VI must exhaust administrative remedies. We assume, only for the purposes of this case, that respondent has a right of action under Title VI. See *Lau* v. *Nichols,* 414 U. S. 563, 571 n. 2 (1974) (STEWART, J., concurring in result).

## B

The language of § 601, 78 Stat. 252, like that of the Equal Protection Clause, is majestic in its sweep:

> "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

The concept of "discrimination," like the phrase "equal protection of the laws," is susceptible of varying interpretations, for as Mr. Justice Holmes declared, "[a] word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne* v. *Eisner,* 245 U. S. 418, 425 (1918). We must, therefore, seek whatever aid is available in determining the precise meaning of the statute before us. *Train* v. *Colorado Public Interest Research Group,* 426 U. S. 1, 10 (1976), quoting *United States* v. *American Trucking Assns.,* 310 U. S. 534, 543–544 (1940). Examination of the voluminous legislative history of Title VI reveals a congressional intent to halt federal funding of entities that violate a prohibition of racial discrimination similar to that of the Constitution. Although isolated statements of various legislators, taken out of context, can be marshaled in support of the proposition that § 601 enacted a purely color-blind scheme,[19] without regard to the reach of the Equal Pro-

---

[19] For example, Senator Humphrey stated as follows:

"Racial discrimination or segregation in the administration of disaster relief is particularly shocking; and offensive to our sense of justice and

tection Clause, these comments must be read against the background of both the problem that Congress was addressing and the broader view of the statute that emerges from a full examination of the legislative debates.

The problem confronting Congress was discrimination against Negro citizens at the hands of recipients of federal moneys. Indeed, the color blindness pronouncements cited in the margin at n. 19, generally occur in the midst of extended remarks dealing with the evils of segregation in federally funded programs. Over and over again, proponents of the bill detailed the plight of Negroes seeking equal treatment in such programs.[20] There simply was no reason for Congress to consider the validity of hypothetical preferences that might be accorded minority citizens; the legislators were dealing with the real and pressing problem of how to guarantee those citizens equal treatment.

In addressing that problem, supporters of Title VI repeatedly declared that the bill enacted constitutional principles. For example, Representative Celler, the Chairman of the House Judiciary Committee and floor manager of the legislation in the House, emphasized this in introducing the bill:

> "The bill would offer assurance that hospitals financed by Federal money would not deny adequate care to Negroes. It would prevent abuse of food distribution programs whereby Negroes have been known to be denied food

---

fair play. Human suffering draws no color lines, and the administration of help to the sufferers should not." *Id.*, at 6547.

See also *id.*, at 12675 (remarks of Sen. Allott); 6561 (remarks of Sen. Kuchel); 2494, 6047 (remarks of Sen. Pastore). But see *id.*, at 15893 (remarks of Rep. MacGregor); 13821 (remarks of Sen. Saltonstall); 10920 (remarks of Sen. Javits); 5266, 5807 (remarks of Sen. Keating).

[20] See, *e. g., id.*, at 7064–7065 (remarks of Sen. Ribicoff); 7054–7055 (remarks of Sen. Pastore); 6543–6544 (remarks of Sen. Humphrey); 2595 (remarks of Rep. Donohue); 2467–2468 (remarks of Rep. Celler); 1643, 2481–2482 (remarks of Rep. Ryan); H. R. Rep. No. 914, 88th Cong., 1st Sess., pt. 2, pp. 24–25 (1963).

surplus supplies when white persons were given such food. It would assure Negroes the benefits now accorded only white students in programs of high[er] education financed by Federal funds. It would, in short, *assure the existing right to equal treatment* in the enjoyment of Federal funds. It would not destroy any rights of private property or freedom of association." 110 Cong. Rec. 1519 (1964) (emphasis added).

Other sponsors shared Representative Celler's view that Title VI embodied constitutional principles.[21]

In the Senate, Senator Humphrey declared that the purpose of Title VI was "to insure that Federal funds are spent in accordance with the Constitution and the moral sense of the Nation." *Id.,* at 6544. Senator Ribicoff agreed that Title VI embraced the constitutional standard: "Basically, there is a constitutional restriction against discrimination in the use of federal funds; and title VI simply spells out the procedure to be used in enforcing that restriction." *Id.,* at 13333. Other Senators expressed similar views.[22]

Further evidence of the incorporation of a constitutional standard into Title VI appears in the repeated refusals of the legislation's supporters precisely to define the term "discrimination." Opponents sharply criticized this failure,[23] but proponents of the bill merely replied that the meaning of

---

[21] See, *e. g.,* 110 Cong. Rec. 2467 (1964) (remarks of Rep. Lindsay). See also *id.,* at 2766 (remarks of Rep. Matsunaga); 2731–2732 (remarks of Rep. Dawson); 2595 (remarks of Rep. Donohue); 1527–1528 (remarks of Rep. Celler).

[22] See, *e. g., id.,* at 12675, 12677 (remarks of Sen. Allott); 7064 (remarks of Sen. Pell); 7057, 7062–7064 (remarks of Sen. Pastore); 5243 (remarks of Sen. Clark).

[23] See, *e. g., id.,* at 6052 (remarks of Sen. Johnston); 5863 (remarks of Sen. Eastland); 5612 (remarks of Sen. Ervin); 5251 (remarks of Sen. Talmadge); 1632 (remarks of Rep. Dowdy); 1619 (remarks of Rep. Abernethy).

"discrimination" would be made clear by reference to the Constitution or other existing law. For example, Senator Humphrey noted the relevance of the Constitution:

> "As I have said, the bill has a simple purpose. That purpose is to give fellow citizens—Negroes—the same rights and opportunities that white people take for granted. This is no more than what was preached by the prophets, and by Christ Himself. It is no more than what our Constitution guarantees." *Id.,* at 6553.[24]

In view of the clear legislative intent, Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment.

## III·

### A

Petitioner does not deny that decisions based on race or ethnic origin by faculties and administrations of state universities are reviewable under the Fourteenth Amendment. See, *e. g., Missouri ex rel. Gaines* v. *Canada,* 305 U. S. 337 (1938); *Sipuel* v. *Board of Regents,* 332 U. S. 631 (1948); *Sweatt* v. *Painter,* 339 U. S. 629 (1950); *McLaurin* v. *Oklahoma State Regents,* 339 U. S. 637 (1950). For his part, respondent does not argue that all racial or ethnic classifications are *per se* invalid. See, *e. g., Hirabayashi* v. *United States,* 320 U. S. 81 (1943); *Korematsu* v. *United States,* 323 U. S. 214 (1944); *Lee* v. *Washington,* 390 U. S. 333, 334 (1968) (Black, Harlan, and Stewart, JJ., concurring); *United Jewish Organizations* v. *Carey,* 430 U. S. 144 (1977). The parties do disagree as to the level of judicial scrutiny to be applied to the special admissions program. Petitioner argues that the court below erred in applying strict scrutiny, as this inexact term has been

---

[24] See also *id.,* at 7057, 13333 (remarks of Sen. Ribicoff); 7057 (remarks of Sen. Pastore); 5606–5607 (remarks of Sen. Javits); 5253, 5863–5864, 13442 (remarks of Sen. Humphrey).

applied in our cases. That level of review, petitioner asserts, should be reserved for classifications that disadvantage "discrete and insular minorities." See *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152 n. 4 (1938). Respondent, on the other hand, contends that the California court correctly rejected the notion that the degree of judicial scrutiny accorded a particular racial or ethnic classification hinges upon membership in a discrete and insular minority and duly recognized that the "rights established [by the Fourteenth Amendment] are personal rights." *Shelley* v. *Kraemer,* 334 U. S. 1, 22 (1948).

En route to this crucial battle over the scope of judicial review,[25] the parties fight a sharp preliminary action over the proper characterization of the special admissions program. Petitioner prefers to view it as establishing a "goal" of minority representation in the Medical School. Respondent, echoing the courts below, labels it a racial quota.[26]

---

[25] That issue has generated a considerable amount of scholarly controversy. See, *e. g.,* Ely, The Constitutionality of Reverse Racial Discrimination, 41 U. Chi. L. Rev. 723 (1974); Greenawalt, Judicial Scrutiny of "Benign" Racial Preference in Law School Admissions, 75 Colum. L. Rev. 559 (1975); Kaplan, Equal Justice in an Unequal World: Equality for the Negro, 61 Nw. U. L. Rev. 363 (1966); Karst & Horowitz, Affirmative Action and Equal Protection, 60 Va. L. Rev. 955 (1974); O'Neil, Racial Preference and Higher Education: The Larger Context, 60 Va. L. Rev. 925 (1974); Posner, The DeFunis Case and the Constitutionality of Preferential Treatment of Racial Minorities, 1974 Sup. Ct. Rev. 1; Redish, Preferential Law School Admissions and the Equal Protection Clause: An Analysis of the Competing Arguments, 22 UCLA L. Rev. 343 (1974); Sandalow, Racial Preferences in Higher Education: Political Responsibility and the Judicial Role, 42 U. Chi. L. Rev. 653 (1975); Sedler, Racial Preference, Reality and the Constitution: Bakke v. Regents of the University of California, 17 Santa Clara L. Rev. 329 (1977); Seeburger, A Heuristic Argument Against Preferential Admissions, 39 U. Pitt. L. Rev. 285 (1977).

[26] Petitioner defines "quota" as a requirement which must be met but can never be exceeded, regardless of the quality of the minority applicants. Petitioner declares that there is no "floor" under the total number of

This semantic distinction is beside the point: The special admissions program is undeniably a classification based on race and ethnic background. To the extent that there existed a pool of at least minimally qualified minority applicants to fill the 16 special admissions seats, white applicants could compete only for 84 seats in the entering class, rather than the 100 open to minority applicants. Whether this limitation is described as a quota or a goal, it is a line drawn on the basis of race and ethnic status.[27]

The guarantees of the Fourteenth Amendment extend to all persons. Its language is explicit: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." It is settled beyond question that the "rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights established are personal rights," *Shelley* v. *Kraemer, supra,* at 22. Accord, *Missouri ex rel. Gaines* v. *Canada, supra,* at 351; *McCabe* v. *Atchison, T. & S. F. R. Co.,* 235 U. S. 151, 161–162 (1914). The guarantee of equal protection cannot mean one thing when applied to one individual and something else when

---

minority students admitted; completely unqualified students will not be admitted simply to meet a "quota." Neither is there a "ceiling," since an unlimited number could be admitted through the general admissions process. On this basis the special admissions program does not meet petitioner's definition of a quota.

The court below found—and petitioner does not deny—that white applicants could not compete for the 16 places reserved solely for the special admissions program. 18 Cal. 3d, at 44, 553 P. 2d, at 1159. Both courts below characterized this as a "quota" system.

[27] Moreover, the University's special admissions program involves a purposeful, acknowledged use of racial criteria. This is not a situation in which the classification on its face is racially neutral, but has a disproportionate racial impact. In that situation, plaintiff must establish an intent to discriminate. *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 264–265 (1977); *Washington* v. *Davis,* 426 U. S. 229, 242 (1976); see *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886).

applied to a person of another color. If both are not accorded the same protection, then it is not equal.

Nevertheless, petitioner argues that the court below erred in applying strict scrutiny to the special admissions program because white males, such as respondent, are not a "discrete and insular minority" requiring extraordinary protection from the majoritarian political process. *Carolene Products Co.*, *supra*, at 152–153, n. 4. This rationale, however, has never been invoked in our decisions as a prerequisite to subjecting racial or ethnic distinctions to strict scrutiny. Nor has this Court held that discreteness and insularity constitute necessary preconditions to a holding that a particular classification is invidious.[28] See, *e. g., Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535, 541 (1942); *Carrington* v. *Rash*, 380 U. S. 89, 94–97 (1965). These characteristics may be relevant in deciding whether or not to add new types of classifications to the list of "suspect" categories or whether a particular classification survives close examination. See, *e. g., Massachusetts Board of Retirement* v. *Murgia*, 427 U. S. 307, 313 (1976) (age); *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 28 (1973) (wealth); *Graham* v. *Richardson*, 403 U. S. 365, 372 (1971) (aliens). Racial and ethnic classifications, however, are subject to stringent examination without regard to these additional characteristics. We declared as much in the first cases explicitly to recognize racial distinctions as suspect:

"Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people

---

[28] After *Carolene Products*, the first specific reference in our decisions to the elements of "discreteness and insularity" appears in *Minersville School District* v. *Gobitis*, 310 U. S. 586, 606 (1940) (Stone, J., dissenting). The next does not appear until 1970. *Oregon* v. *Mitchell*, 400 U. S. 112, 295 n. 14 (STEWART, J., concurring in part and dissenting in part). These elements have been relied upon in recognizing a suspect class in only one group of cases, those involving aliens. *E. g., Graham* v. *Richardson*, 403 U. S. 365, 372 (1971).

whose institutions are founded upon the doctrine of equality." *Hirabayashi,* 320 U. S., at 100.

"[A]ll legal restrictions which curtail the civil rights of a single racial group are immediately suspect. That is not to say that all such restrictions are unconstitutional. It is to say that courts must subject them to the most rigid scrutiny." *Korematsu,* 323 U. S., at 216.

The Court has never questioned the validity of those pronouncements. Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination.

## B

This perception of racial and ethnic distinctions is rooted in our Nation's constitutional and demographic history. The Court's initial view of the Fourteenth Amendment was that its "one pervading purpose" was "the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised dominion over him." *Slaughter-House Cases,* 16 Wall. 36, 71 (1873). The Equal Protection Clause, however, was "[v]irtually strangled in infancy by post-civil-war judicial reactionism." [29] It was relegated to decades of relative desuetude while the Due Process Clause of the Fourteenth Amendment, after a short germinal period, flourished as a cornerstone in the Court's defense of property and liberty of contract. - See, *e. g., Mugler* v. *Kansas,* 123 U. S. 623, 661 (1887); *Allgeyer* v. *Louisiana,* 165 U. S. 578 (1897); *Lochner* v. *New York,* 198 U. S. 45 (1905). In that cause, the Fourteenth Amendment's "one pervading purpose" was displaced. See, *e. g., Plessy* v. *Ferguson,* 163 U. S. 537 (1896). It was only as the era of substantive due process came to a close, see, *e. g., Nebbia* v. *New*

---

[29] Tussman & tenBroek, The Equal Protection of the Laws, 37 Calif. L. Rev. 341, 381 (1949).

*York,* 291 U. S. 502 (1934); *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379 (1937), that the Equal Protection Clause began to attain a genuine measure of vitality, see, *e. g., United States* v. *Carolene Products,* 304 U. S. 144 (1938); *Skinner* v. *Oklahoma ex rel. Williamson, supra.*

By that time it was no longer possible to peg the guarantees of the Fourteenth Amendment to the struggle for equality of one racial minority. During the dormancy of the Equal Protection Clause, the United States had become a Nation of minorities.[30] Each had to struggle [31]—and to some extent struggles still [32]—to overcome the prejudices not of a monolithic majority, but of a "majority" composed of various minority groups of whom it was said—perhaps unfairly in many cases— that a shared characteristic was a willingness to disadvantage other groups.[33] As the Nation filled with the stock of many lands, the reach of the Clause was gradually extended to all ethnic groups seeking protection from official discrimination. See *Strauder* v. *West Virginia,* 100 U. S. 303, 308 (1880) (Celtic Irishmen) (dictum); *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886) (Chinese); *Truax* v. *Raich,* 239 U. S. 33, 41 (1915) (Austrian resident aliens); *Korematsu, supra* (Japanese); *Hernandez* v. *Texas,* 347 U. S. 475 (1954) (Mexican-Americans). The guarantees of equal protection, said the Court in

---

[30] M. Jones, American Immigration 177–246 (1960).

[31] J. Higham, Strangers in the Land (1955); G. Abbott, The Immigrant and the Community (1917); P. Roberts, The New Immigration 66–73, 86–91, 248–261 (1912). See also E. Fenton, Immigrants and Unions: A Case Study 561–562 (1975).

[32] "Members of various religious and ethnic groups, primarily but not exclusively of Eastern, Middle, and Southern European ancestry, such as Jews, Catholics, Italians, Greeks, and Slavic groups, continue to be excluded from executive, middle-management, and other job levels because of discrimination based upon their religion and/or national origin." 41 CFR § 60–50.1 (b) (1977).

[33] *E. g.,* P. Roberts, *supra* n. 31, at 75; G. Abbott, *supra* n. 31, at 270– 271. See generally n. 31, *supra.*

*Yick Wo,* "are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws." 118 U. S., at 369.

Although many of the Framers of the Fourteenth Amendment conceived of its primary function as bridging the vast distance between members of the Negro race and the white "majority," *Slaughter-House Cases, supra,* the Amendment itself was framed in universal terms, without reference to color, ethnic origin, or condition of prior servitude. As this Court recently remarked in interpreting the 1866 Civil Rights Act to extend to claims of racial discrimination against white persons, "the 39th Congress was intent upon establishing in the federal law a broader principle than would have been necessary simply to meet the particular and immediate plight of the newly freed Negro slaves." *McDonald* v. *Santa Fe Trail Transportation Co.,* 427 U. S. 273, 296 (1976). And that legislation was specifically broadened in 1870 to ensure that "all persons," not merely "citizens," would enjoy equal rights under the law. See *Runyon* v. *McCrary,* 427 U. S. 160, 192–202 (1976) (WHITE, J., dissenting). Indeed, it is not unlikely that among the Framers were many who would have applauded a reading of the Equal Protection Clause that states a principle of universal application and is responsive to the racial, ethnic, and cultural diversity of the Nation. See, *e. g.,* Cong. Globe, 39th Cong., 1st Sess., 1056 (1866) (remarks of Rep. Niblack); *id.,* at 2891–2892 (remarks of Sen. Conness); *id.,* 40th Cong., 2d Sess., 883 (1868) (remarks of Sen. Howe) (Fourteenth Amendment "protect[s] classes from class legislation"). See also Bickel, The Original Understanding and the Segregation Decision, 69 Harv. L. Rev. 1, 60–63 (1955).

Over the past 30 years, this Court has embarked upon the crucial mission of interpreting the Equal Protection Clause with the view of assuring to all persons "the protection of

equal laws," *Yick Wo, supra,* at 369, in a Nation confronting a legacy of slavery and racial discrimination. See, *e. g., Shelley* v. *Kraemer,* 334 U. S. 1 (1948); *Brown* v. *Board of Education,* 347 U. S. 483 (1954); *Hills* v. *Gautreaux,* 425 U. S. 284 (1976). Because the landmark decisions in this area arose in response to the continued exclusion of Negroes from the mainstream of American society, they could be characterized as involving discrimination by the "majority" white race against the Negro minority. But they need not be read as depending upon that characterization for their results. It suffices to say that "[o]ver the years, this Court has consistently repudiated '[d]istinctions between citizens solely because of their ancestry' as being 'odious to a free people whose institutions are founded upon the doctrine of equality.'" *Loving* v. *Virginia,* 388 U. S. 1, 11 (1967), quoting *Hirabayashi,* 320 U. S., at 100.

Petitioner urges us to adopt for the first time a more restrictive view of the Equal Protection Clause and hold that discrimination against members of the white "majority" cannot be suspect if its purpose can be characterized as "benign." [34]

---

[34] In the view of MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, MR. JUSTICE MARSHALL, and MR. JUSTICE BLACKMUN, the pliable notion of "stigma" is the crucial element in analyzing racial classifications. See, *e. g., post,* at 361, 362. The Equal Protection Clause is not framed in terms of "stigma." Certainly the word has no clearly defined constitutional meaning. It reflects a subjective judgment that is standardless. *All* state-imposed classifications that rearrange burdens and benefits on the basis of race are likely to be viewed with deep resentment by the individuals burdened. The denial to innocent persons of equal rights and opportunities may outrage those so deprived and therefore may be perceived as invidious. These individuals are likely to find little comfort in the notion that the deprivation they are asked to endure is merely the price of membership in the dominant majority and that its imposition is inspired by the supposedly benign purpose of aiding others. One should not lightly dismiss the inherent unfairness of, and the perception of mistreatment that accompanies, a system of allocating benefits and privileges on the basis of skin color and ethnic origin. Moreover, MR. JUSTICE BRENNAN, MR. JUSTICE

The clock of our liberties, however, cannot be turned back to 1868. *Brown* v. *Board of Education, supra,* at 492; accord, *Loving* v. *Virginia, supra,* at 9. It is far too late to argue that the guarantee of equal protection to *all* persons permits the recognition of special wards entitled to a degree of protection greater than that accorded others.[35] "The Fourteenth Amendment is not directed solely against discrimination due to a 'two-class theory'—that is, based upon differences between 'white' and Negro." *Hernandez,* 347 U. S., at 478.

Once the artificial line of a "two-class theory" of the Fourteenth Amendment is put aside, the difficulties entailed in varying the level of judicial review according to a perceived "preferred" status of a particular racial or ethnic minority are intractable. The concepts of "majority" and "minority" necessarily reflect temporary arrangements and political judgments. As observed above, the white "majority" itself is composed of various minority groups, most of which can lay claim to a history of prior discrimination at the hands of the State and private individuals. Not all of these groups can receive preferential treatment and corresponding judicial toler-

---

WHITE, MR. JUSTICE MARSHALL, and MR. JUSTICE BLACKMUN offer no principle for deciding whether preferential classifications reflect a benign remedial purpose or a malevolent stigmatic classification, since they are willing in this case to accept mere *post hoc* declarations by an isolated state entity—a medical school faculty—unadorned by particularized findings of past discrimination, to establish such a remedial purpose.

[35] Professor Bickel noted the self-contradiction of that view:

"The lesson of the great decisions of the Supreme Court and the lesson of contemporary history have been the same for at least a generation: discrimination on the basis of race is illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society. Now this is to be unlearned and we are told that this is not a matter of fundamental principle but only a matter of whose ox is gored. Those for whom racial equality was demanded are to be more equal than others. Having found support in the Constitution for equality, they now claim support for inequality under the same Constitution." A. Bickel, The Morality of Consent 133 (1975).

ance of distinctions drawn in terms of race and nationality, for then the only "majority" left would be a new minority of white Anglo-Saxon Protestants. There is no principled basis for deciding which groups would merit "heightened judicial solicitude" and which would not.[36] Courts would be asked to evaluate the extent of the prejudice and consequent

---

[36] As I am in agreement with the view that race may be taken into account as a factor in an admissions program, I agree with my Brothers BRENNAN, WHITE, MARSHALL, and BLACKMUN that the portion of the judgment that would proscribe all consideration of race must be reversed. See Part V, *infra*. But I disagree with much that is said in their opinion.

They would require as a justification for a program such as petitioner's, only two findings: (i) that there has been some form of discrimination against the preferred minority groups by "society at large," *post*, at 369 (it being conceded that petitioner had no history of discrimination), and (ii) that "there is reason to believe" that the disparate impact sought to be rectified by the program is the "product" of such discrimination:

"If it was reasonable to conclude—as we hold that it was—that the failure of minorities to qualify for admission at Davis under regular procedures was due principally to the effects of past discrimination, then there is a reasonable likelihood that, but for pervasive racial discrimination, respondent would have failed to qualify for admission even in the absence of Davis' special admissions program." *Post*, at 365–366.

The breadth of this hypothesis is unprecedented in our constitutional system. The first step is easily taken. No one denies the regrettable fact that there has been societal discrimination in this country against various racial and ethnic groups. The second step, however, involves a speculative leap: but for this discrimination by society at large, Bakke "would have failed to qualify for admission" because Negro applicants—nothing is said about Asians, cf., *e. g., post*, at 374 n. 57—would have made better scores. Not one word in the record supports this conclusion, and the authors of the opinion offer no standard for courts to use in applying such a presumption of causation to other racial or ethnic classifications. This failure is a grave one, since if it may be concluded *on this record* that each of the minority groups preferred by the petitioner's special program is entitled to the benefit of the presumption, it would seem difficult to determine that any of the dozens of minority groups that have suffered "societal discrimination" cannot also claim it, in any area of social intercourse. See Part IV–B, *infra*.

harm suffered by various minority groups. Those whose societal injury is thought to exceed some arbitrary level of tolerability then would be entitled to preferential classifications at the expense of individuals belonging to other groups. Those classifications would be free from exacting judicial scrutiny. As these preferences began to have their desired effect, and the consequences of past discrimination were undone, new judicial rankings would be necessary. The kind of variable sociological and political analysis necessary to produce such rankings simply does not lie within the judicial competence—even if they otherwise were politically feasible and socially desirable.[37]

---

[37] Mr. Justice Douglas has noted the problems associated with such inquiries:

"The reservation of a proportion of the law school class for members of selected minority groups is fraught with . . . dangers, for one must immediately determine which groups are to receive such favored treatment and which are to be excluded, the proportions of the class that are to be allocated to each, and even the criteria by which to determine whether an individual is a member of a favored group. [Cf. *Plessy* v. *Ferguson*, 163 U. S. 537, 549, 552 (1896).] There is no assurance that a common agreement can be reached, and first the schools, and then the courts, will be buffeted with the competing claims. The University of Washington included Filipinos, but excluded Chinese and Japanese; another school may limit its program to blacks, or to blacks and Chicanos. Once the Court sanctioned racial preferences such as these, it could not then wash its hands of the matter, leaving it entirely in the discretion of the school, for then we would have effectively overruled *Sweatt* v. *Painter*, 339 U. S. 629, and allowed imposition of a 'zero' allocation. But what standard is the Court to apply when a rejected applicant of Japanese ancestry brings suit to require the University of Washington to extend the same privileges to his group? The Committee might conclude that the population of Washington is now 2% Japanese, and that Japanese also constitute 2% of the Bar, but that had they not been handicapped by a history of discrimination, Japanese would now constitute 5% of the Bar, or 20%. Or, alternatively, the Court could attempt to assess how grievously each group has suffered from discrimination, and allocate proportions accordingly; if that were the standard the current University of Washington policy would almost surely fall, for there is no Western State which can claim that it has always treated Japanese and Chinese in a fair and even-

→ Moreover, there are serious problems of justice connected with the idea of preference itself. First, it may not always be clear that a so-called preference is in fact benign. Courts may be asked to validate burdens imposed upon individual members of a particular group in order to advance the group's general interest. See *United Jewish Organizations* v. *Carey,* 430 U. S., at 172–173 (BRENNAN, J., concurring in part). Nothing in the Constitution supports the notion that individuals may be asked to suffer otherwise impermissible burdens in order to enhance the societal standing of their ethnic groups. Second, preferential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relationship to individual worth. See *DeFunis* v. *Odegaard,* 416 U. S. 312, 343 (1974) (Douglas, J., dissenting). Third, there is a measure of inequity in forcing innocent persons in respondent's position to bear the burdens of redressing grievances not of their making.

By hitching the meaning of the Equal Protection Clause to these transitory considerations, we would be holding, as a constitutional principle, that judicial scrutiny of classifications touching on racial and ethnic background may vary with the ebb and flow of political forces. Disparate constitutional tolerance of such classifications well may serve to exacerbate

---

handed manner. See, *e. g., Yick Wo* v. *Hopkins,* 118 U. S. 356; *Terrace* v. *Thompson,* 263 U. S. 197; *Oyama* v. *California,* 332 U. S. 633. This Court has not sustained a racial classification since the wartime cases of *Korematsu* v. *United States,* 323 U. S. 214, and *Hirabayashi* v. *United States,* 320 U. S. 81, involving curfews and relocations imposed upon Japanese-Americans.

"Nor obviously will the problem be solved if next year the Law School included only Japanese and Chinese, for then Norwegians and Swedes, Poles and Italians, Puerto Ricans and Hungarians, and all other groups which form this diverse Nation would have just complaints." *DeFunis* v. *Odegaard,* 416 U. S. 312, 337–340 (1974) (dissenting opinion) (footnotes omitted).

racial and ethnic antagonisms rather than alleviate them. *United Jewish Organizations, supra,* at 173–174 (BRENNAN, J., concurring in part). Also, the mutability of a constitutional principle, based upon shifting political and social judgments, undermines the chances for consistent application of the Constitution from one generation to the next, a critical feature of its coherent interpretation. *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429, 650–651 (1895) (White, J., dissenting). In expounding the Constitution, the Court's role is to discern "principles sufficiently absolute to give them roots throughout the community and continuity over significant periods of time, and to lift them above the level of the pragmatic political judgments of a particular time and place." A. Cox, The Role of the Supreme Court in American Government 114 (1976).

If it is the individual who is entitled to judicial protection against classifications based upon his racial or ethnic background because such distinctions impinge upon personal rights, rather than the individual only because of his membership in a particular group, then constitutional standards may be applied consistently. Political judgments regarding the necessity for the particular classification may be weighed in the constitutional balance, *Korematsu* v. *United States,* 323 U. S. 214 (1944), but the standard of justification will remain constant. This is as it should be, since those political judgments are the product of rough compromise struck by contending groups within the democratic process.[38] When they touch upon an individual's race or ethnic background, he is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest. The Constitution guarantees that right to every person regardless of his background. *Shelley* v. *Kraemer,* 334 U. S., at 22; *Missouri ex rel. Gaines* v. *Canada,* 305 U. S., at 351.

---

[38] R. Dahl, A Preface to Democratic Theory (1956); Posner, *supra* n. 25, at 27.

## C

Petitioner contends that on several occasions this Court has approved preferential classifications without applying the most exacting scrutiny. Most of the cases upon which petitioner relies are drawn from three areas: school desegregation, employment discrimination, and sex discrimination. Each of the cases cited presented a situation materially different from the facts of this case.

The school desegregation cases are inapposite. Each involved remedies for clearly determined constitutional violations. *E. g., Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1 (1971); *McDaniel* v. *Barresi,* 402 U. S. 39 (1971); *Green* v. *County School Board,* 391 U. S. 430 (1968). Racial classifications thus were designed as remedies for the vindication of constitutional entitlement.[39] Moreover, the scope of the remedies was not permitted to exceed the extent of the

---

[39] Petitioner cites three lower court decisions allegedly deviating from this general rule in school desegregation cases: *Offermann* v. *Nitkowski,* 378 F. 2d 22 (CA2 1967); *Wanner* v. *County School Board,* 357 F. 2d 452 (CA4 1966); *Springfield School Committee* v. *Barksdale,* 348 F. 2d 261 (CA1 1965). Of these, *Wanner* involved a school system held to have been *de jure* segregated and enjoined from maintaining segregation; racial districting was deemed necessary. 357 F. 2d, at 454. Cf. *United Jewish Organizations* v. *Carey,* 430 U. S. 144 (1977). In *Barksdale* and *Offermann,* courts did approve voluntary districting designed to eliminate discriminatory attendance patterns. In neither, however, was there any showing that the school board planned extensive pupil transportation that might threaten liberty or privacy interests. See *Keyes* v. *School District No. 1,* 413 U. S. 189, 240–250 (1973) (POWELL, J., concurring in part and dissenting in part). Nor were white students deprived of an equal opportunity for education.

Respondent's position is wholly dissimilar to that of a pupil bused from his neighborhood school to a comparable school in another neighborhood in compliance with a desegregation decree. Petitioner did not arrange for respondent to attend a different medical school in order to desegregate Davis Medical School; instead, it denied him admission and may have deprived him altogether of a medical education.

violations. *E. g., Dayton Board of Education* v. *Brinkman,* 433 U. S. 406. (1977); *Milliken* v. *Bradley,* 418 U. S. 717 (1974); see *Pasadena City Board of Education* v. *Spangler,* 427 U. S. 424 (1976). See also *Austin Independent School Dist.* v. *United States,* 429 U. S. 990, 991–995 (1976) (POWELL, J., concurring). Here, there was no judicial determination of constitutional violation as a predicate for the formulation of a remedial classification.

The employment discrimination cases also do not advance petitioner's cause. For example, in *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747 (1976), we approved a retroactive award of seniority to a class of Negro truckdrivers who had been the victims of discrimination—not just by society at large, but by the respondent in that case. While this relief imposed some burdens on other employees, it was held necessary " 'to make [the victims] whole for injuries suffered on account of unlawful employment discrimination.' " *Id.,* at 763, quoting *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 418 (1975). The Courts of Appeals have fashioned various types of racial preferences as remedies for constitutional or statutory violations resulting in identified, race-based injuries to individuals held entitled to the preference. *E. g., Bridgeport Guardians, Inc.* v. *Bridgeport Civil Service Commission,* 482 F. 2d 1333 (CA2 1973); *Carter* v. *Gallagher,* 452 F. 2d 315 (CA8 1972), modified on rehearing en banc, *id.,* at 327. Such preferences also have been upheld where a legislative or administrative body charged with the responsibility made determinations of past discrimination by the industries affected, and fashioned remedies deemed appropriate to rectify the discrimination. *E. g., Contractors Association of Eastern Pennsylvania* v. *Secretary of Labor,* 442 F. 2d 159 (CA3), cert. denied, 404 U. S. 854 (1971); [40] *Associated General*

---

[40] Every decision upholding the requirement of preferential hiring under the authority of Exec. Order No. 11246, 3 CFR 339 (1964–1965 Comp.), has emphasized the existence of previous discrimination as a predicate for

*Contractors of Massachusetts, Inc.* v. *Altshuler,* 490 F. 2d 9 (CA1 1973), cert. denied, 416 U. S. 957 (1974); cf. *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966). But we have never approved preferential classifications in the absence of proved constitutional or statutory violations.[41]

Nor is petitioner's view as to the applicable standard supported by the fact that gender-based classifications are not subjected to this level of scrutiny. *E. g., Califano* v. *Webster,* 430 U. S. 313, 316–317 (1977); *Craig* v. *Boren,* 429 U. S. 190, 211 n. (1976) (POWELL, J., concurring). Gender-based distinctions are less likely to create the analytical and prac-

---

the imposition of a preferential remedy. *Contractors Association of Eastern Pennsylvania; Southern Illinois Builders Assn.* v. *Ogilvie,* 471 F. 2d 680 (CA7 1972); *Joyce* v. *McCrane,* 320 F. Supp. 1284 (NJ 1970); *Weiner* v. *Cuyahoga Community College District,* 19 Ohio St. 2d 35, 249 N. E. 2d 907, cert. denied, 396 U. S. 1004 (1970). See also *Rosetti Contracting Co.* v. *Brennan,* 508 F. 2d 1039, 1041 (CA7 1975); *Associated General Contractors of Massachusetts, Inc.* v. *Altshuler,* 490 F. 2d 9 (CA1 1973), cert. denied, 416 U. S. 957 (1974); *Northeast Constr. Co.* v. *Romney,* 157 U. S. App. D. C. 381, 383, 390, 485 F. 2d 752, 754, 761 (1973).

[41] This case does not call into question congressionally authorized administrative actions, such as consent decrees under Title VII or approval of reapportionment plans under § 5 of the Voting Rights Act of 1965, 42 U. S. C. § 1973c (1970 ed., Supp. V). In such cases, there has been detailed legislative consideration of the various indicia of previous constitutional or statutory violations, *e. g., South Carolina* v. *Katzenbach,* 383 U. S. 301, 308–310 (1966) (§ 5), and particular administrative bodies have been charged with monitoring various activities in order to detect such violations and formulate appropriate remedies. See *Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 103 (1976).

Furthermore, we are not here presented with an occasion to review legislation by Congress pursuant to its powers under § 2 of the Thirteenth Amendment and § 5 of the Fourteenth Amendment to remedy the effects of prior discrimination. *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966); *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409 (1968). We have previously recognized the special competence of Congress to make findings with respect to the effects of identified past discrimination and its discretionary authority to take appropriate remedial measures.

tical problems present in preferential programs premised on racial or ethnic criteria. With respect to gender there are only two possible classifications. The incidence of the burdens imposed by preferential classifications is clear. There are no rival groups which can claim that they, too, are entitled to preferential treatment. Classwide questions as to the group suffering previous injury and groups which fairly can be burdened are relatively manageable for reviewing courts. See, e. g., *Califano* v. *Goldfarb,* 430 U. S. 199, 212–217 (1977); *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 645 (1975). The resolution of these same questions in the context of racial and ethnic preferences presents far more complex and intractable problems than gender-based classifications. More importantly, the perception of racial classifications as inherently odious stems from a lengthy and tragic history that gender-based classifications do not share. In sum, the Court has never viewed such classification as inherently suspect or as comparable to racial or ethnic classifications for the purpose of equal protection analysis.

Petitioner also cites *Lau* v. *Nichols,* 414 U. S. 563 (1974), in support of the proposition that discrimination favoring racial or ethnic minorities has received judicial approval without the exacting inquiry ordinarily accorded "suspect" classifications. In *Lau,* we held that the failure of the San Francisco school system to provide remedial English instruction for some 1,800 students of oriental ancestry who spoke no English amounted to a violation of Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d, and the regulations promulgated thereunder. Those regulations required remedial instruction where inability to understand English excluded children of foreign ancestry from participation in educational programs. 414 U. S., at 568. Because we found that the students in *Lau* were denied "a meaningful opportunity to participate in the educational program," *ibid.,* we remanded for the fashioning of a remedial order.

*Lau* provides little support for petitioner's argument. The decision rested solely on the statute, which had been construed by the responsible administrative agency to reach educational practices "which have the effect of subjecting individuals to discrimination," *ibid.* We stated: "Under these state-imposed standards there is no equality of treatment merely by providing students with the same facilities, textbooks, teachers, and curriculum; for students who do not understand English are effectively foreclosed from any meaningful education." *Id.*, at 566. Moreover, the "preference" approved did not result in the denial of the relevant benefit—"meaningful opportunity to participate in the educational program"—to anyone else. No other student was deprived by that preference of the ability to participate in San Francisco's school system, and the applicable regulations required similar assistance for all students who suffered similar linguistic deficiencies. *Id.*, at 570–571 (STEWART, J., concurring in result).

In a similar vein,[42] petitioner contends that our recent decision in *United Jewish Organizations* v. *Carey*, 430 U. S. 144 (1977), indicates a willingness to approve racial classifications designed to benefit certain minorities, without denominating the classifications as "suspect." The State of New York had redrawn its reapportionment plan to meet objections of the Department of Justice under § 5 of the Voting Rights Act of 1965, 42 U. S. C. § 1973c (1970 ed., Supp. V). Specifically, voting districts were redrawn to enhance the electoral power

---

[42] Petitioner also cites our decision in *Morton* v. *Mancari*, 417 U. S. 535 (1974), for the proposition that the State may prefer members of tradi-tionally disadvantaged groups. In *Mancari*, we approved a hiring preference for qualified Indians in the Bureau of Indian Affairs of the Department of the Interior (BIA). We observed in that case, however, that the legal status of the BIA is *sui generis*. *Id.*, at 554. Indeed, we found that the preference was not racial at all, but "an employment criterion reasonably designed to further the cause of Indian self-government and to make the BIA more responsive to . . . groups . . . whose lives and activities are governed by the BIA in a unique fashion." *Ibid.*

of certain "nonwhite" voters found to have been the victims of unlawful "dilution" under the original reapportionment plan. *United Jewish Organizations,* like *Lau,* properly is viewed as a case in which the remedy for an administrative finding of discrimination encompassed measures to improve the previously disadvantaged group's ability to participate, without excluding individuals belonging to any other group from enjoyment of the relevant opportunity—meaningful participation in the electoral process.

In this case, unlike *Lau* and *United Jewish Organizations,* there has been no determination by the legislature or a responsible administrative agency that the University engaged in a discriminatory practice requiring remedial efforts. Moreover, the operation of petitioner's special admissions program is quite different from the remedial measures approved in those cases. It prefers the designated minority groups at the expense of other individuals who are totally foreclosed from competition for the 16 special admissions seats in every Medical School class. Because of that foreclosure, some individuals are excluded from enjoyment of a state-provided benefit—admission to the Medical School—they otherwise would receive. When a classification denies an individual opportunities or benefits enjoyed by others solely because of his race or ethnic background, it must be regarded as suspect. *E. g., McLaurin* v. *Oklahoma State Regents,* 339 U. S., at 641–642.

## IV

We have held that in "order to justify the use of a suspect classification, a State must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is 'necessary . . . to the accomplishment' of its purpose or the safeguarding of its interest." *In re Griffiths,* 413 U. S. 717, 721–722 (1973) (footnotes omitted); *Loving* v. *Virginia,* 388 U. S., at 11; *McLaughlin* v. *Florida,* 379 U. S. 184, 196 (1964). The special admissions

program purports to serve the purposes of: (i) "reducing the historic deficit of traditionally disfavored minorities in medical schools and in the medical profession," Brief for Petitioner 32; (ii) countering the effects of societal discrimination; [43] (iii) increasing the number of physicians who will practice in communities currently underserved; and (iv) obtaining the educational benefits that flow from an ethnically diverse student body. It is necessary to decide which, if any, of these purposes is substantial enough to support the use of a suspect classification.

---

[43] A number of distinct subgoals have been advanced as falling under the rubric of "compensation for past discrimination." For example, it is said that preferences for Negro applicants may compensate for harm done them personally, or serve to place them at economic levels they might have attained but for discrimination against their forebears. Greenawalt, *supra* n. 25, at 581–586. Another view of the "compensation" goal is that it serves as a form of reparation by the "majority" to a victimized group as a whole. B. Bittker, The Case for Black Reparations (1973). That justification for racial or ethnic preference has been subjected to much criticism. *E. g.*, Greenawalt, *supra* n. 25, at 581; Posner, *supra* n. 25, at 16–17, and n. 33. Finally, it has been argued that ethnic preferences "compensate" the group by providing examples of success whom other members of the group will emulate, thereby advancing the group's interest and society's interest in encouraging new generations to overcome the barriers and frustrations of the past. Redish, *supra* n. 25, at 391. For purposes of analysis these subgoals need not be considered separately.

Racial classifications in admissions conceivably could serve a fifth purpose, one which petitioner does not articulate: fair appraisal of each individual's academic promise in the light of some cultural bias in grading or testing procedures. To the extent that race and ethnic background were considered only to the extent of curing established inaccuracies in predicting academic performance, it might be argued that there is no "preference" at all. Nothing in this record, however, suggests either that any of the quantitative factors considered by the Medical School were culturally biased or that petitioner's special admissions program was formulated to correct for any such biases. Furthermore, if race or ethnic background were used solely to arrive at an unbiased prediction of academic success, the reservation of fixed numbers of seats would be inexplicable.

## A

If petitioner's purpose is to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin, such a preferential purpose must be rejected not as insubstantial but as facially invalid. Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids. *E. g., Loving* v. *Virginia, supra,* at 11; *McLaughlin* v. *Florida, supra,* at 196; *Brown* v. *Board of Education,* 347 U. S. 483 (1954).

## B

The State certainly has a legitimate and substantial interest in ameliorating, or eliminating where feasible, the disabling effects of identified discrimination. The line of school desegregation cases, commencing with *Brown,* attests to the importance of this state goal and the commitment of the judiciary to affirm all lawful means toward its attainment. In the school cases, the States were required by court order to redress the wrongs worked by specific instances of racial discrimination. That goal was far more focused than the remedying of the effects of "societal discrimination," an amorphous concept of injury that may be ageless in its reach into the past.

We have never approved a classification that aids persons perceived as members of relatively victimized groups at the expense of other innocent individuals in the absence of judicial, legislative, or administrative findings of constitutional or statutory violations. See, *e. g., Teamsters* v. *United States,* 431 U. S. 324, 367–376 (1977); *United Jewish Organizations,* 430 U. S., at 155–156; *South Carolina* v. *Katzenbach,* 383 U. S. 301, 308 (1966). After such findings have been made, the governmental interest in preferring members of the injured groups at the expense of others is substantial, since the legal rights of the victims must be vindicated. In such a case, the

extent of the injury and the consequent remedy will have been judicially, legislatively, or administratively defined. Also, the remedial action usually remains subject to continuing oversight to assure that it will work the least harm possible to other innocent persons competing for the benefit. Without such findings of constitutional or statutory violations,[44] it cannot be

---

[44] Mr. Justice Brennan, Mr. Justice White, Mr. Justice Marshall, and Mr. Justice Blackmun misconceive the scope of this Court's holdings under Title VII when they suggest that "disparate impact" alone is sufficient to establish a violation of that statute and, by analogy, other civil rights measures. See *post*, at 363–366, and n. 42. That this was not the meaning of Title VII was made quite clear in the seminal decision in this area, *Griggs* v. *Duke Power Co.*, 401 U. S. 424 (1971):

*"Discriminatory preference* for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of *artificial, arbitrary, and unnecessary barriers* to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." *Id.*, at 431 (emphasis added).

Thus, disparate impact is a basis for relief under Title VII only if the practice in question is not founded on "business necessity," *ibid.*, or lacks "a manifest relationship to the employment in question," *id.*, at 432. See also *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792, 802–803, 805–806 (1973). Nothing *in this record*—as opposed to some of the general literature cited by Mr. Justice Brennan, Mr. Justice White, Mr. Justice Marshall, and Mr. Justice Blackmun—even remotely suggests that the disparate impact of the general admissions program at Davis Medical School, resulting primarily from the sort of disparate test scores and grades set forth in n. 7, *supra*, is without educational justification.

Moreover, the presumption in *Griggs*—that disparate impact without any showing of business justification established the existence of discrimination in violation of the statute—was based on legislative determinations, wholly absent here, that past discrimination had handicapped various minority groups to such an extent that disparate impact could be traced to identifiable instances of past discrimination:

"[Congress sought] to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of

said that the government has any greater interest in helping one individual than in refraining from harming another. Thus, the government has no compelling justification for inflicting such harm.

Petitioner does not purport to have made, and is in no position to make, such findings. Its broad mission is education, not the formulation of any legislative policy or the adjudication of particular claims of illegality. For reasons similar to those stated in Part III of this opinion, isolated segments of our vast governmental structures are not competent to make those decisions, at least in the absence of legislative mandates and legislatively determined criteria.[45] Cf. *Hampton* v. *Mow Sun Wong,* 426 U. S. 88 (1976); n. 41, *supra.* Before relying upon these sorts of findings in establishing a racial classification, a governmental body must have the authority and capability to establish, in the record, that the classification is responsive to identified discrimination. See, *e. g., Califano* v. *Webster,* 430 U. S., at 316–321; *Califano*

---

intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." *Griggs, supra,* at 429–430. See, *e. g.,* H. R. Rep. No. 914, 88th Cong., 1st Sess., pt. 2, p. 26 (1963) ("Testimony supporting the fact of discrimination in employment is overwhelming"). See generally Vaas, Title VII: The Legislative History, 7 B. C. Ind. & Com. L. Rev. 431 (1966). The Court emphasized that "the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group." 401 U. S., at 430–431. Indeed, § 703 (j) of the Act makes it clear that preferential treatment for an individual or minority group to correct an existing "imbalance" may not be required under Title VII. 42 U. S. C. § 2000e–2 (j). Thus, Title VII principles support the proposition that findings of identified discrimination must precede the fashioning of remedial measures embodying racial classifications.

[45] For example, the University is unable to explain its selection of only the four favored groups—Negroes, Mexican-Americans, American Indians, and Asians—for preferential treatment. The inclusion of the last group is especially curious in light of the substantial numbers of Asians admitted through the regular admissions process. See also n. 37, *supra.*

v. *Goldfarb*, 430 U. S., at 212–217. Lacking this capability, petitioner has not carried its burden of justification on this issue.

Hence, the purpose of helping certain groups whom the faculty of the Davis Medical School perceived as victims of "societal discrimination" does not justify a classification that imposes disadvantages upon persons like respondent, who bear no responsibility for whatever harm the beneficiaries of the special admissions program are thought to have suffered. To hold otherwise would be to convert a remedy heretofore reserved for violations of legal rights into a privilege that all institutions throughout the Nation could grant at their pleasure to whatever groups are perceived as victims of societal discrimination. That is a step we have never approved. Cf. *Pasadena City Board of Education* v. *Spangler*, 427 U. S. 424 (1976).

## C

Petitioner identifies, as another purpose of its program, improving the delivery of health-care services to communities currently underserved. It may be assumed that in some situations a State's interest in facilitating the health care of its citizens is sufficiently compelling to support the use of a suspect classification. But there is virtually no evidence in the record indicating that petitioner's special admissions program is either needed or geared to promote that goal.[46] The court below addressed this failure of proof:

"The University concedes it cannot assure that minority doctors who entered under the program, all of whom expressed an 'interest' in practicing in a disadvantaged community, will actually do so. It may be correct to assume that some of them will carry out this intention, and that it is more likely they will practice in minority

---

[46] The only evidence in the record with respect to such underservice is a newspaper article. Record 473.

communities than the average white doctor. (See Sanda-low, *Racial Preferences in Higher Education: Political Responsibility and the Judicial Role* (1975) 42 U. Chi. L. Rev. 653, 688.) Nevertheless, there are more precise and reliable ways to identify applicants who are genuinely interested in the medical problems of minorities than by race. An applicant of whatever race who has demonstrated his concern for disadvantaged minorities in the past and who declares that practice in such a community is his primary professional goal would be more likely to contribute to alleviation of the medical shortage than one who is chosen entirely on the basis of race and disadvantage. In short, there is no empirical data to demonstrate that any one race is more selflessly socially oriented or by contrast that another is more selfishly acquisitive." 18 Cal. 3d, at 56, 553 P. 2d, at 1167.

Petitioner simply has not carried its burden of demonstrating that it must prefer members of particular ethnic groups over all other individuals in order to promote better health-care delivery to deprived citizens. Indeed, petitioner has not shown that its preferential classification is likely to have any significant effect on the problem.[47]

## D

The fourth goal asserted by petitioner is the attainment of a diverse student body. This clearly is a constitutionally per-

---

[47] It is not clear that petitioner's two-track system, even if adopted throughout the country, would substantially increase representation of blacks in the medical profession. That is the finding of a recent study by Sleeth & Mishell, Black Under-Representation in United States Medical Schools, 297 New England J. of Med. 1146 (1977). Those authors maintain that the cause of black underrepresentation lies in the small size of the national pool of qualified black applicants. In their view, this problem is traceable to the poor premedical experiences of black undergraduates, and can be remedied effectively only by developing remedial programs for black students before they enter college.

missible goal for an institution of higher education. Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment. The freedom of a university to make its own judgments as to education includes the selection of its student body. Mr. Justice Frankfurter summarized the "four essential freedoms" that constitute academic freedom:

> " 'It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail "the four essential freedoms" of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.' " *Sweezy* v. *New Hampshire,* 354 U. S. 234, 263 (1957) (concurring in result).

Our national commitment to the safeguarding of these freedoms within university communities was emphasized in *Keyishian* v. *Board of Regents,* 385 U. S. 589, 603 (1967) :

> "Our Nation is deeply committed to safeguarding academic freedom which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment . . . . The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.' *United States* v. *Associated Press,* 52 F. Supp. 362, 372."

The atmosphere of "speculation, experiment and creation"—so essential to the quality of higher education—is widely believed to be promoted by a diverse student body.[48] As the Court

---

[48] The president of Princeton University has described some of the benefits derived from a diverse student body:

"[A] great deal of learning occurs informally. It occurs through interactions among students of both sexes; of different races, religions, and

noted in *Keyishian,* it is not too much to say that the "nation's future depends upon leaders trained through wide exposure" to the ideas and mores of students as diverse as this Nation of many peoples.

Thus, in arguing that its universities must be accorded the right to select those students who will contribute the most to the "robust exchange of ideas," petitioner invokes a countervailing constitutional interest, that of the First Amendment. In this light, petitioner must be viewed as seeking to achieve a goal that is of paramount importance in the fulfillment of its mission.

It may be argued that there is greater force to these views at the undergraduate level than in a medical school where the training is centered primarily on professional competency. But even at the graduate level, our tradition and experience lend support to the view that the contribution of diversity is substantial. In *Sweatt* v. *Painter,* 339 U. S., at 634, the

---

backgrounds; who come from cities and rural areas, from various states and countries; who have a wide variety of interests, talents, and perspectives; and who are able, directly or indirectly, to learn from their differences and to stimulate one another to reexamine even their most deeply held assumptions about themselves and their world. As a wise graduate of ours observed in commenting on this aspect of the educational process, 'People do not learn very much when they are surrounded only by the likes of themselves.'

"In the nature of things, it is hard to know how, and when, and even if, this informal 'learning through diversity' actually occurs. It does not occur for everyone. For many, however, the unplanned, casual encounters with roommates, fellow sufferers in an organic chemistry class, student workers in the library, teammates on a basketball squad, or other participants in class affairs or student government can be subtle and yet powerful sources of improved understanding and personal growth." Bowen, Admissions and the Relevance of Race, Princeton Alumni Weekly 7, 9 (Sept. 26, 1977).

314

Court made a similar point with specific reference to legal education:

> "The law school, the proving ground for legal learning and practice, cannot be effective in isolation from the individuals and institutions with which the law interacts. Few students and no one who has practiced law would choose to study in an academic vacuum, removed from the interplay of ideas and the exchange of views with which the law is concerned."

Physicians serve a heterogeneous population. An otherwise qualified medical student with a particular background—whether it be ethnic, geographic, culturally advantaged or disadvantaged—may bring to a professional school of medicine experiences, outlooks, and ideas that enrich the training of its student body and better equip its graduates to render with understanding their vital service to humanity.[49]

Ethnic diversity, however, is only one element in a range of factors a university properly may consider in attaining the goal of a heterogeneous student body. Although a university must have wide discretion in making the sensitive judgments as to who should be admitted, constitutional limitations protecting individual rights may not be disregarded. Respondent urges—and the courts below have held—that petitioner's dual admissions program is a racial classification that impermissibly infringes his rights under the Fourteenth Amendment. As the interest of diversity is compelling in the context of a university's admissions program, the question remains whether the

---

[49] Graduate admissions decisions, like those at the undergraduate level, are concerned with "assessing the potential contributions to the society of each individual candidate following his or her graduation—contributions defined in the broadest way to include the doctor and the poet, the most active participant in business or government affairs and the keenest critic of all things organized, the solitary scholar and the concerned parent." *Id.*, at 10.

program's racial classification is necessary to promote this interest. *In re Griffiths,* 413 U. S., at 721–722.

## V

### A

It may be assumed that the reservation of a specified number of seats in each class for individuals from the preferred ethnic groups would contribute to the attainment of considerable ethnic diversity in the student body. But petitioner's argument that this is the only effective means of serving the interest of diversity is seriously flawed. In a most fundamental sense the argument misconceives the nature of the state interest that would justify consideration of race or ethnic background. It is not an interest in simple ethnic diversity, in which a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups, with the remaining percentage an undifferentiated aggregation of students. The diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element. Petitioner's special admissions program, focused *solely* on ethnic diversity, would hinder rather than further attainment of genuine diversity.[50]

Nor would the state interest in genuine diversity be served by expanding petitioner's two-track system into a multitrack program with a prescribed number of seats set aside for each identifiable category of applicants. Indeed, it is inconceivable that a university would thus pursue the logic of petitioner's two-track program to the illogical end of insulating each category of applicants with certain desired qualifications from competition with all other applicants.

---

[50] See Manning, The Pursuit of Fairness in Admissions to Higher Education, in Carnegie Council on Policy Studies in Higher Education, Selective Admissions in Higher Education 19, 57–59 (1977).

The experience of other university admissions programs, which take race into account in achieving the educational diversity valued by the First Amendment, demonstrates that the assignment of a fixed number of places to a minority group is not a necessary means toward that end. An illuminating example is found in the Harvard College program:

"In recent years Harvard College has expanded the concept of diversity to include students from disadvantaged economic, racial and ethnic groups. Harvard College now recruits not only Californians or Louisianans but also blacks and Chicanos and other minority students. . . .

"In practice, this new definition of diversity has meant that race has been a factor in some admission decisions. When the Committee on Admissions reviews the large middle group of applicants who are 'admissible' and deemed capable of doing good work in their courses, the race of an applicant may tip the balance in his favor just as geographic origin or a life spent on a farm may tip the balance in other candidates' cases. A farm boy from Idaho can bring something to Harvard College that a Bostonian cannot offer. Similarly, a black student can usually bring something that a white person cannot offer. . . . [See Appendix hereto.]

"In Harvard College admissions the Committee has not set target-quotas for the number of blacks, or of musicians, football players, physicists or Californians to be admitted in a given year. . . . But that awareness [of the necessity of including more than a token number of black students] does not mean that the Committee sets a minimum number of blacks or of people from west of the Mississippi who are to be admitted. It means only that in choosing among thousands of applicants who are not only 'admissible' academically but have other strong qualities, the Committee, with a number of criteria in mind, pays some attention to distribution among many

types and categories of students." App. to Brief for Columbia University, Harvard University, Stanford University, and the University of Pennsylvania, as *Amici Curiae* 2–3.

In such an admissions program,[51] race or ethnic background may be deemed a "plus" in a particular applicant's file, yet it does not insulate the individual from comparison with all other candidates for the available seats. The file of a particular black applicant may be examined for his potential contribution to diversity without the factor of race being decisive when compared, for example, with that of an applicant identified as an Italian-American if the latter is thought to exhibit qualities more likely to promote beneficial educational pluralism. Such qualities could include exceptional personal talents, unique work or service experience, leadership potential, maturity, demonstrated compassion, a history of overcoming disadvantage, ability to communicate with the poor, or other qualifications deemed important. In short, an admissions program operated in this way is flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight. Indeed, the weight attributed to a

---

[51] The admissions program at Princeton has been described in similar terms:

"While race is not in and of itself a consideration in determining basic qualifications, and while there are obviously significant differences in background and experience among applicants of every race, in some situations race can be helpful information in enabling the admission officer to understand more fully what a particular candidate has accomplished—and against what odds. Similarly, such factors as family circumstances and previous educational opportunities may be relevant, either in conjunction with race or ethnic background (with which they may be associated) or on their own." Bowen, *supra* n. 48, at 8–9.

For an illuminating discussion of such flexible admissions systems, see Manning, *supra* n. 50, at 57–59.

318

particular quality may vary from year to year depending upon the "mix" both of the student body and the applicants for the incoming class.

This kind of program treats each applicant as an individual in the admissions process. The applicant who loses out on the last available seat to another candidate receiving a "plus" on the basis of ethnic background will not have been foreclosed from all consideration for that seat simply because he was not the right color or had the wrong surname. It would mean only that his combined qualifications, which may have included similar nonobjective factors, did not outweigh those of the other applicant. His qualifications would have been weighed fairly and competitively, and he would have no basis to complain of unequal treatment under the Fourteenth Amendment.[52]

It has been suggested that an admissions program which considers race only as one factor is simply a subtle and more sophisticated—but no less effective—means of according racial preference than the Davis program. A facial intent to discriminate, however, is evident in petitioner's preference program and not denied in this case. No such facial infirmity exists in an admissions program where race or ethnic background is simply one element—to be weighed fairly against other elements—in the selection process. "A boundary line," as Mr. Justice Frankfurter remarked in another connection, "is none the worse for being narrow." *McLeod* v. *Dilworth*, 322 U. S. 327, 329 (1944). And a court would not assume that a university, professing to employ a facially nondiscriminatory admissions policy, would operate it as a cover for the functional equivalent of a quota system. In short, good faith

---

[52] The denial to respondent of this right to individualized consideration without regard to his race is the principal evil of petitioner's special admissions program. Nowhere in the opinion of MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, MR. JUSTICE MARSHALL, and MR. JUSTICE BLACKMUN is this denial even addressed.

would be presumed in the absence of a showing to the contrary in the manner permitted by our cases. See, *e. g., Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252 (1977); *Washington* v. *Davis*, 426 U. S. 229 (1976); *Swain* v. *Alabama*, 380 U. S. 202 (1965).[53]

## B

In summary, it is evident that the Davis special admissions program involves the use of an explicit racial classification never before countenanced by this Court. It tells applicants who are not Negro, Asian, or Chicano that they are totally excluded from a specific percentage of the seats in an entering class. No matter how strong their qualifications, quantitative and extracurricular, including their own potential for contribution to educational diversity, they are never afforded the chance to compete with applicants from the preferred groups for the special admissions seats. At the same time, the preferred

---

[53] Universities, like the prosecutor in *Swain*, may make individualized decisions, in which ethnic background plays a part, under a presumption of legality and legitimate educational purpose. So long as the university proceeds on an individualized, case-by-case basis, there is no warrant for judicial interference in the academic process. If an applicant can establish that the institution does not adhere to a policy of individual comparisons, or can show that a systematic exclusion of certain groups results, the presumption of legality might be overcome, creating the necessity of proving legitimate educational purpose.

There also are strong policy reasons that correspond to the constitutional distinction between petitioner's preference program and one that assures a measure of competition among all applicants. Petitioner's program will be viewed as inherently unfair by the public generally as well as by applicants for admission to state universities. Fairness in individual competition for opportunities, especially those provided by the State, is a widely cherished American ethic. Indeed, in a broader sense, an underlying assumption of the rule of law is the worthiness of a system of justice based on fairness to the individual. As Mr. Justice Frankfurter declared in another connection, "[j]ustice must satisfy the appearance of justice." *Offutt* v. *United States*, 348 U. S. 11, 14 (1954).

applicants have the opportunity to compete for every seat in the class.

The fatal flaw in petitioner's preferential program is its disregard of individual rights as guaranteed by the Fourteenth Amendment. *Shelley* v. *Kraemer,* 334 U. S., at 22. Such rights are not absolute. But when a State's distribution of benefits or imposition of burdens hinges on ancestry or the color of a person's skin, that individual is entitled to a demonstration that the challenged classification is necessary to promote a substantial state interest. Petitioner has failed to carry this burden. For this reason, that portion of the California court's judgment holding petitioner's special admissions program invalid under the Fourteenth Amendment must be affirmed.

## C

In enjoining petitioner from ever considering the race of any applicant, however, the courts below failed to recognize that the State has a substantial interest that legitimately may be served by a properly devised admissions program involving the competitive consideration of race and ethnic origin. For this reason, so much of the California court's judgment as enjoins petitioner from any consideration of the race of any applicant must be reversed.

## VI

With respect to respondent's entitlement to an injunction directing his admission to the Medical School, petitioner has conceded that it could not carry its burden of proving that, but for the existence of its unlawful special admissions program, respondent still would not have been admitted. Hence, respondent is entitled to the injunction, and that portion of the judgment must be affirmed.[54]

[54] There is no occasion for remanding the case to permit petitioner to reconstruct what might have happened if it had been operating the type of program described as legitimate in Part V, *supra.* Cf. *Mt. Healthy*

## APPENDIX TO OPINION OF POWELL, J.

### Harvard College Admissions Program [55]

For the past 30 years Harvard College has received each year applications for admission that greatly exceed the number of places in the freshman class. The number of applicants who are deemed to be not "qualified" is comparatively small. The vast majority of applicants demonstrate through test scores, high school records and teachers' recommendations that they have the academic ability to do adequate work at Harvard, and perhaps to do it with distinction. Faced with the dilemma of choosing among a large number of "qualified" candidates, the Committee on Admissions could use the single criterion of scholarly excellence and attempt to determine who among the candidates were likely to perform best academically. But for the past 30 years the Committee on Admissions has never adopted this approach. The belief has been that if scholarly excellence were the sole or even predominant criterion, Harvard College would lose a great deal of its vitality and intellectual excellence and that the quality of the educa-

---

*City Board of Ed.* v. *Doyle,* 429 U. S. 274, 284–287 (1977). In *Mt. Healthy,* there was considerable doubt whether protected First Amendment activity had been the "but for" cause of Doyle's protested discharge. Here, in contrast, there is no question as to the sole reason for respondent's rejection—purposeful racial discrimination in the form of the special admissions program. Having injured respondent solely on the basis of an unlawful classification, petitioner cannot now hypothesize that it might have employed lawful means of achieving the same result. See *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S., at 265–266. No one can say how—or even if—petitioner would have operated its admissions process if it had known that legitimate alternatives were available. Nor is there a record revealing that legitimate alternative grounds for the decision existed, as there was in *Mt. Healthy.* In sum, a remand would result in fictitious recasting of past conduct.

[55] This statement appears in the Appendix to the Brief for Columbia University, Harvard University, Stanford University, and the University of Pennsylvania, as *Amici Curiae.*

tional experience offered to all students would suffer. Final Report of W. J. Bender, Chairman of the Admission and Scholarship Committee and Dean of Admissions and Financial Aid, pp. 20 *et seq.* (Cambridge, 1960). Consequently, after selecting those students whose intellectual potential will seem extraordinary to the faculty—perhaps 150 or so out of an entering class of over 1,100—the Committee seeks—

> variety in making its choices. This has seemed important . . . in part because it adds a critical ingredient to the effectiveness of the educational experience [in Harvard College]. . . . *The effectiveness of our students' educational experience has seemed to the Committee to be affected as importantly by a wide variety of interests, talents, backgrounds and career goals as it is by a fine faculty and our libraries, laboratories and housing arrangements.* (Dean of Admissions Fred L. Glimp, Final Report to the Faculty of Arts and Sciences, 65 Official Register of Harvard University No. 25, 93, 104–105 (1968) (emphasis supplied).

The belief that diversity adds an essential ingredient to the educational process has long been a tenet of Harvard College admissions. Fifteen or twenty years ago, however, diversity meant students from California, New York, and Massachusetts; city dwellers and farm boys; violinists, painters and football players; biologists, historians and classicists; potential stockbrokers, academics and politicians. The result was that very few ethnic or racial minorities attended Harvard College. In recent years Harvard College has expanded the concept of diversity to include students from disadvantaged economic, racial and ethnic groups. Harvard College now recruits not only Californians or Louisianans but also blacks and Chicanos and other minority students. Contemporary conditions in the United States mean that if Harvard College is to continue to offer a first-rate education to its students,

minority representation in the undergraduate body cannot be ignored by the Committee on Admissions.

In practice, this new definition of diversity has meant that race has been a factor in some admission decisions. When the Committee on Admissions reviews the large middle group of applicants who are "admissible" and deemed capable of doing good work in their courses, the race of an applicant may tip the balance in his favor just as geographic origin or a life spent on a farm may tip the balance in other candidates' cases. A farm boy from Idaho can bring something to Harvard College that a Bostonian cannot offer. Similarly, a black student can usually bring something that a white person cannot offer. The quality of the educational experience of all the students in Harvard College depends in part on these differences in the background and outlook that students bring with them.

In Harvard College admissions the Committee has not set target-quotas for the number of blacks, or of musicians, football players, physicists or Californians to be admitted in a given year. At the same time the Committee is aware that if Harvard College is to provide a truly heterogen[e]ous environment that reflects the rich diversity of the United States, it cannot be provided without some attention to numbers. It would not make sense, for example, to have 10 or 20 students out of 1,100 whose homes are west of the Mississippi. Comparably, 10 or 20 black students could not begin to bring to their classmates and to each other the variety of points of view, backgrounds and experiences of blacks in the United States. Their small numbers might also create a sense of isolation among the black students themselves and thus make it more difficult for them to develop and achieve their potential. Consequently, when making its decisions, the Committee on Admissions is aware that there is some relationship between numbers and achieving the benefits to be derived from a diverse student body, and between numbers and providing a reasonable environment for those students admitted. But

that awareness does not mean that the Committee sets a minimum number of blacks or of people from west of the Mississippi who are to be admitted. It means only that in choosing among thousands of applicants who are not only "admissible" academically but have other strong qualities, the Committee, with a number of criteria in mind, pays some attention to distribution among many types and categories of students.

The further refinements sometimes required help to illustrate the kind of significance attached to race. The Admissions Committee, with only a few places left to fill, might find itself forced to choose between A, the child of a successful black physician in an academic community with promise of superior academic performance, and B, a black who grew up in an inner-city ghetto of semi-literate parents whose academic achievement was lower but who had demonstrated energy and leadership as well as an apparently-abiding interest in black power. If a good number of black students much like A but few like B had already been admitted, the Committee might prefer B; and vice versa. If C, a white student with extraordinary artistic talent, were also seeking one of the remaining places, his unique quality might give him an edge over both A and B. Thus, the critical criteria are often individual qualities or experience not dependent upon race but sometimes associated with it.

Opinion of MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, MR. JUSTICE MARSHALL, and MR. JUSTICE BLACKMUN, concurring in the judgment in part and dissenting in part.

The Court today, in reversing in part the judgment of the Supreme Court of California, affirms the constitutional power of Federal and State Governments to act affirmatively to achieve equal opportunity for all. The difficulty of the issue presented—whether government may use race-conscious programs to redress the continuing effects of past discrimination—

and the mature consideration which each of our Brethren has brought to it have resulted in many opinions, no single one speaking for the Court. But this should not and must not mask the central meaning of today's opinions: Government may take race into account when it acts not to demean or insult any racial group, but to remedy disadvantages cast on minorities by past racial prejudice, at least when appropriate findings have been made by judicial, legislative, or administrative bodies with competence to act in this area.

THE CHIEF JUSTICE and our Brothers STEWART, REHNQUIST, and STEVENS, have concluded that Title VI of the Civil Rights Act of 1964, 78 Stat. 252, as amended, 42 U. S. C. § 2000d *et seq.,* prohibits programs such as that at the Davis Medical School. On this statutory theory alone, they would hold that respondent Allan Bakke's rights have been violated and that he must, therefore, be admitted to the Medical School. Our Brother POWELL, reaching the Constitution, concludes that, although race may be taken into account in university admissions, the particular special admissions program used by petitioner, which resulted in the exclusion of respondent Bakke, was not shown to be necessary to achieve petitioner's stated goals. Accordingly, these Members of the Court form a majority of five affirming the judgment of the Supreme Court of California insofar as it holds that respondent Bakke "is entitled to an order that he be admitted to the University." 18 Cal. 3d 34, 64, 553 P. 2d 1152, 1172 (1976).

We agree with MR. JUSTICE POWELL that, as applied to the case before us, Title VI goes no further in prohibiting the use of race than the Equal Protection Clause of the Fourteenth Amendment itself. We also agree that the effect of the California Supreme Court's affirmance of the judgment of the Superior Court of California would be to prohibit the University from establishing in the future affirmative-action programs that take race into account. See *ante,* at 271 n. Since we conclude that the affirmative admissions program at the Davis

Medical School is constitutional, we would reverse the judgment below in all respects.    MR. JUSTICE POWELL agrees that some uses of race in university admissions are permissible and, therefore, he joins with us to make five votes reversing the judgment below insofar as it prohibits the University from establishing race-conscious programs in the future.[1]

## I

Our Nation was founded on the principle that "all Men are created equal."   Yet candor requires acknowledgment that the Framers of our Constitution, to forge the 13 Colonies into one Nation, openly compromised this principle of equality with its antithesis: slavery.   The consequences of this compromise are well known and have aptly been called our "American Dilemma."   Still, it is well to recount how recent the time has been, if it has yet come, when the promise of our principles has flowered into the actuality of equal opportunity for all regardless of race or color.

The Fourteenth Amendment, the embodiment in the Constitution of our abiding belief in human equality, has been the law of our land for only slightly more than half its 200 years.   And for half of that half, the Equal Protection Clause of the Amendment was largely moribund so that, as late as 1927, Mr. Justice Holmes could sum up the importance of that Clause by remarking that it was the "last resort of constitutional arguments."   *Buck* v. *Bell,* 274 U. S. 200, 208 (1927).   Worse than desuetude, the Clause was early turned against those whom it was intended to set free, condemning them to a "separate but equal" [2] status before the law, a status

---

[1] We also agree with MR. JUSTICE POWELL that a plan like the "Harvard" plan, see *ante,* at 316–318, is constitutional under our approach, at least so long as the use of race to achieve an integrated student body is necessitated by the lingering effects of past discrimination.

[2] See *Plessy* v. *Ferguson,* 163 U. S. 537 (1896).

always separate but seldom equal. Not until 1954—only 24 years ago—was this odious doctrine interred by our decision in *Brown* v. *Board of Education,* 347 U. S. 483 (*Brown I*), and its progeny,[3] which proclaimed that separate schools and public facilities of all sorts were inherently unequal and forbidden under our Constitution. Even then inequality was not eliminated with "all deliberate speed." *Brown* v. *Board of Education,* 349 U. S. 294, 301 (1955). In 1968[4] and again in 1971,[5] for example, we were forced to remind school boards of their obligation to eliminate racial discrimination root and branch. And a glance at our docket[6] and at dockets of lower courts will show that even today officially sanctioned discrimination is not a thing of the past.

Against this background, claims that law must be "color-blind" or that the datum of race is no longer relevant to public policy must be seen as aspiration rather than as description of reality. This is not to denigrate aspiration; for reality rebukes us that race has too often been used by those who would stigmatize and oppress minorities. Yet we cannot—and, as we shall demonstrate, need not under our Constitution or Title VI, which merely extends the constraints of the Fourteenth ←— Amendment to private parties who receive federal funds—let color blindness become myopia which masks the reality that many "created equal" have been treated within our lifetimes as inferior both by the law and by their fellow citizens.

---

[3] *New Orleans City Park Improvement Assn.* v. *Detiege,* 358 U. S. 54 (1958); *Muir* v. *Louisville Park Theatrical Assn.,* 347 U. S. 971 (1954); *Mayor of Baltimore* v. *Dawson,* 350 U. S. 877 (1955); *Holmes* v. *Atlanta,* 350 U. S. 879 (1955); *Gayle* v. *Browder,* 352 U. S. 903 (1956).

[4] See *Green* v. *County School Board,* 391 U. S. 430 (1968).

[5] See *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1 (1971); *Davis* v. *School Comm'rs of Mobile County,* 402 U. S. 33 (1971); *North Carolina Board of Education* v. *Swann,* 402 U. S. 43 (1971).

[6] See, *e. g.,* cases collected in *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658, 663 n. 5 (1978).

## II

The threshold question we must decide is whether Title VI of the Civil Rights Act of 1964 bars recipients of federal funds from giving preferential consideration to disadvantaged members of racial minorities as part of a program designed to enable such individuals to surmount the obstacles imposed by racial discrimination.[7] We join Parts I and V-C of our Brother POWELL's opinion and three of us agree with his conclusion in Part II that this case does not require us to resolve the question whether there is a private right of action under Title VI.[8]

In our view, Title VI prohibits only those uses of racial criteria that would violate the Fourteenth Amendment if employed by a State or its agencies; it does not bar the preferential treatment of racial minorities as a means of remedying past societal discrimination to the extent that such action is consistent with the Fourteenth Amendment. The legislative history of Title VI, administrative regulations interpreting the statute, subsequent congressional and executive action, and the prior decisions of this Court compel this conclusion. None of these sources lends support to the proposition that Congress intended to bar all race-conscious efforts to extend the benefits of federally financed programs to minorities who have been historically excluded from the full benefits of American life.

### A

The history of Title VI—from President Kennedy's request that Congress grant executive departments and agencies au-

---

[7] Section 601 of Title VI provides:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U. S. C. § 2000d.

[8] MR. JUSTICE WHITE believes we should address the private-right-of-action issue. Accordingly, he has filed a separate opinion stating his view that there is no private right of action under Title VI. See post, p. 379.

thority to cut off federal funds to programs that discriminate against Negroes through final enactment of legislation incorporating his proposals—reveals one fixed purpose: to give the Executive Branch of Government clear authority to terminate federal funding of private programs that use race as a means of disadvantaging minorities in a manner that would be prohibited by the Constitution if engaged in by government.

This purpose was first expressed in President Kennedy's June 19, 1963, message to Congress proposing the legislation that subsequently became the Civil Rights Act of 1964.[9]

---

[9] "Simple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes or results in racial discrimination. Direct discrimination by Federal, State or local governments is prohibited by the Constitution. But indirect discrimination, through the use of Federal funds, is just as invidious; and it should not be necessary to resort to the courts to prevent each individual violation. Congress and the Executive have their responsibilities to uphold the Constitution also . . . .

"Many statutes providing Federal financial assistance, however, define with such precision both the Administrator's role and the conditions upon which specified amounts shall be given to designated recipients that the amount of administrative discretion remaining—which might be used to withhold funds if discrimination were not ended—is at best questionable. No administrator has the unlimited authority to invoke the Constitution in opposition to the mandate of the Congress. Nor would it always be helpful to require unconditionally—as is often proposed—the withdrawal of all Federal funds from programs urgently needed by Negroes as well as whites; for this may only penalize those who least deserve it without ending discrimination.

"Instead of permitting this issue to become a political device often exploited by those opposed to social or economic progress, it would be better at this time to pass a single comprehensive provision making it clear that the Federal Government is not required, under any statute, to furnish any kind of financial assistance—by way of grant, loan, contract, guaranty, insurance, or otherwise—to any program or activity in which racial discrimination occurs. This would not permit the Federal Government to cut off all Federal aid of all kinds as a means of punishing an area for the discrimination occurring therein—but it would clarify the authority

Representative Celler, the Chairman of the House Judiciary Committee, and the floor manager of the legislation in the House, introduced Title VI in words unequivocally expressing the intent to provide the Federal Government with the means of assuring that its funds were not used to subsidize racial discrimination inconsistent with the standards imposed by the Fourteenth and Fifth Amendments upon state and federal action.

> "The bill would offer assurance that hospitals financed by Federal money would not deny adequate care to Negroes. It would prevent abuse of food distribution programs whereby Negroes have been known to be denied food surplus supplies when white persons were given such food. It would assure Negroes the benefits now accorded only white students in programs of high[er] education financed by Federal funds. It would, in short, assure the existing right to equal treatment in the enjoyment of Federal funds. It would not destroy any rights of private property or freedom of association." 110 Cong. Rec. 1519 (1964).

It was clear to Representative Celler that Title VI, apart from the fact that it reached all federally funded activities even in the absence of sufficient state or federal control to invoke the Fourteenth or Fifth Amendments, was not placing new substantive limitations upon the use of racial criteria, but rather was designed to extend to such activities "the existing right to equal treatment" enjoyed by Negroes under those Amendments, and he later specifically defined the purpose of Title VI in this way:

> "In general, it seems rather anomalous that the Federal Government should aid and abet discrimination on the basis of race, color, or national origin by granting money

---

of any administrator with respect to Federal funds or financial assistance and discriminatory practices." 109 Cong. Rec. 11161 (1963).

and other kinds of financial aid. It seems rather shocking, moreover, that while we have on the one hand the 14th amendment, which is supposed to do away with discrimination since it provides for equal protection of the laws, on the other hand, we have the Federal Government aiding and abetting those who persist in practicing racial discrimination.

"It is for these reasons that we bring forth title VI. The enactment of title VI will serve to override specific provisions of law which contemplate Federal assistance to racially segregated institutions." *Id.*, at 2467.

Representative Celler also filed a memorandum setting forth the legal basis for the enactment of Title VI which reiterated the theme of his oral remarks: "In exercising its authority to fix the terms on which Federal funds will be disbursed . . . , Congress clearly has power to legislate so as to insure that the Federal Government does not become involved in a violation of the Constitution." *Id.*, at 1528.

Other sponsors of the legislation agreed with Representative Celler that the function of Title VI was to end the Federal Government's complicity in conduct, particularly the segregation or exclusion of Negroes, inconsistent with the standards to be found in the antidiscrimination provisions of the Constitution. Representative Lindsay, also a member of the Judiciary Committee, candidly acknowledged, in the course of explaining why Title VI was necessary, that it did not create any new standard of equal treatment beyond that contained in the Constitution:

"Both the Federal Government and the States are under constitutional mandates not to discriminate. Many have raised the question as to whether legislation is required at all. Does not the Executive already have the power in the distribution of Federal funds to apply those conditions which will enable the Federal Government itself to live up to the mandate of the Constitution and to require

States and local government entities to live up to the Constitution, most especially the 5th and 14th amendments?" *Id.*, at 2467.

He then explained that legislation was needed to authorize the termination of funding by the Executive Branch because existing legislation seemed to contemplate the expenditure of funds to support racially segregated institutions. *Ibid.* The views of Representatives Celler and Lindsay concerning the purpose and function of Title VI were shared by other sponsors and proponents of the legislation in the House.[10] Nowhere is there any suggestion that Title VI was intended to terminate federal funding for any reason other than consideration of race or national origin by the recipient institution in a manner inconsistent with the standards incorporated in the Constitution.

The Senate's consideration of Title VI reveals an identical understanding concerning the purpose and scope of the legislation. Senator Humphrey, the Senate floor manager, opened the Senate debate with a section-by-section analysis of the Civil Rights Act in which he succinctly stated the purpose of Title VI:

"The purpose of title VI is to make sure that funds of the United States are not used to support racial discrimination. In many instances the practices of segregation or discrimination, which title VI seeks to end, are unconstitutional. This is clearly so wherever Federal funds go to a State agency which engages in racial discrimination. It may also be so where Federal funds go to support private, segregated institutions, under the decision in *Simkins* v. *Moses H. Cone Memorial Hospital,* 323 F. 2d 959 (C. A. 4, 1963), [cert. denied, 376 U. S. 938 (1964)]. In all cases, such discrimination is contrary to national policy, and to the moral sense of the Nation. Thus, title VI is simply

---

[10] See, *e. g.,* 110 Cong. Rec. 2732 (1964) (Rep. Dawson); *id.,* at 2481–2482 (Rep. Ryan); *id.,* at 2766 (Rep. Matsunaga); *id.,* at 2595 (Rep. Donahue).

designed to insure that Federal funds are spent in accordance with the Constitution and the moral sense of the Nation." *Id.*, at 6544.

Senator Humphrey, in words echoing statements in the House, explained that legislation was needed to accomplish this objective because it was necessary to eliminate uncertainty concerning the power of federal agencies to terminate financial assistance to programs engaging in racial discrimination in the face of various federal statutes which appeared to authorize grants to racially segregated institutions. *Ibid.* Although Senator Humphrey realized that Title VI reached conduct which, because of insufficient governmental action, might be beyond the reach of the Constitution, it was clear to him that the substantive standard imposed by the statute was that of the Fifth and Fourteenth Amendments.

Senate supporters of Title VI repeatedly expressed agreement with Senator Humphrey's description of the legislation as providing the explicit authority and obligation to apply the standards of the Constitution to all recipients of federal funds. Senator Ribicoff described the limited function of Title VI:

"Basically, there is a constitutional restriction against discrimination in the use of Federal funds; and title VI simply spells out the procedure to be used in enforcing that restriction." *Id.*, at 13333.

Other strong proponents of the legislation in the Senate repeatedly expressed their intent to assure that federal funds would only be spent in accordance with constitutional standards. See remarks of Senator Pastore, *id.*, at 7057, 7062; Senator Clark, *id.*, at 5243; Senator Allott, *id.*, at 12675, 12677.[11]

---

[11] There is also language in 42 U. S. C. § 2000d–5, enacted in 1966, which supports the conclusion that Title VI's standard is that of the Constitution. Section 2000d–5 provides that "for the purpose of determining

Respondent's contention that Congress intended Title VI to bar affirmative-action programs designed to enable minorities disadvantaged by the effects of discrimination to participate in federally financed programs is also refuted by an examination of the type of conduct which Congress thought it was prohibiting by means of Title VI. The debates reveal that the legislation was motivated primarily by a desire to eradicate a very specific evil: federal financial support of programs which disadvantaged Negroes by excluding them from participation or providing them with separate facilities. Again and again supporters of Title VI emphasized that the purpose of the statute was to end segregation in federally funded activities and to end other discriminatory uses of race disadvantaging Negroes. Senator Humphrey set the theme in his speech presenting Title VI to the Senate:

"Large sums of money are contributed by the United States each year for the construction, operation, and maintenance of segregated schools.

.        .        .        .        .

"Similarly, under the Hill-Burton Act, Federal grants are made to hospitals which admit whites only or Negroes only. . . .

"In higher education also, a substantial part of the Federal grants to colleges, medical schools and so forth, in the South is still going to segregated institutions.

---

whether a local educational agency is in compliance with [Title VI], compliance by such agency with a final order or judgment of a Federal court for the desegregation of the school or school system operated by such agency shall be deemed to be compliance with [Title VI], insofar as the matters covered in the order or judgment are concerned." This provision was clearly intended to avoid subjecting local educational agencies simultaneously to the jurisdiction of the federal courts and the federal administrative agencies in connection with the imposition of remedial measures designed to end school segregation. Its inclusion reflects the congressional judgment that the requirements imposed by Title VI are identical to those imposed by the Constitution as interpreted by the federal courts.

"Nor is this all. In several States, agricultural extension services, supported by Federal funds, maintain racially segregated offices for Negroes and whites. . . .

" . . . Vocational training courses, supported with Federal funds, are given in segregated schools and institutions and often limit Negroes to training in less skilled occupations. In particular localities it is reported that Negroes have been cut off from relief rolls, or denied surplus agricultural commodities, or otherwise deprived of the benefit of federally assisted programs, in retaliation for their participation in voter registration drives, sit-in demonstrations and the like." *Id.,* at 6543–6544.

See also the remarks of Senator Pastore (*id.,* at 7054–7055); Senator Ribicoff (*id.,* at 7064–7065); Senator Clark (*id.,* at 5243, 9086); Senator Javits (*id.,* at 6050, 7102).[12]

The conclusion to be drawn from the foregoing is clear. Congress recognized that Negroes, in some cases with congressional acquiescence, were being discriminated against in the administration of programs and denied the full benefits of activities receiving federal financial support. It was aware that there were many federally funded programs and institutions which discriminated against minorities in a manner inconsistent with the standards of the Fifth and Fourteenth Amendments but whose activities might not involve sufficient state or federal action so as to be in violation of these Amendments. Moreover, Congress believed that it was questionable whether the Executive Branch possessed legal authority to terminate the funding of activities on the ground that they discriminated racially against Negroes in a manner violative of the standards contained in the Fourteenth and Fifth

---

[12] As has already been seen, the proponents of Title VI in the House were motivated by the identical concern. See remarks of Representative Celler (110 Cong. Rec. 2467 (1964)); Representative Ryan (*id.,* at 1643, 2481–2482); H. R. Rep. No. 914, 88th Cong., 1st Sess., pt. 2, Additional Views of Seven Representatives 24–25 (1963).

Amendments. Congress' solution was to end the Government's complicity in constitutionally forbidden racial discrimination by providing the Executive Branch with the authority and the obligation to terminate its financial support of any activity which employed racial criteria in a manner condemned by the Constitution.

Of course, it might be argued that the Congress which enacted Title VI understood the Constitution to require strict racial neutrality or color blindness, and then enshrined that concept as a rule of statutory law. Later interpretation and clarification of the Constitution to permit remedial use of race would then not dislodge Title VI's prohibition of race-conscious action. But there are three compelling reasons to reject such a hypothesis.

First, no decision of this Court has ever adopted the proposition that the Constitution must be colorblind. See *infra,* at 355–356.

Second, even if it could be argued in 1964 that the Constitution might conceivably require color blindness, Congress surely would not have chosen to codify such a view unless the Constitution clearly required it. The legislative history of Title VI, as well as the statute itself, reveals a desire to induce voluntary compliance with the requirement of nondiscriminatory treatment.[13] See § 602 of the Act, 42 U. S. C. § 2000d–1 (no funds shall be terminated unless and until it has been "determined that compliance cannot be secured by voluntary means"); H. R. Rep. No. 914, 88th Cong., 1st Sess., pt. 1, p. 25 (1963); 110 Cong. Rec. 13700 (1964) (Sen. Pastore); *id.,* at 6546 (Sen. Humphrey). It is inconceivable that Congress intended to encourage voluntary efforts to eliminate the evil of racial discrimination while at the same time forbidding the voluntary use of race-conscious remedies to cure acknowledged or obvious statutory violations. Yet a reading of Title VI as prohibiting all action predicated upon race which adversely

---

[13] See separate opinion of Mr. Justice White, *post,* at 382–383, n. 2.

affects any individual would require recipients guilty of discrimination to await the imposition of such remedies by the Executive Branch. Indeed, such an interpretation of Title VI would prevent recipients of federal funds from taking race into account even when necessary to bring their programs into compliance with federal constitutional requirements. This would be a remarkable reading of a statute designed to eliminate constitutional violations, especially in light of judicial decisions holding that under certain circumstances the remedial use of racial criteria is not only permissible but is constitutionally required to eradicate constitutional violations. For example, in *Board of Education* v. *Swann,* 402 U. S. 43 (1971), the Court held that a statute forbidding the assignment of students on the basis of race was unconstitutional because it would hinder the implementation of remedies necessary to accomplish the desegregation of a school system: "Just as the race of students must be considered in determining whether a constitutional violation has occurred, so also must race be considered in formulating a remedy." *Id.,* at 46. Surely Congress did not intend to prohibit the use of racial criteria when constitutionally required or to terminate the funding of any entity which implemented such a remedy. It clearly desired to encourage all remedies, including the use of race, necessary to eliminate racial discrimination in violation of the Constitution rather than requiring the recipient to await a judicial adjudication of unconstitutionality and the judicial imposition of a racially oriented remedy.

Third, the legislative history shows that Congress specifically eschewed any static definition of discrimination in favor of broad language that could be shaped by experience, administrative necessity, and evolving judicial doctrine. Although it is clear from the debates that the supporters of Title VI intended to ban uses of race prohibited by the Constitution and, more specifically, the maintenance of segre-

gated facilities, they never precisely defined the term "discrimination," or what constituted an exclusion from participation or a denial of benefits on the ground of race. This failure was not lost upon its opponents. Senator Ervin complained:

> "The word 'discrimination,' as used in this reference, has no contextual explanation whatever, other than the provision that the discrimination 'is to be against' individuals participating in or benefiting from federally assisted programs and activities on the ground specified. With this context, the discrimination condemned by this reference occurs only when an individual is treated unequally or unfairly because of his race, color, religion, or national origin. What constitutes unequal or unfair treatment? Section 601 and section 602 of title VI do not say. They leave the determination of that question to the executive department or agencies administering each program, without any guideline whatever to point out what is the congressional intent." 110 Cong. Rec. 5612 (1964).

See also remarks of Representative Abernethy (*id.*, at 1619); Representative Dowdy (*id.*, at 1632); Senator Talmadge (*id.*, at 5251); Senator Sparkman (*id.*, at 6052). Despite these criticisms, the legislation's supporters refused to include in the statute or even provide in debate a more explicit definition of what Title VI prohibited.

The explanation for this failure is clear. Specific definitions were undesirable, in the views of the legislation's principal backers, because Title VI's standard was that of the Constitution and one that could and should be administratively and judicially applied. See remarks of Senator Humphrey (*id.*, at 5253, 6553); Senator Ribicoff (*id.*, at 7057, 13333); Senator Pastore (*id.*, at 7057); Senator Javits (*id.*, at 5606–5607, 6050).[14] Indeed, there was a strong emphasis throughout

---

[14] These remarks also reflect the expectations of Title VI's proponents that the application of the Constitution to the conduct at the core of their

Congress' consideration of Title VI on providing the Executive Branch with considerable flexibility in interpreting and applying the prohibition against racial discrimination. Attorney General Robert Kennedy testified that regulations had not been written into the legislation itself because the rules and regulations defining discrimination might differ from one program to another so that the term would assume different meanings in different contexts.[15] This determination to preserve flexibility in the administration of Title VI was shared by the legislation's supporters. When Senator Johnston offered an amendment that would have expressly authorized federal grantees to take race into account in placing children in adoptive and foster homes, Senator Pastore opposed the amendment, which was ultimately defeated by a 56–29 vote, on the ground that federal administrators could be trusted to act reasonably and that there was no danger that they would prohibit the use of racial criteria under such circumstances. *Id.*, at 13695.

Congress' resolve not to incorporate a static definition of discrimination into Title VI is not surprising. In 1963 and 1964, when Title VI was drafted and debated, the courts had only recently applied the Equal Protection Clause to strike down public racial discrimination in America, and the scope of that Clause's nondiscrimination principle was in a state of flux and rapid evolution. Many questions, such as whether the Fourteenth Amendment barred only *de jure* discrimination or in at least some circumstances reached *de facto* discrimination, had not yet received an authoritative judicial resolution. The congressional debate reflects an awareness of the evolu-

---

concern—the segregation of Negroes in federally funded programs and their exclusion from the full benefits of such programs—was clear. See *supra,* at 333–336; *infra,* at 340–342, n. 17.

[15] Testimony of Attorney General Kennedy in Hearings before the Senate Committee on the Judiciary on S. 1731 and S. 1750, 88th Cong., 1st Sess., 398–399 (1963).

tionary change that constitutional law in the area of racial discrimination was undergoing in 1964.[16]

In sum, Congress' equating of Title VI's prohibition with the commands of the Fifth and Fourteenth Amendments, its refusal precisely to define that racial discrimination which it intended to prohibit, and its expectation that the statute would be administered in a flexible manner, compel the conclusion that Congress intended the meaning of the statute's prohibition to evolve with the interpretation of the commands of the Constitution. Thus, any claim that the use of racial criteria is barred by the plain language of the statute must fail in light of the remedial purpose of Title VI and its legislative history. The cryptic nature of the language employed in Title VI merely reflects Congress' concern with the then-prevalent use of racial standards as a means of excluding or disadvantaging Negroes and its determination to prohibit absolutely such discrimination. We have recently held that " '[w]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination." ' " *Train* v. *Colorado Public Interest Research Group*, 426 U. S. 1, 10 (1976), quoting *United States* v. *American Trucking Assns.*, 310 U. S. 534, 543–544 (1940). This is especially so when, as is the case here, the literal application of what is believed to be the plain language of the statute, assuming that it is so plain, would lead to results in direct conflict with Congress' unequivocally expressed legislative purpose.[17]

---

[16] See, *e. g.*, 110 Cong. Rec. 6544, 13820 (1964) (Sen. Humphrey); *id.*, at 6050 (Sen. Javits); *id.*, at 12677 (Sen. Allott).

[17] Our Brother STEVENS finds support for a colorblind theory of Title VI in its legislative history, but his interpretation gives undue weight to a few isolated passages from among the thousands of pages of the legislative history of Title VI. See *id.*, at 6547 (Sen. Humphrey); *id.*, at 6047, 7055 (Sen. Pastore); *id.*, at 12675 (Sen. Allott); *id.*, at 6561 (Sen. Kuchel). These fragmentary comments fall far short of supporting a congressional

B

Section 602 of Title VI, 42 U. S. C. § 2000d–1, instructs
federal agencies to promulgate regulations interpreting Title

intent to prohibit a racially conscious admissions program designed to
assist those who are likely to have suffered injuries from the effects of past
discrimination. In the first place, these statements must be read in the
context in which they were made. The concern of the speakers was far
removed from the incidental injuries which may be inflicted upon non-
minorities by the use of racial preferences. It was rather with the evil of
the segregation of Negroes in federally financed programs and, in some
cases, their arbitrary exclusion on account of race from the benefits of such
programs. Indeed, in this context there can be no doubt that the Four-
teenth Amendment does command color blindness and forbids the use of
racial criteria. No consideration was given by these legislators, however,
to the permissibility of racial preference designed to redress the effects of
injuries suffered as a result of one's color. Significantly one of the legisla-
tors, Senator Pastore, and perhaps also Senator Kuchel, who described
Title VI as proscribing decisionmaking based upon skin color, also made it
clear that Title VI does not outlaw the use of racial criteria in all circum-
stances. See *supra*, at 339–340; 110 Cong. Rec. 6562 (1964). See also *id.*,
at 2494 (Rep. Celler). Moreover, there are many statements in the legis-
lative history explicitly indicating that Congress intended neither to require
nor to prohibit the remedial use of racial preferences where not otherwise
required or prohibited by the Constitution. Representative MacGregor
addressed directly the problem of preferential treatment:

"Your mail and mine, your contacts and mine with our constituents,
indicates a great degree of misunderstanding about this bill. People com-
plain about racial 'balancing' in the public schools, about open occupancy
in housing, about preferential treatment or quotas in employment. There
is a mistaken belief that Congress is legislating in these areas in this
bill. When we drafted this bill we excluded these issues largely because
the problems raised by these controversial questions are more properly
handled at a governmental level close to the American people and by
communities and individuals themselves. The Senate has spelled out our
intentions more specifically." *Id.*, at 15893.

Other legislators explained that the achievement of racial balance in ele-
mentary and secondary schools where there had been no segregation by
law was not compelled by Title VI but was rather left to the judgment of
state and local communities. See, *e. g., id.*, at 10920 (Sen. Javits); *id.*,
at 5807, 5266 (Sen. Keating); *id.*, at 13821 (Sens. Humphrey and

VI. These regulations, which, under the terms of the statute, require Presidential approval, are entitled to considerable deference in construing Title VI. See, *e. g., Lau* v. *Nichols,*

Saltonstall). See also, *id.,* at 6562 (Sen. Kuchel); *id.,* at 13695 (Sen. Pastore).

Much the same can be said of the scattered remarks to be found in the legislative history of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.* (1970 ed. and Supp. V), which prohibits employment discrimination on the basis of race in terms somewhat similar to those contained in Title VI, see 42 U. S. C. § 2000e–2 (a) (1) (unlawful "to fail or refuse to hire" any applicant "because of such individual's race, color, religion, sex, or national origin . . . ."), to the effect that any deliberate attempt by an employer to maintain a racial balance is not required by the statute and might in fact violate it. See, *e. g.,* 110 Cong. Rec. 7214 (1964) (Sens. Clark and Case); *id.,* at 6549 (Sen. Humphrey); *id.,* at 2560 (Rep. Goodell). Once again, there is no indication that Congress intended to bar the voluntary use of racial preferences to assist minorities to surmount the obstacles imposed by the remnants of past discrimination. Even assuming that Title VII prohibits employers from deliberately maintaining a particular racial composition in their work force as an end in itself, this does not imply, in the absence of any consideration of the question, that Congress intended to bar the use of racial preferences as a tool for achieving the objective of remedying past discrimination or other compelling ends. The former may well be contrary to the requirements of the Fourteenth Amendment (where state action is involved), while the latter presents very different constitutional considerations. Indeed, as discussed *infra,* at 353, this Court has construed Title VII as requiring the use of racial preferences for the purpose of hiring and advancing those who have been adversely affected by past discriminatory employment practices, even at the expense of other employees innocent of discrimination. *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747, 767–768 (1976). Although Title VII clearly does not require employers to take action to remedy the disadvantages imposed upon racial minorities by hands other than their own, such an objective is perfectly consistent with the remedial goals of the statute. See *id.,* at 762–770; *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 418 (1975). There is no more indication in the legislative history of Title VII than in that of Title VI that Congress desired to prohibit such affirmative action to the extent that it is permitted by the Constitution, yet judicial decisions as well as subsequent executive and congressional action clearly establish that Title VII does not forbid race-conscious remedial action. See *infra,* at 353–355, and n. 28.

414 U. S. 563 (1974); *Mourning* v. *Family Publications Service, Inc.,* 411 U. S. 356, 369 (1973); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 381 (1969). Consequently, it is most significant that the Department of Health, Education, and Welfare (HEW), which provides much of the federal assistance to institutions of higher education, has adopted regulations *requiring* affirmative measures designed to enable racial minorities which have been previously discriminated against by a federally funded institution or program to overcome the effects of such actions and *authorizing* the voluntary undertaking of affirmative-action programs by federally funded institutions that have not been guilty of prior discrimination in order to overcome the effects of conditions which have adversely affected the degree of participation by persons of a particular race.

Title 45 CFR § 80.3 (b) (6) (i) (1977) provides:

> "In administering a program regarding which the recipient has previously discriminated against persons on the ground of race, color, or national origin, the recipient must take affirmative action to overcome the effects of prior discrimination."

Title 45 CFR § 80.5 (i) (1977) elaborates upon this requirement:

> "In some situations, even though past discriminatory practices attributable to a recipient or applicant have been abandoned, the consequences of such practices continue to impede the full availability of a benefit. If the efforts required of the applicant or recipient under § 80.6 (d), to provide information as to the availability of the program or activity and the rights of beneficiaries under this regulation, have failed to overcome these consequences, it will become necessary under the requirement stated in (i) of § 80.3 (b) (6) for such applicant or recipient to take additional steps to make the benefits

fully available to racial and nationality groups previously subject to discrimination. This action might take the form, for example, of special arrangements for obtaining referrals or making selections which will insure that groups previously subjected to discrimination are adequately served."

These regulations clearly establish that where there is a need to overcome the effects of past racially discriminatory or exclusionary practices engaged in by a federally funded institution, race-conscious action is not only permitted but required to accomplish the remedial objectives of Title VI.[18] Of course, there is no evidence that the Medical School has been guilty of past discrimination and consequently these regulations would not compel it to employ a program of preferential admissions in behalf of racial minorities. It would be difficult to explain from the language of Title VI, however, much less from its legislative history, why the statute *compels* race-conscious remedies where a recipient institution has engaged in past discrimination but *prohibits* such remedial action where racial minorities, as a result of the effects of past discrimination imposed by entities other than the recipient, are excluded from the benefits of federally funded programs. HEW was fully aware of the incongruous nature of such an interpretation of Title VI.

Title 45 CFR § 80.3 (b) (6) (ii) (1977) provides:

"Even in the absence of such prior discrimination, a recipient in administering a program may take affirmative action to overcome the effects of conditions which resulted

---

[18] HEW has stated that the purpose of these regulations is "to specify that affirmative steps to make services more equitably available are not prohibited and that such steps are required when necessary to overcome the consequences of prior discrimination." 36 Fed. Reg. 23494 (1971). Other federal agencies which provide financial assistance pursuant to Title VI have adopted similar regulations. See Supplemental Brief for United States as *Amicus Curiae* 16 n. 14.

in limiting participation by persons of a particular race, color, or national origin."

An explanatory regulation explicitly states that the affirmative action which § 80.3 (b)(6)(ii) contemplates includes the use of racial preferences:

"Even though an applicant or recipient has never used discriminatory policies, the services and benefits of the program or activity it administers may not in fact be equally available to some racial or nationality groups. In such circumstances, an applicant or recipient may properly give special consideration to race, color, or national origin to make the benefits of its program more widely available to such groups, not then being adequately served. For example, where a university is not adequately serving members of a particular racial or nationality group, it may establish special recruitment policies to make its program better known and more readily available to such group, and take other steps to provide that group with more adequate service." 45 CFR § 80.5 (j) (1977).

This interpretation of Title VI is fully consistent with the statute's emphasis upon voluntary remedial action and reflects the views of an agency[19] responsible for achieving its objectives.[20]

---

[19] Moreover, the President has delegated to the Attorney General responsibility for coordinating the enforcement of Title VI by federal departments and agencies and has directed him to "assist the departments and agencies in accomplishing effective implementation." Exec. Order No. 11764, 3 CFR 849 (1971–1975 Comp.). Accordingly, the views of the Solicitor General, as well as those of HEW, that the use of racial preferences for remedial purposes is consistent with Title VI are entitled to considerable respect.

[20] HEW administers at least two explicitly race-conscious programs. Details concerning them may be found in the Office of Management and

The Court has recognized that the construction of a statute by those charged with its execution is particularly deserving of respect where Congress has directed its attention to the administrative construction and left it unaltered. Cf. *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S., at 381; *Zemel* v. *Rusk,* 381 U. S. 1, 11–12 (1965). Congress recently took just this kind of action when it considered an amendment to the Departments of Labor and Health, Education, and Welfare appropriation bill for 1978, which would have restricted significantly the remedial use of race in programs funded by the appropriation. The amendment, as originally submitted by Representative Ashbrook, provided that "[n]one of the funds appropriated in this Act may be used to initiate, carry out or enforce any program of affirmative action or any other system of quotas or goals in regard to admission policies or employment practices which encourage or require any discrimination on the basis of race, creed, religion, sex or age." 123 Cong.

---

Budget, 1977 Catalogue of Federal Domestic Assistance 205–206, 401–402. The first program, No. 13.375, "Minority Biomedical Support," has as its objectives:

"To increase the number of ethnic minority faculty, students, and investigators engaged in biomedical research. To broaden the opportunities for participation in biomedical research of ethnic minority faculty, students, and investigators by providing support for biomedical research programs at eligible institutions."

Eligibility for grants under this program is limited to (1) four-year colleges, universities, and health professional schools with over 50% minority enrollments; (2) four-year institutions with significant but not necessarily over 50% minority enrollment provided they have a history of encouragement and assistance to minorities; (3) two-year colleges with 50% minority enrollment; and (4) American Indian Tribal Councils. Grants made pursuant to this program are estimated to total $9,711,000 for 1977.

The second program, No. 13.880, entitled "Minority Access To Research Careers," has as its objective to "assist minority institutions to train greater numbers of scientists and teachers in health related fields." Grants under this program are made directly to individuals and to institutions for the purpose of enabling them to make grants to individuals.

Rec. 19715 (1977). In support of the measure, Representative Ashbrook argued that the 1964 Civil Rights Act never authorized the imposition of affirmative action and that this was a creation of the bureaucracy. *Id.*, at 19722. He explicitly stated, however, that he favored permitting universities to adopt affirmative-action programs giving consideration to racial identity but opposed the imposition of such programs by the Government. *Id.*, at 19715. His amendment was itself amended to reflect this position by only barring the *imposition* of race-conscious remedies by HEW:

> "None of the funds appropriated in this Act may be obligated or expended in connection with the issuance, implementation, or enforcement of any rule, regulation, standard, guideline, recommendation, or order issued by the Secretary of Health, Education, and Welfare which for purposes of compliance with any ratio, quota, or other numerical requirement related to race, creed, color, national origin, or sex requires any individual or entity to take any action with respect to (1) the hiring or promotion policies or practices of such individual or entity, or (2) the admissions policies or practices of such individual or entity." *Id.*, at 19722.

This amendment was adopted by the House. *Ibid.* The Senate bill, however, contained no such restriction upon HEW's authority to impose race-conscious remedies and the Conference Committee, upon the urging of the Secretary of HEW, deleted the House provision from the bill.[21] More significant for present purposes, however, is the fact that even the proponents of imposing limitations upon HEW's implementation of Title VI did not challenge the right of federally funded educational institutions voluntarily to extend preferences to racial minorities.

---

[21] H. R. Conf. Rep. No. 95–538, p. 22 (1977); 123 Cong. Rec. 26188 (1977). See H. J. Res. 662, 95th Cong., 1st Sess. (1977); Pub. L. 95–205, 91 Stat. 1460.

Finally, congressional action subsequent to the passage of Title VI eliminates any possible doubt about Congress' views concerning the permissibility of racial preferences for the purpose of assisting disadvantaged racial minorities. It confirms that Congress did not intend to prohibit and does not now believe that Title VI prohibits the consideration of race as part of a remedy for societal discrimination even where there is no showing that the institution extending the preference has been guilty of past discrimination nor any judicial finding that the particular beneficiaries of the racial preference have been adversely affected by societal discrimination.

Just last year Congress enacted legislation [22] explicitly requiring that no grants shall be made "for any local public works project unless the applicant gives satisfactory assurance to the Secretary [of Commerce] that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises." The statute defines the term "minority business enterprise" as "a business, at least 50 per centum of which is owned by minority group members or, in case of a publicly owned business, at least 51 per centum of the stock of which is owned by minority group members." The term "minority group members" is defined in explicitly racial terms: "citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts." Although the statute contains an exemption from this requirement "to the extent that the Secretary determines otherwise," this escape clause was provided only to deal with the possibility that certain areas of the country might not contain sufficient qualified "minority business enterprises" to permit compliance with the quota provisions of the legislation.[23]

The legislative history of this race-conscious legislation reveals that it represents a deliberate attempt to deal with

[22] 91 Stat. 117, 42 U. S. C. § 6705 (f) (2) (1976 ed.).
[23] 123 Cong. Rec. 7156 (1977); id., at 5327–5330.

the excessive rate of unemployment among minority citizens and to encourage the development of viable minority controlled enterprises.[24] It was believed that such a "set-aside" was required in order to enable minorities, still "new on the scene" and "relatively small," to compete with larger and more established companies which would always be successful in underbidding minority enterprises. 123 Cong. Rec. 5327 (1977) (Rep. Mitchell). What is most significant about the congressional consideration of the measure is that although the use of a racial quota or "set-aside" by a recipient of federal funds would constitute a direct violation of Title VI if that statute were read to prohibit race-conscious action, no mention was made during the debates in either the House or the Senate of even the possibility that the quota provisions for minority contractors might in any way conflict with or modify Title VI. It is inconceivable that such a purported conflict would have escaped congressional attention through an inadvertent failure to recognize the relevance of Title VI. Indeed, the Act of which this affirmative-action provision is a part also contains a provision barring discrimination on the basis of sex which states that this prohibition "will be enforced through agency provisions and rules similar to those already established, with respect to racial and other discrimination under Title VI of the Civil Rights Act of 1964." 42 U. S. C. § 6709 (1976 ed.). Thus Congress was fully aware of the applicability of Title VI to the funding of public works projects. Under these circumstances, the enactment of the 10% "set-aside" for minority enterprises reflects a congressional judgment that the remedial use of race is permissible under Title VI. We have repeatedly recognized that subsequent legislation reflecting an interpretation of an earlier Act is entitled to great weight in determining the meaning of the earlier statute. *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S., at 380–

---

[24] See *id.*, at 7156 (Sen. Brooke).

381; *Erlenbaugh* v. *United States,* 409 U. S. 239, 243–244 (1972). See also *United States* v. *Stewart,* 311 U. S. 60, 64–65 (1940).[25]

### C

Prior decisions of this Court also strongly suggest that Title VI does not prohibit the remedial use of race where such action is constitutionally permissible. In *Lau* v. *Nichols,* 414 U. S. 563 (1974), the Court held that the failure of the San

---

[25] In addition to the enactment of the 10% quota provision discussed *supra,* Congress has also passed other Acts mandating race-conscious measures to overcome disadvantages experienced by racial minorities. Although these statutes have less direct bearing upon the meaning of Title VI, they do demonstrate that Congress believes race-conscious remedial measures to be both permissible and desirable under at least some circumstances. This in turn undercuts the likelihood that Congress intended to limit voluntary efforts to implement similar measures. For example, § 7 (a) of the National Science Foundation Authorization Act, 1977, provides:

"The Director of the National Science Foundation shall initiate an intensive search for qualified women, members of minority groups, and handicapped individuals to fill executive level positions in the National Science Foundation. In carrying out the requirement of this subsection, the Director shall work closely with organizations which have been active in seeking greater recognition and utilization of the scientific and technical capabilities of minorities, women, and handicapped individuals. The Director shall improve the representation of minorities, women, and handicapped individuals on advisory committees, review panels, and all other mechanisms by which the scientific community provides assistance to the Foundation." 90 Stat. 2056, note following 42 U. S. C. § 1873 (1976 ed.). Perhaps more importantly, the Act also authorizes the funding of Minority Centers for Graduate Education. Section 7 (c)(2) of the Act, 90 Stat. 2056, requires that these Centers:

"(A) have substantial minority student enrollment;

"(B) are geographically located near minority population centers;

"(C) demonstrate a commitment to encouraging and assisting minority students, researchers, and faculty;

.          .          .          .          .

"(F) will serve as a regional resource in science and engineering for the minority community which the Center is designed to serve; and

"(G) will develop joint educational programs with nearby undergradu-

Francisco school system to provide English-language instruction to students of Chinese ancestry who do not speak English, or to provide them with instruction in Chinese, constituted a violation of Title VI. The Court relied upon an HEW regulation which stipulates that a recipient of federal funds "may not . . . utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination" or have "the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin." 45 CFR § 80.3 (b)(2) (1977). It interpreted this regulation as requiring San Francisco to extend the same educational benefits to Chinese-speaking students as to English-speaking students, even though there was no finding or allegation that the city's failure to do so was a result of a purposeful design to discriminate on the basis of race.

*Lau* is significant in two related respects. First, it indicates that in at least some circumstances agencies responsible for the administration of Title VI may require recipients who have not been guilty of any constitutional violations to depart from a policy of color blindness and to be cognizant of the impact of their actions upon racial minorities. Secondly, *Lau* clearly requires that institutions receiving federal funds be accorded considerable latitude in voluntarily undertaking race-conscious action designed to remedy the exclusion of significant num-

---

ate institutions of higher education which have a substantial minority student enrollment."

Once again, there is no indication in the legislative history of this Act or elsewhere that Congress saw any inconsistency between the race-conscious nature of such legislation and the meaning of Title VI. And, once again, it is unlikely in the extreme that a Congress which believed that it had commanded recipients of federal funds to be absolutely colorblind would itself expend federal funds in such a race-conscious manner. See also the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U. S. C. § 801 *et seq.* (1976 ed.), 49 U. S. C. § 1657a *et seq.* (1976 ed.); the Emergency School Aid Act, 20 U. S. C. § 1601 *et seq.* (1976 ed.).

bers of minorities from the benefits of federally funded programs. Although this Court has not yet considered the question, presumably, by analogy to our decisions construing Title VII, a medical school would not be in violation of Title VI under *Lau* because of the serious underrepresentation of racial minorities in its student body as long as it could demonstrate that its entrance requirements correlated sufficiently with the performance of minority students in medical school and the medical profession.[26] It would be inconsistent with *Lau* and the emphasis of Title VI and the HEW regulations on voluntary action, however, to require that an institution wait to be adjudicated to be in violation of the law before being permitted to voluntarily undertake corrective action based upon a good-faith and reasonable belief that the failure of certain racial minorities to satisfy entrance requirements is not a measure of their ultimate performance as doctors but a result of the lingering effects of past societal discrimination.

We recognize that *Lau*, especially when read in light of our subsequent decision in *Washington* v. *Davis*, 426 U. S. 229 (1976), which rejected the general proposition that governmental action is unconstitutional solely because it has a racially disproportionate impact, may be read as being predicated upon the view that, at least under some circumstances, Title VI proscribes conduct which might not be prohibited by the Constitution. Since we are now of the opinion, for the reasons set forth above, that Title VI's standard, applicable alike to public and private recipients of federal funds, is no broader than the Constitution's, we have serious doubts concerning the correctness of what appears to be the premise of that decision. However, even accepting *Lau*'s implication that impact alone is in some contexts sufficient to establish a prima facie violation of Title VI, contrary to our view that Title VI's definition of racial discrimination is absolutely coextensive with the Constitution's, this would not assist the respondent

---

[26] Cf. *Griggs* v. *Duke Power Co.*, 401 U. S. 424 (1971).

in the least. First, for the reasons discussed *supra,* at 336–350, regardless of whether Title VI's prohibitions extend beyond the Constitution's, the evidence fails to establish, and, indeed, compels the rejection of, the proposition that Congress intended to prohibit recipients of federal funds from voluntarily employing race-conscious measures to eliminate the effects of past societal discrimination against racial minorities such as Negroes. Secondly, *Lau* itself, for the reasons set forth in the immediately preceding paragraph, strongly supports the view that voluntary race-conscious remedial action is permissible under Title VI. If discriminatory racial impact alone is enough to demonstrate at least a prima facie Title VI violation, it is difficult to believe that the Title would forbid the Medical School from attempting to correct the racially exclusionary effects of its initial admissions policy during the first two years of the School's operation.

The Court has also declined to adopt a "colorblind" interpretation of other statutes containing nondiscrimination provisions similar to that contained in Title VI. We have held under Title VII that where employment requirements have a disproportionate impact upon racial minorities they constitute a statutory violation, even in the absence of discriminatory intent, unless the employer is able to demonstrate that the requirements are sufficiently related to the needs of the job.[27] More significantly, the Court has required that preferences be given by employers to members of racial minorities as a remedy for past violations of Title VII, even where there has been no finding that the employer has acted with a discriminatory intent.[28] Finally, we have construed the Voting

---

[27] *Ibid.; Albemarle Paper Co.* v. *Moody,* 422 U. S. 405 (1975).

[28] *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747 (1976); *Teamsters* v. *United States,* 431 U. S. 324 (1977). Executive, judicial, and congressional action subsequent to the passage of Title VII conclusively established that the Title did not bar the remedial use of race. Prior to the 1972 amendments to Title VII (Equal Employment Opportunity Act

Rights Act of 1965, 42 U. S. C. § 1973 *et seq.* (1970 ed. and Supp. V), which contains a provision barring any voting procedure or qualification that denies or abridges "the right of

of 1972, 86 Stat. 103) a number of Courts of Appeals approved race-conscious action to remedy the effects of employment discrimination. See, *e. g., Heat & Frost Insulators & Asbestos Workers* v. *Vogler,* 407 F. 2d 1047 (CA5 1969); *United States* v. *Electrical Workers,* 428 F. 2d 144, 149–150 (CA6), cert. denied, 400 U. S. 943 (1970); *United States* v. *Sheetmetal Workers,* 416 F. 2d 123 (CA8 1969). In 1965, the President issued Exec. Order No. 11246, 3 CFR 339 (1964–1965 Comp.), which as amended by Exec. Order No. 11375, 3 CFR 684 (1966–1970 Comp.), required federal contractors to take affirmative action to remedy the disproportionately low employment of racial minorities in the construction industry. The Attorney General issued an opinion concluding that the race consciousness required by Exec. Order No. 11246 did not conflict with Title VII:

"It is not correct to say that Title VII prohibits employers from making race or national origin a factor for consideration at any stage in the process of obtaining employees. The legal definition of discrimination is an evolving one, but it is now well recognized in judicial opinions that the obligation of nondiscrimination, whether imposed by statute or by the Constitution, does not require and, in some circumstances, may not permit obliviousness or indifference to the racial consequences of alternative courses of action which involve the application of outwardly neutral criteria." 42 Op. Atty. Gen. 405, 411 (1969).

The federal courts agreed. See, *e. g., Contractors Assn. of Eastern Pa.* v. *Secretary of Labor,* 442 F. 2d 159 (CA3), cert. denied, 404 U. S. 854 (1971) (which also held, 442 F. 2d, at 173, that race-conscious affirmative action was permissible under Title VI); *Southern Illinois Builders Assn.* v. *Ogilvie,* 471 F. 2d 680 (CA7 1972). Moreover, Congress, in enacting the 1972 amendments to Title VII, explicitly considered and rejected proposals to alter Exec. Order No. 11246 and the prevailing judicial interpretations of Title VII as permitting, and in some circumstances requiring, race-conscious action. See Comment, The Philadelphia Plan: A Study in the Dynamics of Executive Power, 39 U. Chi. L. Rev. 723, 747–757 (1972). The section-by-section analysis of the 1972 amendments to Title VII undertaken by the Conference Committee Report on H. R. 1746 reveals a resolve to accept the then (as now) prevailing judicial interpretations of the scope of Title VII:

"In any area where the new law does not address itself, or in any areas where a specific contrary intent is not indicated, it was assumed that

any citizen of the United States to vote on account of race or color," as permitting States to voluntarily take race into account in a way that fairly represents the voting strengths of different racial groups in order to comply with the commands of the statute, even where the result is a gain for one racial group at the expense of others.[29]

These prior decisions are indicative of the Court's unwillingness to construe remedial statutes designed to eliminate discrimination against racial minorities in a manner which would impede efforts to attain this objective. There is no justification for departing from this course in the case of Title VI and frustrating the clear judgment of Congress that race-conscious remedial action is permissible.

We turn, therefore, to our analysis of the Equal Protection Clause of the Fourteenth Amendment.

## III

### A

The assertion of human equality is closely associated with the proposition that differences in color or creed, birth or status, are neither significant nor relevant to the way in which persons should be treated. Nonetheless, the position that such factors must be "constitutionally an irrelevance," *Edwards* v. *California,* 314 U. S. 160, 185 (1941) (Jackson, J., concurring), summed up by the shorthand phrase "[o]ur Constitution is color-blind," *Plessy* v. *Ferguson,* 163 U. S. 537, 559 (1896) (Harlan, J., dissenting), has never been adopted by this Court as the proper meaning of the Equal Protection Clause. In-

---

the present case law as developed by the courts would continue to govern the applicability and construction of Title VII." Legislative History of the Equal Employment Opportunity Act of 1972, p. 1844 (Comm. Print 1972).

[29] *United Jewish Organizations* v. *Carey,* 430 U. S. 144 (1977). See also *id.,* at 167–168 (opinion of WHITE, J.).

deed, we have expressly rejected this proposition on a number of occasions.

Our cases have always implied that an "overriding statutory purpose," *McLaughlin* v. *Florida,* 379 U. S. 184, 192 (1964), could be found that would justify racial classifications. See, *e. g., ibid.; Loving* v. *Virginia,* 388 U. S. 1, 11 (1967); *Korematsu* v. *United States,* 323 U. S. 214, 216 (1944); *Hirabayashi* v. *United States,* 320 U. S. 81, 100–101 (1943). More recently, in *McDaniel* v. *Barresi,* 402 U. S. 39 (1971), this Court unanimously reversed the Georgia Supreme Court which had held that a desegregation plan voluntarily adopted by a local school board, which assigned students on the basis of race, was *per se* invalid because it was not colorblind. And in *North Carolina Board of Education* v. *Swann* we held, again unanimously, that a statute mandating colorblind school-assignment plans could not stand "against the background of segregation," since such a limit on remedies would "render illusory the promise of *Brown [I]*." 402 U. S., at 45–46.

 We conclude, therefore, that racial classifications are not *per se* invalid under the Fourteenth Amendment. Accordingly, we turn to the problem of articulating what our role should be in reviewing state action that expressly classifies by race.

## B

Respondent argues that racial classifications are always suspect and, consequently, that this Court should weigh the importance of the objectives served by Davis' special admissions program to see if they are compelling. In addition, he asserts that this Court must inquire whether, in its judgment, there are alternatives to racial classifications which would suit Davis' purposes. Petitioner, on the other hand, states that our proper role is simply to accept petitioner's determination that the racial classifications used by its program are reasonably related to what it tells us are its benign

purposes. We reject petitioner's view, but, because our prior cases are in many respects inapposite to that before us now, we find it necessary to define with precision the meaning of that inexact term, "strict scrutiny."

Unquestionably we have held that a government practice or statute which restricts "fundamental rights" or which contains "suspect classifications" is to be subjected to "strict scrutiny" and can be justified only if it furthers a compelling government purpose and, even then, only if no less restrictive alternative is available.[30] See, e. g., San Antonio Independent School District v. Rodriguez, 411 U. S. 1, 16–17 (1973); Dunn v. Blumstein, 405 U. S. 330 (1972). But no fundamental right is involved here. See San Antonio, supra, at 29–36. Nor do whites as a class have any of the "traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." Id., at 28; see United States v. Carolene Products Co., 304 U. S. 144, 152 n. 4 (1938).[31]

Moreover, if the University's representations are credited, this is not a case where racial classifications are "irrelevant and therefore prohibited." Hirabayashi, supra, at 100. Nor has anyone suggested that the University's purposes contravene the cardinal principle that racial classifications that stigmatize— because they are drawn on the presumption that one race is inferior to another or because they put the weight of govern-

---

[30] We do not pause to debate whether our cases establish a "two-tier" analysis, a "sliding scale" analysis, or something else altogether. It is enough for present purposes that strict scrutiny is applied at least in some cases.

[31] Of course, the fact that whites constitute a political majority in our Nation does not necessarily mean that active judicial scrutiny of racial classifications that disadvantage whites is inappropriate. Cf. Castaneda v. Partida, 430 U. S. 482, 499–500 (1977); id., at 501 (MARSHALL, J., concurring).

ment behind racial hatred and separatism—are invalid without more. See *Yick Wo* v. *Hopkins,* 118 U. S. 356, 374 (1886); [32] accord, *Strauder* v. *West Virginia,* 100 U. S. 303, 308 (1880); *Korematsu* v. *United States, supra,* at 223; *Oyama* v. *California,* 332 U. S. 633, 663 (1948) (Murphy, J., concurring); *Brown I,* 347 U. S. 483 (1954); *McLaughlin* v. *Florida, supra,* at 191–192; *Loving* v. *Virginia, supra,* at 11–12; *Reitman* v. *Mulkey,* 387 U. S. 369, 375–376 (1967); *United Jewish Organizations* v. *Carey,* 430 U. S. 144, 165 (1977) (*UJO*) (opinion of WHITE, J., joined by REHNQUIST and STEVENS, JJ.); *id.,* at 169 (opinion concurring in part). [33]

On the other hand, the fact that this case does not fit neatly into our prior analytic framework for race cases does not mean that it should be analyzed by applying the very loose rational-basis standard of review that is the very least that is always applied in equal protection cases. [34] " '[T]he mere recitation of a benign, compensatory purpose is not an automatic shield

---

[32] "[T]he conclusion cannot be resisted, that no reason for [the refusal to issue permits to Chinese] exists except hostility to the race and nationality to which the petitioners belong . . . . The discrimination is, therefore, illegal . . . ."

[33] Indeed, even in *Plessy* v. *Ferguson* the Court recognized that a classification by race that presumed one race to be inferior to another would have to be condemned. See 163 U. S., at 544–551.

[34] Paradoxically, petitioner's argument is supported by the cases generally thought to establish the "strict scrutiny" standard in race cases, *Hirabayashi* v. *United States,* 320 U. S. 81 (1943), and *Korematsu* v. *United States,* 323 U. S. 214 (1944). In *Hirabayashi,* for example, the Court, responding to a claim that a racial classification was rational, sustained a racial classification solely on the basis of a conclusion in the double negative that it could not say that facts which might have been available "could afford no ground for differentiating citizens of Japanese ancestry from other groups in the United States." 320 U. S., at 101. A similar mode of analysis was followed in *Korematsu,* see 323 U. S., at 224, even though the Court stated there that racial classifications were "immediately suspect" and should be subject to "the most rigid scrutiny." *Id.,* at 216.

which protects against any inquiry into the actual purposes underlying a statutory scheme.' " *Califano* v. *Webster,* 430 U. S. 313, 317 (1977), quoting *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 648 (1975). Instead, a number of considerations—developed in gender-discrimination cases but which carry even more force when applied to racial classifications—lead us to conclude that racial classifications designed to further remedial purposes " 'must serve important governmental objectives and must be substantially related to achievement of those objectives.' " *Califano* v. *Webster, supra,* at 317, quoting *Craig* v. *Boren,* 429 U. S. 190, 197 (1976).[35]

---

[35] We disagree with our Brother POWELL's suggestion, *ante,* at 303, that the presence of "rival groups which can claim that they, too, are entitled to preferential treatment" distinguishes the gender cases or is relevant to the question of scope of judicial review of race classifications. We are not asked to determine whether groups other than those favored by the Davis program should similarly be favored. All we are asked to do is to pronounce the constitutionality of what Davis has done.

But, were we asked to decide whether any given rival group—German-Americans for example—must constitutionally be accorded preferential treatment, we do have a "'principled basis," *ante,* at 296, for deciding this question, one that is well established in our cases: The Davis program expressly sets out four classes which receive preferred status. *Ante,* at 274. The program clearly distinguishes whites, but one cannot reason from this a conclusion that German-Americans, as a national group, are singled out for invidious treatment. And even if the Davis program had a differential impact on German-Americans, they would have no constitutional claim unless they could prove that Davis intended invidiously to discriminate against German-Americans. See *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 264–265 (1977); *Washington* v. *Davis,* 426 U. S. 229, 238–241 (1976). If this could not be shown, then "the principle that calls for the closest scrutiny of distinctions in laws *denying* fundamental rights . . . is inapplicable," *Katzenbach* v. *Morgan,* 384 U. S. 641, 657 (1966), and the only question is whether it was rational for Davis to conclude that the groups it preferred had a greater claim to compensation than the groups it excluded. See *ibid.*; *San Antonio Independent School District* v. *Rodriguez,* 411 U. S. 1, 38–39 (1973) (applying *Katzenbach* test to state action intended to remove discrimination in edu-

First, race, like, "gender-based classifications too often [has] been inexcusably utilized to stereotype and stigmatize politically powerless segments of society." *Kahn* v. *Shevin,* 416 U. S. 351, 357 (1974) (dissenting opinion). While a carefully tailored statute designed to remedy past discrimination could avoid these vices, see *Califano* v. *Webster, supra; Schlesinger* v. *Ballard,* 419 U. S. 498 (1975); *Kahn* v. *Shevin, supra,* we nonetheless have recognized that the line between honest and thoughtful appraisal of the effects of past discrimination and paternalistic stereotyping is not so clear and that a statute based on the latter is patently capable of stigmatizing all women with a badge of inferiority. Cf. *Schlesinger* v. *Ballard, supra,* at 508; *UJO, supra,* at 174, and n. 3 (opinion concurring in part); *Califano* v. *Goldfarb,* 430 U. S. 199, 223 (1977) (STEVENS, J., concurring in judgment). See also *Stanton* v. *Stanton,* 421 U. S. 7, 14–15 (1975). State programs designed ostensibly to ameliorate the effects of past racial discrimination obviously create the same hazard of stigma, since they may promote racial separatism and reinforce the views of those who believe that members of racial minorities are inherently incapable of succeeding on their own. See *UJO, supra,* at 172 (opinion concurring in part); *ante,* at 298 (opinion of POWELL, J.).

Second, race, like gender and illegitimacy, see *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164 (1972), is an immutable characteristic which its possessors are powerless to escape or set aside. While a classification is not *per se* invalid because it divides classes on the basis of an immutable characteristic, see *supra,* at 355–356, it is nevertheless true that such divisions are contrary to our deep belief that "legal burdens should bear some relationship to individual responsibility or

cational opportunity). Thus, claims of rival groups, although they may create thorny political problems, create relatively simple problems for the courts.

wrongdoing," *Weber, supra,* at 175; *Frontiero* v. *Richardson,* 411 U. S. 677, 686 (1973) (opinion of BRENNAN, WHITE, and MARSHALL, JJ.), and that advancement sanctioned, sponsored, or approved by the State should ideally be based on individual merit or achievement, or at the least on factors within the control of an individual. See *UJO,* 430 U. S., at 173 (opinion concurring in part); *Kotch* v. *Board of River Port Pilot Comm'rs,* 330 U. S. 552, 566 (1947) (Rutledge, J., dissenting).

Because this principle is so deeply rooted it might be supposed that it would be considered in the legislative process and weighed against the benefits of programs preferring individuals because of their race. But this is not necessarily so: The "natural consequence of our governing processes [may well be] that the most 'discrete and insular' of whites . . . will be called upon to bear the immediate, direct costs of benign discrimination." *UJO, supra,* at 174 (opinion concurring in part). Moreover, it is clear from our cases that there are limits beyond which majorities may not go when they classify on the basis of immutable characteristics. See, *e. g., Weber, supra.* Thus, even if the concern for individualism is weighed by the political process, that weighing cannot waive the personal rights of individuals under the Fourteenth Amendment. See *Lucas* v. *Colorado General Assembly,* 377 U. S. 713, 736 (1964).

In sum, because of the significant risk that racial classifications established for ostensibly benign purposes can be misused, causing effects not unlike those created by invidious classifications, it is inappropriate to inquire only whether there is any conceivable basis that might sustain such a classification. Instead, to justify such a classification an important and articulated purpose for its use must be shown. In addition, any statute must be stricken that stigmatizes any group or that singles out those least well represented in the political process to bear the brunt of a benign program. Thus, our review under the Fourteenth Amendment should be

strict—not " 'strict' in theory and fatal in fact," [36] because it is stigma that causes fatality—but strict and searching nonetheless.

## IV

Davis' articulated purpose of remedying the effects of past societal discrimination is, under our cases, sufficiently important to justify the use of race-conscious admissions programs where there is a sound basis for concluding that minority underrepresentation is substantial and chronic, and that the handicap of past discrimination is impeding access of minorities to the Medical School.

## A

At least since *Green* v. *County School Board,* 391 U. S. 430 (1968), it has been clear that a public body which has itself been adjudged to have engaged in racial discrimination cannot bring itself into compliance with the Equal Protection Clause simply by ending its unlawful acts and adopting a neutral stance. Three years later, *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1 (1971), and its companion cases, *Davis* v. *School Comm'rs of Mobile County,* 402 U. S. 33 (1971); *McDaniel* v. *Barresi,* 402 U. S. 39 (1971); and *North Carolina Board of Education* v. *Swann,* 402 U. S. 43 (1971), reiterated that racially neutral remedies for past discrimination were inadequate where consequences of past discriminatory acts influence or control present decisions. See, *e. g., Charlotte-Mecklenburg, supra,* at 28. And the Court further held both that courts could enter desegregation orders which assigned students and faculty by reference to race, *Charlotte-Mecklenburg, supra; Davis, supra; United States* v. *Montgomery County Board of Ed.,* 395 U. S. 225 (1969), and that local school boards could *voluntarily* adopt desegregation

---

[36] Gunther, The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L. Rev. 1, 8 (1972).

plans which made express reference to race if this was necessary to remedy the effects of past discrimination. *McDaniel* v. *Barresi, supra.* Moreover, we stated that school boards, even in the absence of a judicial finding of past discrimination, could voluntarily adopt plans which assigned students with the end of creating racial pluralism by establishing fixed ratios of black and white students in each school. *Charlotte-Mecklenburg, supra,* at 16. In each instance, the creation of unitary school systems, in which the effects of past discrimination had been "eliminated root and branch," *Green, supra,* at 438, was recognized as a compelling social goal justifying the overt use of race.

Finally, the conclusion that state educational institutions may constitutionally adopt admissions programs designed to avoid exclusion of historically disadvantaged minorities, even when such programs explicitly take race into account, finds direct support in our cases construing congressional legislation designed to overcome the present effects of past discrimination. Congress can and has outlawed actions which have a disproportionately adverse and unjustified impact upon members of racial minorities and has required or authorized race-conscious action to put individuals disadvantaged by such impact in the position they otherwise might have enjoyed. See *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747 (1976); *Teamsters* v. *United States,* 431 U. S. 324 (1977). Such relief does not require as a predicate proof that recipients of preferential advancement have been individually discriminated against; it is enough that each recipient is within a general class of persons likely to have been the victims of discrimination. See *id.,* at 357–362. Nor is it an objection to such relief that preference for minorities will upset the settled expectations of nonminorities. See *Franks, supra.* In addition, we have held that Congress, to remove barriers to equal opportunity, can and has required employers to use test criteria that fairly reflect the qualifications of minority applicants

vis-à-vis nonminority applicants, even if this means interpreting the qualifications of an applicant in light of his race. See *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 435 (1975).[37]

These cases cannot be distinguished simply by the presence of judicial findings of discrimination, for race-conscious remedies have been approved where such findings have not been made. *McDaniel* v. *Barresi, supra; UJO;* see *Califano* v. *Webster,* 430 U. S. 313 (1977); *Schlesinger* v. *Ballard,* 419 U. S. 498 (1975); *Kahn* v. *Shevin,* 416 U. S. 351 (1974). See also *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966). Indeed, the requirement of a judicial determination of a constitutional or statutory violation as a predicate for race-conscious remedial actions would be self-defeating. Such a requirement would severely undermine efforts to achieve voluntary compliance with the requirements of law. And our society and jurisprudence have always stressed the value of voluntary efforts to further the objectives of the law. Judicial intervention is a last resort to achieve cessation of illegal conduct or the remedying of its effects rather than a prerequisite to action.[38]

---

[37] In *Albemarle,* we approved "differential validation" of employment tests. See 422 U. S., at 435. That procedure requires that an employer must ensure that a test score of, for example, 50 for a minority job applicant means the same thing as a score of 50 for a nonminority applicant. By implication, were it determined that a test score of 50 for a minority corresponded in "potential for employment" to a 60 for whites, the test could not be used consistently with Title VII unless the employer hired minorities with scores of 50 even though he might not hire nonminority applicants with scores above 50 but below 60. Thus, it is clear that employers, to ensure equal opportunity, may have to adopt race-conscious hiring practices.

[38] Indeed, Titles VI and VII of the Civil Rights Act of 1964 put great emphasis on voluntarism in remedial action. See *supra,* at 336–338. And, significantly, the Equal Employment Opportunity Commission has recently proposed guidelines authorizing employers to adopt racial preferences as a remedial measure where they have a reasonable basis for

Nor can our cases be distinguished on the ground that the entity using explicit racial classifications itself had violated § 1 of the Fourteenth Amendment or an antidiscrimination regulation, for again race-conscious remedies have been approved where this is not the case. See *UJO,* 430 U. S., at 157 (opinion of WHITE, J., joined by BRENNAN, BLACKMUN, and STEVENS, JJ.); [39] *id.,* at 167 (opinion of WHITE, J., joined by REHNQUIST and STEVENS, JJ.); [40] cf. *Califano* v. *Webster, supra,* at 317; *Kahn* v. *Shevin, supra.* Moreover, the presence or absence of past discrimination by universities or employers is largely irrelevant to resolving respondent's constitutional claims. The claims of those burdened by the race-conscious actions of a university or employer who has never been adjudged in violation of an antidiscrimination law are not any more or less entitled to deference than the claims of the burdened nonminority workers in *Franks* v. *Bowman Transportation Co., supra,* in which the employer had violated Title VII, for in each case the employees are innocent of past discrimination. And, although it might be argued that, where an employer has violated an antidiscrimination law, the expectations of non-minority workers are themselves products of discrimination and hence "tainted," see *Franks, supra,* at 776, and therefore more easily upset, the same argument can be made with respect to respondent. If it was reasonable to conclude—as we hold that it was—that the failure of minorities to qualify for admission at Davis under regular procedures was due principally to the effects of past discrimination, than there is a reasonable likelihood that, but for pervasive racial discrim-

---

believing that they might otherwise be held in violation of Title VII. See 42 Fed. Reg. 64826 (1977).

[39] "[T]he [Voting Rights] Act's prohibition . . . is not dependent upon proving past unconstitutional apportionments . . . ."

[40] "[T]he State is [not] powerless to minimize the consequences of racial discrimination by voters when it is regularly practiced at the polls."

ination, respondent would have failed to qualify for admission even in the absence of Davis' special admissions program.[41]

Thus, our cases under Title VII of the Civil Rights Act have held that, in order to achieve minority participation in previously segregated areas of public life, Congress may require or authorize preferential treatment for those likely disadvantaged by societal racial discrimination. Such legislation has been sustained even without a requirement of findings of intentional racial discrimination by those required or authorized to accord preferential treatment, or a case-by-case determination that those to be benefited suffered from racial discrimination. These decisions compel the conclusion that States also may adopt race-conscious programs designed to overcome substantial, chronic minority underrepresentation where there is reason to believe that the evil addressed is a product of past racial discrimination.[42]

---

[41] Our cases cannot be distinguished by suggesting, as our Brother POWELL does, that in none of them was anyone deprived of "the relevant benefit." *Ante,* at 304. Our school cases have deprived whites of the neighborhood school of their choice; our Title VII cases have deprived nondiscriminating employees of their settled seniority expectations; and *UJO* deprived the Hassidim of bloc-voting strength. Each of these injuries was constitutionally cognizable as is respondent's here.

[42] We do not understand MR. JUSTICE POWELL to disagree that providing a remedy for past racial prejudice can constitute a compelling purpose sufficient to meet strict scrutiny. See *ante,* at 305. Yet, because petitioner is a corporation administering a university, he would not allow it to exercise such power in the absence of "judicial, legislative, or administrative findings of constitutional or statutory violations." *Ante,* at 307. While we agree that reversal in this case would follow *a fortiori* had Davis been guilty of invidious racial discrimination or if a federal statute mandated that universities refrain from applying any admissions policy that had a disparate and unjustified racial impact, see, *e. g., McDaniel* v. *Barresi,* 402 U. S. 39 (1971); *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747 (1976), we do not think it of constitutional significance that Davis has not been so adjudged.

Generally, the manner in which a State chooses to delegate governmental functions is for it to decide. Cf. *Sweezy* v. *New Hampshire,* 354 U. S. 234,

Title VII was enacted pursuant to Congress' power under the Commerce Clause and § 5 of the Fourteenth Amendment. To the extent that Congress acted under the Commerce Clause power, it was restricted in the use of race in governmental decisionmaking by the equal protection component of the Due Process Clause of the Fifth Amendment precisely to the same extent as are the States by § 1 of the Fourteenth Amendment.[43] Therefore, to the extent that Title VII rests on the Commerce Clause power, our decisions such as *Franks* and

256 (1957) (Frankfurter, J., concurring in result). California, by constitutional provision, has chosen to place authority over the operation of the University of California in the Board of Regents. See Cal. Const., Art. 9, § 9 (a). Control over the University is to be found not in the legislature, but rather in the Regents who have been vested with full legislative (including policymaking), administrative, and adjudicative powers by the citizens of California. See *ibid.; Ishimatsu* v. *Regents,* 266 Cal. App. 2d 854, 863–864, 72 Cal. Rptr. 756, 762–763 (1968); *Goldberg* v. *Regents,* 248 Cal. App. 2d 867, 874, 57 Cal. Rptr. 463, 468 (1967); 30 Op. Cal. Atty. Gen. 162, 166 (1957) ("The Regents, not the legislature, have the general rule-making or policy-making power in regard to the University"). This is certainly a permissible choice, see *Sweezy, supra,* and we, unlike our Brother POWELL, find nothing in the Equal Protection Clause that requires us to depart from established principle by limiting the scope of power the Regents may exercise more narrowly than the powers that may constitutionally be wielded by the Assembly.

Because the Regents can exercise plenary legislative and administrative power, it elevates form over substance to insist that Davis could not use race-conscious remedial programs until it had been adjudged in violation of the Constitution or an antidiscrimination statute. For, if the Equal Protection Clause required such a violation as a predicate, the Regents could simply have promulgated a regulation prohibiting disparate treatment not justified by the need to admit only qualified students, and could have declared Davis to have been in violation of such a regulation on the basis of the exclusionary effect of the admissions policy applied during the first two years of its operation. See *infra,* at 370.

[43] "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley* v. *Valeo,* 424 U. S. 1, 93 (1976) (*per curiam*), citing *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 638 n. 2 (1975).

*Teamsters* v. *United States*, 431 U. S. 324 (1977), implicitly recognize that the affirmative use of race is consistent with the equal protection component of the Fifth Amendment and therefore with the Fourteenth Amendment. To the extent that Congress acted pursuant to § 5 of the Fourteenth Amendment, those cases impliedly recognize that Congress was empowered under that provision to accord preferential treatment to victims of past discrimination in order to overcome the effects of segregation, and we see no reason to conclude that the States cannot voluntarily accomplish under § 1 of the Fourteenth Amendment what Congress under § 5 of the Fourteenth Amendment validly may authorize or compel either the States or private persons to do. A contrary position would conflict with the traditional understanding recognizing the competence of the States to initiate measures consistent with federal policy in the absence of congressional pre-emption of the subject matter. Nothing whatever in the legislative history of either the Fourteenth Amendment or the Civil Rights Acts even remotely suggests that the States are foreclosed from furthering the fundamental purpose of equal opportunity to which the Amendment and those Acts are addressed. Indeed, voluntary initiatives by the States to achieve the national goal of equal opportunity have been recognized to be essential to its attainment. "To use the Fourteenth Amendment as a sword against such State power would stultify that Amendment." *Railway Mail Assn.* v. *Corsi,* 326 U. S. 88, 98 (1945) (Frankfurter, J., concurring).[44] We there-

---

[44] *Railway Mail Assn.* held that a state statute forbidding racial discrimination by certain labor organizations did not abridge the Association's due process rights secured by the Fourteenth Amendment because that result "would be a distortion of the policy manifested in that amendment, which was adopted to prevent state legislation designed to perpetuate discrimination on the basis of race or color." 326 U. S., at 94. That case thus established the principle that a State voluntarily could go beyond what the Fourteenth Amendment required in eliminating private racial discrimination.

fore conclude that Davis' goal of admitting minority students disadvantaged by the effects of past discrimination is sufficiently important to justify use of race-conscious admissions criteria.

## B

Properly construed, therefore, our prior cases unequivocally show that a state government may adopt race-conscious programs if the purpose of such programs is to remove the disparate racial impact its actions might otherwise have and if there is reason to believe that the disparate impact is itself the product of past discrimination, whether its own or that of society at large. There is no question that Davis' program is valid under this test.

Certainly, on the basis of the undisputed factual submissions before this Court, Davis had a sound basis for believing that the problem of underrepresentation of minorities was substantial and chronic and that the problem was attributable to handicaps imposed on minority applicants by past and present racial discrimination. Until at least 1973, the practice of medicine in this country was, in fact, if not in law, largely the prerogative of whites.[45] In 1950, for example, while Negroes

---

[45] According to 89 schools responding to a questionnaire sent to 112 medical schools (all of the then-accredited medical schools in the United States except Howard and Meharry), substantial efforts to admit minority students did not begin until 1968. That year was the earliest year of involvement for 34% of the schools; an additional 66% became involved during the years 1969 to 1973. See C. Odegaard, Minorities in Medicine: From Receptive Passivity to Positive Action, 1966–1976, p. 19 (1977) (hereinafter Odegaard). These efforts were reflected in a significant increase in the percentage of minority M. D. graduates. The number of American Negro graduates increased from 2.2% in 1970 to 3.3% in 1973 and 5.0% in 1975. Significant percentage increases in the number of Mexican-American, American Indian, and mainland Puerto Rican graduates were also recorded during those years. Id., at 40.

The statistical information cited in this and the following notes was compiled by Government officials or medical educators, and has been

constituted 10% of the total population, Negro physicians constituted only 2.2% of the total number of physicians.[46] The overwhelming majority of these, moreover, were educated in two predominantly Negro medical schools, Howard and Meharry.[47] By 1970, the gap between the proportion of Negroes in medicine and their proportion in the population had widened: The number of Negroes employed in medicine remained frozen at 2.2% [48] while the Negro population had increased to 11.1%.[49] The number of Negro admittees to predominantly white medical schools, moreover, had declined in absolute numbers during the years 1955 to 1964. Odegaard 19.

Moreover, Davis had very good reason to believe that the national pattern of underrepresentation of minorities in medicine would be perpetuated if it retained a single admissions standard. For example, the entering classes in 1968 and 1969, the years in which such a standard was used, included only 1 Chicano and 2 Negroes out of the 50 admittees for each year. Nor is there any relief from this pattern of underrepresentation in the statistics for the regular admissions program in later years.[50]

Davis clearly could conclude that the serious and persistent underrepresentation of minorities in medicine depicted by these statistics is the result of handicaps under which minority applicants labor as a consequence of a background of deliberate, purposeful discrimination against minorities in education

---

brought to our attention in many of the briefs. Neither the parties nor the *amici* challenge the validity of the statistics alluded to in our discussion.

[46] D. Reitzes, Negroes and Medicine, pp. xxvii, 3 (1958).

[47] Between 1955 and 1964, for example, the percentage of Negro physicians graduated in the United States who were trained at these schools ranged from 69.0% to 75.8%. See Odegaard 19.

[48] U. S. Dept. of Health, Education, and Welfare, Minorities and Women in the Health Fields 7 (Pub. No. (HRA) 75–22, May 1974).

[49] U. S. Dept. of Commerce, Bureau of the Census, 1970 Census, vol. 1, pt. 1, Table 60 (1973).

[50] See *ante*, at 276 n. 6 (opinion of POWELL, J.).

and in society generally, as well as in the medical profession. From the inception of our national life, Negroes have been subjected to unique legal disabilities impairing access to equal educational opportunity. Under slavery, penal sanctions were imposed upon anyone attempting to educate Negroes.[51] After enactment of the Fourteenth Amendment the States continued to deny Negroes equal educational opportunity, enforcing a strict policy of segregation that itself stamped Negroes as inferior, *Brown I*, 347 U. S. 483 (1954), that relegated minorities to inferior educational institutions,[52] and that denied them intercourse in the mainstream of professional life necessary to advancement. See *Sweatt* v. *Painter*, 339 U. S. 629 (1950). Segregation was not limited to public facilities, moreover, but was enforced by criminal penalties against private action as well. Thus, as late as 1908, this Court enforced a state criminal conviction against a private college for teaching Negroes together with whites. *Berea College* v. *Kentucky*, 211 U. S. 45. See also *Plessy* v. *Ferguson*, 163 U. S. 537 (1896).

*Green* v. *County School Board*, 391 U. S. 430 (1968), gave explicit recognition to the fact that the habit of discrimination and the cultural tradition of race prejudice cultivated by centuries of legal slavery and segregation were not immediately dissipated when *Brown I, supra*, announced the constitutional principle that equal educational opportunity and participation in all aspects of American life could not be denied on the basis of race. Rather, massive official and private resistance prevented, and to a lesser extent still prevents, attainment of equal opportunity in education at all levels and in the professions. The generation of minority students applying to Davis Medical School since it opened in 1968—most of whom

---

[51] See, *e. g.*, R. Wade, Slavery in the Cities: The South 1820–1860, pp. 90–91 (1964).

[52] For an example of unequal facilities in California schools, see *Soria* v. *Oxnard School Dist. Board*, 386 F. Supp. 539, 542 (CD Cal. 1974). See also R. Kluger, Simple Justice (1976).

were born before or about the time *Brown I* was decided—clearly have been victims of this discrimination. Judicial decrees recognizing discrimination in public education in California testify to the fact of widespread discrimination suffered by California-born minority applicants;[53] many minority group members living in California, moreover, were born and reared in school districts in Southern States segregated by law.[54] Since separation of schoolchildren by race "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone," *Brown I, supra,* at 494, the conclusion is inescapable that applicants to medical school must be few indeed who endured the effects of *de jure* segregation, the resistance to *Brown I,* or the equally debilitating pervasive private discrimination fostered by our long history of official discrimination, cf. *Reitman* v. *Mulkey,* 387 U. S. 369 (1967), and yet come to the starting line with an education equal to whites.[55]

Moreover, we need not rest solely on our own conclusion that Davis had sound reason to believe that the effects of past discrimination were handicapping minority applicants to the Medical School, because the Department of Health, Education, and Welfare, the expert agency charged by Congress with promulgating regulations enforcing Title VI of the Civil Rights Act of 1964, see *supra,* at 341–343, has also reached the conclusion that race may be taken into account in situations

---

[53] See, *e. g., Crawford* v. *Board of Education,* 17 Cal. 3d 280, 551 P. 2d 28 (1976); *Soria* v. *Oxnard School Dist. Board, supra; Spangler* v. *Pasadena City Board of Education,* 311 F. Supp. 501 (CD Cal. 1970); C. Wollenberg, All Deliberate Speed: Segregation and Exclusion in California Schools, 1855–1975, pp. 136–177 (1976).

[54] For example, over 40% of American-born Negro males aged 20 to 24 residing in California in 1970 were born in the South, and the statistic for females was over 48%. These statistics were computed from data contained in Census, *supra* n. 49, pt. 6, California, Tables 139, 140.

[55] See, *e. g.,* O'Neil, Preferential Admissions: Equalizing the Access of Minority Groups to Higher Education, 80 Yale L. J. 699, 729–731 (1971).

where a failure to do so would limit participation by minorities in federally funded programs, and regulations promulgated by the Department expressly contemplate that appropriate race-conscious programs may be adopted by universities to remedy unequal access to university programs caused by their own or by past societal discrimination. See *supra*, at 344–345, discussing 45 CFR §§ 80.3 (b)(6)(ii) and 80.5 (j) (1977). It cannot be questioned that, in the absence of the special admissions program, access of minority students to the Medical School would be severely limited and, accordingly, race-conscious admissions would be deemed an appropriate response under these federal regulations. Moreover, the Department's regulatory policy is not one that has gone unnoticed by Congress. See *supra*, at 346–347. Indeed, although an amendment to an appropriations bill was introduced just last year that would have prevented the Secretary of Health, Education, and Welfare from mandating race-conscious programs in university admissions, proponents of this measure, significantly, did not question the validity of voluntary implementation of race-conscious admissions criteria. See *ibid*. In these circumstances, the conclusion implicit in the regulations—that the lingering effects of past discrimination continue to make race-conscious remedial programs appropriate means for ensuring equal educational opportunity in universities—deserves considerable judicial deference. See, *e. g., Katzenbach* v. *Morgan*, 384 U. S. 641 (1966); *UJO*, 430 U. S., at 175–178 (opinion concurring in part).[56]

## C

The second prong of our test—whether the Davis program stigmatizes any discrete group or individual and whether race

---

[56] Congress and the Executive have also adopted a series of race-conscious programs, each predicated on an understanding that equal opportunity cannot be achieved by neutrality because of the effects of past and present discrimination. See *supra*, at 348–349.

is reasonably used in light of the program's objectives—is clearly satisfied by the Davis program.

It is not even claimed that Davis' program in any way operates to stigmatize or single out any discrete and insular, or even any identifiable, nonminority group. Nor will harm comparable to that imposed upon racial minorities by exclusion or separation on grounds of race be the likely result of the program. It does not, for example, establish an exclusive preserve for minority students apart from and exclusive of whites. Rather, its purpose is to overcome the effects of segregation by bringing the races together. True, whites are excluded from participation in the special admissions program, but this fact only operates to reduce the number of whites to be admitted in the regular admissions program in order to permit admission of a reasonable percentage—less than their proportion of the California population [57]—of otherwise underrepresented qualified minority applicants.[58]

---

[57] Negroes and Chicanos alone constitute approximately 22% of California's population. This percentage was computed from data contained in Census, *supra* n. 49, pt. 6, California, sec. 1, 6–4, and Table 139.

[58] The constitutionality of the special admissions program is buttressed by its restriction to only 16% of the positions in the Medical School, a percentage less than that of the minority population in California, see *ibid.*, and to those minority applicants deemed qualified for admission and deemed likely to contribute to the Medical School and the medical profession. Record 67. This is consistent with the goal of putting minority applicants in the position they would have been in if not for the evil of racial discrimination. Accordingly, this case does not raise the question whether even a remedial use of race would be unconstitutional if it admitted unqualified minority applicants in preference to qualified applicants or admitted, as a result of preferential consideration, racial minorities in numbers significantly in excess of their proportional representation in the relevant population. Such programs might well be inadequately justified by the legitimate remedial objectives. Our allusion to the proportional percentage of minorities in the population of the State administering the program is not intended to establish either that figure or that population universe as a constitutional benchmark. In this case,

Nor was Bakke in any sense stamped as inferior by the Medical School's rejection of him. Indeed, it is conceded by all that he satisfied those criteria regarded by the school as generally relevant to academic performance better than most of the minority members who were admitted. Moreover, there is absolutely no basis for concluding that Bakke's rejection as a result of Davis' use of racial preference will affect him throughout his life in the same way as the segregation of the Negro schoolchildren in *Brown I* would have affected them. Unlike discrimination against racial minorities, the use of racial preferences for remedial purposes does not inflict a pervasive injury upon individual whites in the sense that wherever they go or whatever they do there is a significant likelihood that they will be treated as second-class citizens because of their color. This distinction does not mean that the exclusion of a white resulting from the preferential use of race is not sufficiently serious to require justification; but it does mean that the injury inflicted by such a policy is not distinguishable from disadvantages caused by a wide range of government actions, none of which has ever been thought impermissible for that reason alone.

In addition, there is simply no evidence that the Davis program discriminates intentionally or unintentionally against any minority group which it purports to benefit. The program does not establish a quota in the invidious sense of a ceiling on the number of minority applicants to be admitted. Nor can the program reasonably be regarded as stigmatizing the program's beneficiaries or their race as inferior. The Davis program does not simply advance less qualified applicants; rather, it compensates applicants, who it is uncontested are fully qualified to study medicine, for educational disadvantages which it was reasonable to conclude were a product of

even respondent, as we understand him, does not argue that, if the special admissions program is otherwise constitutional, the allotment of 16 places in each entering class for special admittees is unconstitutionally high.

state-fostered discrimination. Once admitted, these students must satisfy the same degree requirements as regularly admitted students; they are taught by the same faculty in the same classes; and their performance is evaluated by the same standards by which regularly admitted students are judged. Under these circumstances, their performance and degrees must be regarded equally with the regularly admitted students with whom they compete for standing. Since minority graduates cannot justifiably be regarded as less well qualified than nonminority graduates by virtue of the special admissions program, there is no reasonable basis to conclude that minority graduates at schools using such programs would be stigmatized as inferior by the existence of such programs.

## D

We disagree with the lower courts' conclusion that the Davis program's use of race was unreasonable in light of its objectives. First, as petitioner argues, there are no practical means by which it could achieve its ends in the foreseeable future without the use of race-conscious measures. With respect to any factor (such as poverty or family educational background) that may be used as a substitute for race as an indicator of past discrimination, whites greatly outnumber racial minorities simply because whites make up a far larger percentage of the total population and therefore far outnumber minorities in absolute terms at every socioeconomic level.[59] For example, of a class of recent medical school applicants from families with less than $10,000 income, at least 71% were white.[60] Of all 1970 families headed by a

---

[59] See Census, *supra* n. 49, Sources and Structure of Family Income, pp. 1–12.

[60] This percentage was computed from data presented in B. Waldman, Economic and Racial Disadvantage as Reflected in Traditional Medical School Selection Factors: A Study of 1976 Applicants to U. S. Medical Schools 34 (Table A–15), 42 (Table A–23) (Association of American Medical Colleges 1977).

person *not* a high school graduate which included related children under 18, 80% were white and 20% were racial minorities.[61] Moreover, while race is positively correlated with differences in GPA and MCAT scores, economic disadvantage is not. Thus, it appears that economically disadvantaged whites do not score less well than economically advantaged whites, while economically advantaged blacks score less well than do disadvantaged whites.[62] These statistics graphically illustrate that the University's purpose to integrate its classes by compensating for past discrimination could not be achieved by a general preference for the economically disadvantaged or the children of parents of limited education unless such groups were to make up the entire class.

Second, the Davis admissions program does not simply equate minority status with disadvantage. Rather, Davis considers on an individual basis each applicant's personal history to determine whether he or she has likely been disadvantaged by racial discrimination. The record makes clear that only minority applicants likely to have been isolated from the mainstream of American life are considered in the special program; other minority applicants are eligible only through the regular admissions program. True, the procedure by which disadvantage is detected is informal, but we have never insisted that educators conduct their affairs through adjudicatory proceedings, and such insistence here is misplaced. A case-by-case inquiry into the extent to which each individual applicant has been affected, either directly or indirectly, by racial discrimination, would seem to be, as a practical matter, virtually impossible, despite the fact that there are excellent reasons for concluding that such effects generally exist. When individual measurement is impossible or extremely impractical, there is nothing to prevent a State

---

[61] This figure was computed from data contained in Census, *supra* n. 49, pt. 1, United States Summary, Table 209.

[62] See Waldman, *supra* n. 60, at 10–14 (Figures 1–5).

from using categorical means to achieve its ends, at least where the category is closely related to the goal. Cf. *Gaston County* v. *United States,* 395 U. S. 285, 295–296 (1969); *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966). And it is clear from our cases that specific proof that a person has been victimized by discrimination is not a necessary predicate to offering him relief where the probability of victimization is great. See *Teamsters* v. *United States,* 431 U. S. 324 (1977).

E

Finally, Davis' special admissions program cannot be said to violate the Constitution simply because it has set aside a predetermined number of places for qualified minority applicants rather than using minority status as a positive factor to be considered in evaluating the applications of disadvantaged minority applicants. For purposes of constitutional adjudication, there is no difference between the two approaches. In any admissions program which accords special consideration to disadvantaged racial minorities, a determination of the degree of preference to be given is unavoidable, and any given preference that results in the exclusion of a white candidate is no more or less constitutionally acceptable than a program such as that at Davis. Furthermore, the extent of the preference inevitably depends on how many minority applicants the particular school is seeking to admit in any particular year so long as the number of qualified minority applicants exceeds that number. There is no sensible, and certainly no constitutional, distinction between, for example, adding a set number of points to the admissions rating of disadvantaged minority applicants as an expression of the preference with the expectation that this will result in the admission of an approximately determined number of qualified minority applicants and setting a fixed number of places for such applicants as was done here.[63]

---

[63] The excluded white applicant, despite MR. JUSTICE POWELL's conten-

The "Harvard" program, see *ante,* at 316–318, as those employing it readily concede, openly and successfully employs a racial criterion for the purpose of ensuring that some of the scarce places in institutions of higher education are allocated to disadvantaged minority students. That the Harvard approach does not also make public the extent of the preference and the precise workings of the system while the Davis program employs a specific, openly stated number, does not condemn the latter plan for purposes of Fourteenth Amendment adjudication. It may be that the Harvard plan is more acceptable to the public than is the Davis "quota." If it is, any State, including California, is free to adopt it in preference to a less acceptable alternative, just as it is generally free, as far as the Constitution is concerned, to abjure granting any racial preferences in its admissions program. But there is no basis for preferring a particular preference program simply because in achieving the same goals that the Davis Medical School is pursuing, it proceeds in a manner that is not immediately apparent to the public.

## V

Accordingly, we would reverse the judgment of the Supreme Court of California holding the Medical School's special admissions program unconstitutional and directing respondent's admission, as well as that portion of the judgment enjoining the Medical School from according any consideration to race in the admissions process.

Mr. Justice White.

I write separately concerning the question of whether Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d *et seq.,* provides for a private cause of action. Four Justices are apparently of the view that such a private cause of action

tion to the contrary, *ante,* at 318 n. 52, receives no more or less "individualized consideration" under our approach than under his.

exists, and four Justices assume it for purposes of this case. I am unwilling merely to assume an affirmative answer. If in fact no private cause of action exists, this Court and the lower courts as well are without jurisdiction to consider respondent's Title VI claim. As I see it, if we are not obliged to do so, it is at least advisable to address this threshold jurisdictional issue. See *United States* v. *Griffin,* 303 U. S. 226, 229 (1938).[1] Furthermore, just as it is inappropriate to address constitutional issues without determining whether statutory grounds urged before us are dispositive, it is at least questionable practice to adjudicate a novel and difficult statutory issue without first considering whether we have jurisdiction to decide it. Consequently, I address the question of whether respondent may bring suit under Title VI.

A private cause of action under Title VI, in terms both of

---

[1] It is also clear from *Griffin* that "lack of jurisdiction . . . touching the subject matter of the litigation cannot be waived by the parties . . . ." 303 U. S., at 229. See also *Mount Healthy City Bd. of Ed.* v. *Doyle,* 429 U. S. 274, 278 (1977); *Louisville & Nashville R. Co.* v. *Mottley,* 211 U. S. 149, 152 (1908); *Mansfield, C. & L. M. R. Co.* v. *Swan,* 111 U. S. 379, 382 (1884).

In *Lau* v. *Nichols,* 414 U. S. 563 (1974), we did adjudicate a Title VI claim brought by a class of individuals. But the existence of a private cause of action was not at issue. In addition, the understanding of MR. JUSTICE STEWART's concurring opinion, which observed that standing was not being contested, was that the standing alleged by petitioners was as third-party beneficiaries of the funding contract between the Department of Health, Education, and Welfare and the San Francisco United School District, a theory not alleged by the present respondent. *Id.,* at 571 n. 2. Furthermore, the plaintiffs in *Lau* alleged jurisdiction under 42 U. S. C. § 1983 rather than directly under the provisions of Title VI, as does the plaintiff in this case. Although the Court undoubtedly had an obligation to consider the jurisdictional question, this is surely not the first instance in which the Court has bypassed a jurisdictional problem not presented by the parties. Certainly the Court's silence on the jurisdictional question, when considered in the context of the indifference of the litigants to it and the fact that jurisdiction was alleged under § 1983, does not foreclose a reasoned conclusion that Title VI affords no private cause of action.

the Civil Rights Act as a whole and that Title, would not be "consistent with the underlying purposes of the legislative scheme" and would be contrary to the legislative intent. *Cort v. Ash,* 422 U. S. 66, 78 (1975). Title II, 42 U. S. C. § 2000a *et seq.,* dealing with public accommodations, and Title VII, 42 U. S. C. § 2000e *et seq.* (1970 ed. and Supp. V), dealing with employment, proscribe private discriminatory conduct that as of 1964 neither the Constitution nor other federal statutes had been construed to forbid. Both Titles carefully provided for private actions as well as for official participation in enforcement. Title III, 42 U. S. C. § 2000b *et seq.,* and Title IV, 42 U. S. C. § 2000c *et seq.* (1970 ed. and Supp. V), dealing with public facilities and public education, respectively, authorize suits by the Attorney General to eliminate racial discrimination in these areas. Because suits to end discrimination in public facilities and public education were already available under 42 U. S. C. § 1983, it was, of course, unnecessary to provide for private actions under Titles III and IV. But each Title carefully provided that its provisions for public actions would not adversely affect pre-existing private remedies. §§ 2000b–2 and 2000c–8.

The role of Title VI was to terminate federal financial support for public and private institutions or programs that discriminated on the basis of race. Section 601, 42 U. S. C. § 2000d, imposed the proscription that no person, on the grounds of race, color, or national origin, was to be excluded from or discriminated against under any program or activity receiving federal financial assistance. But there is no express provision for private actions to enforce Title VI, and it would be quite incredible if Congress, after so carefully attending to the matter of private actions in other Titles of the Act, intended silently to create a private cause of action to enforce Title VI.

It is also evident from the face of § 602, 42 U. S. C. § 2000d–1, that Congress intended the departments and agen-

cies to define and to refine, by rule or regulation, the general proscription of § 601, subject only to judicial review of agency action in accordance with established procedures. Section 602 provides for enforcement: Every federal department or agency furnishing financial support is to implement the proscription by appropriate rule or regulation, each of which requires approval by the President. Termination of funding as a sanction for noncompliance is authorized, but *only* after a hearing and after the failure of voluntary means to secure compliance. Moreover, termination may not take place until the department or agency involved files with the appropriate committees of the House and Senate a full written report of the circumstances and the grounds for such action and 30 days have elapsed thereafter. Judicial review was provided, at least for actions terminating financial assistance.

Termination of funding was regarded by Congress as a serious enforcement step, and the legislative history is replete with assurances that it would not occur until every possibility for conciliation had been exhausted.[2] To allow a private

---

[2] "Yet, before that principle [that 'Federal funds are not to be used to support racial discrimination'] is implemented to the detriment of any person, agency, or State, regulations giving notice of what conduct is required must be drawn up by the agency administering the program. . . . Before such regulations become effective, they must be submitted to and approved by the President.

"Once having become effective, there is still a long road to travel before any sanction whatsoever is imposed. Formal action to compel compliance can only take place after the following has occurred: first, there must be an unsuccessful attempt to obtain voluntary compliance; second, there must be an administrative hearing; third, a written report of the circumstances and the grounds for such action must be filed with the appropriate committees of the House and Senate; and fourth, 30 days must have elapsed between such filing and the action denying benefits under a Federal program. Finally, even that action is by no means final because it is subject to judicial review and can be further postponed by judicial action granting temporary relief pending review in order to avoid irreparable injury. It would be difficult indeed to concoct any additional safe-

individual to sue to cut off funds under Title VI would compromise these assurances and short circuit the procedural preconditions provided in Title VI. If the Federal Government may not cut off funds except pursuant to an agency rule, approved by the President, and presented to the appropriate committee of Congress for a layover period, and after voluntary means to achieve compliance have failed, it is inconceivable that Congress intended to permit individuals to circumvent these administrative prerequisites themselves.

Furthermore, although Congress intended Title VI to end federal financial support for racially discriminatory policies of not only public but also private institutions and programs, it is extremely unlikely that Congress, without a word indicating that it intended to do so, contemplated creating an independent, private statutory cause of action against all private as well as public agencies that might be in violation of the section. There is no doubt that Congress regarded private litigation as an important tool to attack discriminatory practices. It does not at all follow, however, that Congress anticipated new private actions under Title VI itself. Wherever a discriminatory program was a public undertaking, such as a public school, private remedies were already available under other statutes, and a private remedy under Title VI was

guards to incorporate in such a procedure." 110 Cong. Rec. 6749 (1964) (Sen. Moss).

"[T]he authority to cut off funds is hedged about with a number of procedural restrictions. . . . [There follow details of the preliminary steps.]

"In short, title VI is a reasonable, moderate, cautious, carefully worked out solution to a situation that clearly calls for legislative action." *Id.*, at 6544 (Sen. Humphrey). "Actually, *no action whatsoever* can be taken against anyone until the Federal agency involved has advised the appropriate person of his failure to comply with nondiscrimination requirements and until voluntary efforts to secure compliance have failed." *Id.*, at 1519 (Rep. Celler) (emphasis added). See also remarks of Sen. Ribicoff (*id.*, at 7066–7067); Sen. Proxmire (*id.*, at 8345); Sen. Kuchel (*id.*, at 6562). These safeguards were incorporated into 42 U. S. C. § 2000d–1.

unnecessary. Congress was well aware of this fact. Significantly, there was frequent reference to *Simkins* v. *Moses H. Cone Memorial Hospital,* 323 F. 2d 959 (CA4 1963), cert. denied, 376 U. S. 938 (1964), throughout the congressional deliberations. See, *e. g.,* 110 Cong. Rec. 6544 (1964) (Sen. Humphrey). *Simkins* held that under appropriate circumstances, the operation of a private hospital with "massive use of public funds and extensive state-federal sharing in the common plan" constituted "state action" for the purposes of the Fourteenth Amendment. 323 F. 2d, at 967. It was unnecessary, of course, to create a Title VI private action against private discriminators where they were already within the reach of existing private remedies. But when they were not—and *Simkins* carefully disclaimed holding that "every subvention by the federal or state government automatically involves the beneficiary in 'state action,' " *ibid.*[3]—it is difficult

[3] This Court has never held that the mere receipt of federal or state funds is sufficient to make the recipient a federal or state actor. In *Norwood* v. *Harrison,* 413 U. S. 455 (1973), private schools that received state aid were held subject to the Fourteenth Amendment's ban on discrimination, but the Court's test required "tangible financial aid" with a "significant tendency to facilitate, reinforce, and support private discrimination." *Id.,* at 466. The mandate of *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, 722 (1961), to sift facts and weigh circumstances of governmental support in each case to determine whether private or state action was involved, has not been abandoned for an automatic rule based on receipt of funds.

Contemporaneous with the congressional debates on the Civil Rights Act was this Court's decision in *Griffin* v. *School Board,* 377 U. S. 218 (1964). Tuition grants and tax concessions were provided for parents of students in private schools, which discriminated racially. The Court found sufficient state action, but carefully limited its holding to the circumstances presented: "[C]losing the Prince Edward schools and meanwhile contributing to the support of the private segregated white schools that took their place denied petitioners the equal protection of the laws." *Id.,* at 232.

Hence, neither at the time of the enactment of Title VI, nor at the present time to the extent this Court has spoken, has mere receipt of

to believe that Congress *silently* created a *private* remedy to terminate conduct that previously had been entirely beyond the reach of federal law.

For those who believe, contrary to my views, that Title VI was intended to create a stricter standard of color blindness than the Constitution itself requires, the result of no private cause of action follows even more readily. In that case Congress must be seen to have banned degrees of discrimination, as well as types of discriminators, not previously reached by law. A Congress careful enough to provide that existing private causes of action would be preserved (in Titles III and IV) would not leave for inference a vast new extension of private enforcement power. And a Congress so exceptionally concerned with the satisfaction of procedural preliminaries before confronting fund recipients with the choice of a cutoff or of stopping discriminating would not permit private parties to pose precisely that same dilemma in a greatly widened category of cases with no procedural requirements whatsoever.

Significantly, in at least three instances legislators who played a major role in the passage of Title VI explicitly stated that a private right of action under Title VI does not exist.[4]

---

state funds created state action. Moreover, *Simkins* has not met with universal approval among the United States Courts of Appeals. See cases cited in *Greco* v. *Orange Memorial Hospital Corp.*, 423 U. S. 1000, 1004 (1975) (WHITE, J., dissenting from denial of certiorari).

[4] "Nowhere in this section do you find a comparable right of legal action for a person who feels he has been denied his rights to participate in the benefits of Federal funds. Nowhere. Only those who have been cut off can go to court and present their claim." 110 Cong. Rec. 2467 (1964) (Rep. Gill).

"[A] good case could be made that a remedy is provided for the State or local official who is practicing discrimination, but none is provided for the victim of the discrimination." *Id.*, at 6562 (Sen. Kuchel).

"Parenthetically, while we favored the inclusion of the right to sue on the part of the agency, the State, or the facility which was deprived of

As an "indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one," *Cort* v. *Ash,* 422 U. S., at 78, clearer statements cannot be imagined, and under *Cort,* "an explicit purpose to *deny* such cause of action [is] controlling." *Id.,* at 82. Senator Keating, for example, proposed a private "right to sue" for the "person suffering from discrimination"; but the Department of Justice refused to include it, and the Senator acquiesced.[5] These are not neutral, ambiguous statements. They indicate the absence of a legislative intent to create a private remedy. Nor do any of these statements make nice distinctions between a private cause of action to enjoin discrimination and one to cut off funds, as MR. JUSTICE STEVENS and the three Justices who join his opinion apparently would. See *post,* at 419–420, n. 26. Indeed, it would be odd if they did, since the practical effect of either type of private cause of action would be identical. If private suits to enjoin conduct allegedly violative of § 601 were permitted, recipients of federal funds would be presented with the choice of either ending what the court, rather than the agency, determined to be a discriminatory practice within the meaning of Title VI or refusing federal funds and thereby escaping from the statute's jurisdictional predicate.[6] This is precisely the same choice as would confront recipients if suit were brought to cut off funds. Both types of actions would equally jeopardize the administrative processes so carefully structured into the law.

---

Federal funds, we also favored the inclusion of a provision granting the right to sue to the person suffering from discrimination. This was not included in the bill. However, both the Senator from Connecticut and I are grateful that our other suggestions were adopted by the Justice Department." *Id.,* at 7065 (Sen. Keating).

[5] *Ibid.*

[6] As Senator Ribicoff stated: "Sometimes those eligible for Federal assistance may elect to reject such aid, unwilling to agree to a nondiscrimination requirement. If they choose that course, the responsibility is theirs." *Id.,* at 7067.

This Court has always required "that the inference of such a private cause of action not otherwise authorized by the statute must be consistent with the evident legislative intent and, of course, with the effectuation of the purposes intended to be served by the Act." *National Railroad Passenger Corp.* v. *National Association of Railroad Passengers,* 414 U. S. 453, 458 (1974). See also *Securities Investor Protection Corp.* v. *Barbour,* 421 U. S. 412, 418–420 (1975). A private cause of action under Title VI is unable to satisfy either prong of this test.

Because each of my colleagues either has a different view or assumes a private cause of action, however, the merits of the Title VI issue must be addressed. My views in that regard, as well as my views with respect to the equal protection issue, are included in the joint opinion that my Brothers BRENNAN, MARSHALL, and BLACKMUN and I have filed.[7]

MR. JUSTICE MARSHALL.

I agree with the judgment of the Court only insofar as it permits a university to consider the race of an applicant in making admissions decisions. I do not agree that petitioner's admissions program violates the Constitution. For it must be remembered that, during most of the past 200 years, the Constitution as interpreted by this Court did not prohibit the most ingenious and pervasive forms of discrimination against the Negro. Now, when a State acts to remedy the effects of that legacy of discrimination, I cannot believe that this same Constitution stands as a barrier.

I

A

Three hundred and fifty years ago, the Negro was dragged to this country in chains to be sold into slavery. Uprooted from his homeland and thrust into bondage for forced labor,

---

[7] I also join Parts I, III–A, and V–C of MR. JUSTICE POWELL's opinion.

the slave was deprived of all legal rights. It was unlawful to teach him to read; he could be sold away from his family and friends at the whim of his master; and killing or maiming him was not a crime. The system of slavery brutalized and dehumanized both master and slave.[1]

The denial of human rights was etched into the American Colonies' first attempts at establishing self-government. When the colonists determined to seek their independence from England, they drafted a unique document cataloguing their grievances against the King and proclaiming as "self-evident" that "all men are created equal" and are endowed "with certain unalienable Rights," including those to "Life, Liberty and the pursuit of Happiness." The self-evident truths and the unalienable rights were intended, however, to apply only to white men. An earlier draft of the Declaration of Independence, submitted by Thomas Jefferson to the Continental Congress, had included among the charges against the King that

> "[h]e has waged cruel war against human nature itself, violating its most sacred rights of life and liberty in the persons of a distant people who never offended him, captivating and carrying them into slavery in another hemisphere, or to incur miserable death in their transportation thither." Franklin 88.

The Southern delegation insisted that the charge be deleted; the colonists themselves were implicated in the slave trade, and inclusion of this claim might have made it more difficult to justify the continuation of slavery once the ties to England were severed. Thus, even as the colonists embarked on a

---

[1] The history recounted here is perhaps too well known to require documentation. But I must acknowledge the authorities on which I rely in retelling it. J. Franklin, From Slavery to Freedom (4th ed. 1974) (hereinafter Franklin); R. Kluger, Simple Justice (1975) (hereinafter Kluger); C. Woodward, The Strange Career of Jim Crow (3d ed. 1974) (hereinafter Woodward).

course to secure their own freedom and equality, they ensured perpetuation of the system that deprived a whole race of those rights.

The implicit protection of slavery embodied in the Declaration of Independence was made explicit in the Constitution, which treated a slave as being equivalent to three-fifths of a person for purposes of apportioning representatives and taxes among the States. Art. I, § 2. The Constitution also contained a clause ensuring that the "Migration or Importation" of slaves into the existing States would be legal until at least 1808, Art. I, § 9, and a fugitive slave clause requiring that when a slave escaped to another State, he must be returned on the claim of the master, Art. IV, § 2. In their declaration of the principles that were to provide the cornerstone of the new Nation, therefore, the Framers made it plain that "we the people," for whose protection the Constitution was designed, did not include those whose skins were the wrong color. As Professor John Hope Franklin has observed, Americans "proudly accepted the challenge and responsibility of their new political freedom by establishing the machinery and safeguards that insured the continued enslavement of blacks." Franklin 100.

The individual States likewise established the machinery to protect the system of slavery through the promulgation of the Slave Codes, which were designed primarily to defend the property interest of the owner in his slave. The position of the Negro slave as mere property was confirmed by this Court in *Dred Scott* v. *Sandford*, 19 How. 393 (1857), holding that the Missouri Compromise—which prohibited slavery in the portion of the Louisiana Purchase Territory north of Missouri—was unconstitutional because it deprived slave owners of their property without due process. The Court declared that under the Constitution a slave was property, and "[t]he right to traffic in it, like an ordinary article of merchandise and property, was guarantied to the citizens of the United

States . . . ." *Id.,* at 451. The Court further concluded that Negroes were not intended to be included as citizens under the Constitution but were "regarded as beings of an inferior order . . . altogether unfit to associate with the white race, either in social or political relations; and so far inferior, that they had no rights which the white man was bound to respect . . . ." *Id.,* at 407.

### B

· The status of the Negro as property was officially erased by his emancipation at the end of the Civil War. But the long-awaited emancipation, while freeing the Negro from slavery, did not bring him citizenship or equality in any meaningful way. Slavery was replaced by a system of "laws which imposed upon the colored race onerous disabilities and burdens, and curtailed their rights in the pursuit of life, liberty, and property to such an extent that their freedom was of little value." *Slaughter-House Cases,* 16 Wall. 36, 70 (1873). Despite the passage of the Thirteenth, Fourteenth, and Fifteenth Amendments, the Negro was systematically denied the rights those Amendments were supposed to secure. The combined actions and inactions of the State and Federal Governments maintained Negroes in a position of legal inferiority for another century after the Civil War.

The Southern States took the first steps to re-enslave the Negroes. Immediately following the end of the Civil War, many of the provisional legislatures passed Black Codes, similar to the Slave Codes, which, among other things, limited the rights of Negroes to own or rent property and permitted imprisonment for breach of employment contracts. Over the next several decades, the South managed to disenfranchise the Negroes in spite of the Fifteenth Amendment by various techniques, including poll taxes, deliberately complicated balloting processes, property and literacy qualifications, and finally the white primary.

Congress responded to the legal disabilities being imposed

in the Southern States by passing the Reconstruction Acts and the Civil Rights Acts. Congress also responded to the needs of the Negroes at the end of the Civil War by establishing the Bureau of Refugees, Freedmen, and Abandoned Lands, better known as the Freedmen's Bureau, to supply food, hospitals, land, and education to the newly freed slaves. Thus, for a time it seemed as if the Negro might be protected from the continued denial of his civil rights and might be relieved of the disabilities that prevented him from taking his place as a free and equal citizen.

That time, however, was short-lived. Reconstruction came to a close, and, with the assistance of this Court, the Negro was rapidly stripped of his new civil rights. In the words of C. Vann Woodward: "By narrow and ingenious interpretation [the Supreme Court's] decisions over a period of years had whittled away a great part of the authority presumably given the government for protection of civil rights." Woodward 139.

The Court began by interpreting the Civil War Amendments in a manner that sharply curtailed their substantive protections. See, e. g., *Slaughter-House Cases, supra; United States* v. *Reese,* 92 U. S. 214 (1876); *United States* v. *Cruikshank,* 92 U. S. 542 (1876). Then in the notorious *Civil Rights Cases,* 109 U. S. 3 (1883), the Court strangled Congress' efforts to use its power to promote racial equality. In those cases the Court invalidated sections of the Civil Rights Act of 1875 that made it a crime to deny equal access to "inns, public conveyances, theatres and other places of public amusement." *Id.,* at 10. According to the Court, the Fourteenth Amendment gave Congress the power to proscribe only discriminatory action by the State. The Court ruled that the Negroes who were excluded from public places suffered only an invasion of their social rights at the hands of private individuals, and Congress had no power to remedy that. *Id.,* at 24–25. "When a man has emerged from slavery, and by the aid of beneficent legislation has shaken off the inseparable concomitants of that

state," the Court concluded, "there must be some stage in the progress of his elevation when he takes the rank of a mere citizen, and ceases to be the special favorite of the laws . . . ." *Id.,* at 25. As Mr. Justice Harlan noted in dissent, however, the Civil War Amendments and Civil Rights Acts did not make the Negroes the "special favorite" of the laws but instead "sought to accomplish in reference to that race . . .—what had already been done in every State of the Union for the white race—to secure and protect rights belonging to them as freemen and citizens; nothing more." *Id.,* at 61.

The Court's ultimate blow to the Civil War Amendments and to the equality of Negroes came in *Plessy* v. *Ferguson,* 163 U. S. 537 (1896). In upholding a Louisiana law that required railway companies to provide "equal but separate" accommodations for whites and Negroes, the Court held that the Fourteenth Amendment was not intended "to abolish distinctions based upon color, or to enforce social, as distinguished from political equality, or a commingling of the two races upon terms unsatisfactory to either." *Id.,* at 544. Ignoring totally the realities of the positions of the two races, the Court remarked:

> "We consider the underlying fallacy of the plaintiff's argument to consist in the assumption that the enforced separation of the two races stamps the colored race with a badge of inferiority. If this be so, it is not by reason of anything found in the act, but solely because the colored race chooses to put that construction upon it." *Id.,* at 551.

Mr. Justice Harlan's dissenting opinion recognized the bankruptcy of the Court's reasoning. He noted that the "real meaning" of the legislation was "that colored citizens are so inferior and degraded that they cannot be allowed to sit in public coaches occupied by white citizens." *Id.,* at 560. He expressed his fear that if like laws were enacted in other

States, "the effect would be in the highest degree mischievous." *Id.*, at 563. Although slavery would have disappeared, the States would retain the power "to interfere with the full enjoyment of the blessings of freedom; to regulate civil rights, common to all citizens, upon the basis of race; and to place in a condition of legal inferiority a large body of American citizens . . . ." *Ibid.*

The fears of Mr. Justice Harlan were soon to be realized. In the wake of *Plessy,* many States expanded their Jim Crow laws, which had up until that time been limited primarily to passenger trains and schools. The segregation of the races was extended to residential areas, parks, hospitals, theaters, waiting rooms, and bathrooms. There were even statutes and ordinances which authorized separate phone booths for Negroes and whites, which required that textbooks used by children of one race be kept separate from those used by the other, and which required that Negro and white prostitutes be kept in separate districts. In 1898, after *Plessy,* the Charlestown News and Courier printed a parody of Jim Crow laws:

> " 'If there must be Jim Crow cars on the railroads, there should be Jim Crow cars on the street railways. Also on all passenger boats. . . . If there are to be Jim Crow cars, moreover, there should be Jim Crow waiting saloons at all stations, and Jim Crow eating houses. . . . There should be Jim Crow sections of the jury box, and a separate Jim Crow dock and witness stand in every court— and a Jim Crow Bible for colored witnesses to kiss.' " Woodward 68.

The irony is that before many years had passed, with the exception of the Jim Crow witness stand, "all the improbable applications of the principle suggested by the editor in derision had been put into practice—down to and including the Jim Crow Bible." *Id.*, at 69.

Nor were the laws restricting the rights of Negroes limited

solely to the Southern States.  In many of the Northern States, the Negro was denied the right to vote, prevented from serving on juries, and excluded from theaters, restaurants, hotels, and inns.  Under President Wilson, the Federal Government began to require segregation in Government buildings; desks of Negro employees were curtained off; separate bathrooms and separate tables in the cafeterias were provided; and even the galleries of the Congress were segregated.  When his segregationist policies were attacked, President Wilson responded that segregation was " 'not humiliating but a benefit' " and that he was " 'rendering [the Negroes] more safe in their possession of office and less likely to be discriminated against.' "  Kluger 91.

The enforced segregation of the races continued into the middle of the 20th century.  In both World Wars, Negroes were for the most part confined to separate military units; it was not until 1948 that an end to segregation in the military was ordered by President Truman.  And the history of the exclusion of Negro children from white public schools is too well known and recent to require repeating here.  That Negroes were deliberately excluded from public graduate and professional schools—and thereby denied the opportunity to become doctors, lawyers, engineers, and the like—is also well established.  It is of course true that some of the Jim Crow laws (which the decisions of this Court had helped to foster) were struck down by this Court in a series of decisions leading up to *Brown* v. *Board of Education,* 347 U. S. 483 (1954).  See, *e. g., Morgan* v. *Virginia,* 328 U. S. 373 (1946); *Sweatt* v. *Painter,* 339 U. S. 629 (1950); *McLaurin* v. *Oklahoma State Regents,* 339 U. S. 637 (1950).  Those decisions, however, did not automatically end segregation, nor did they move Negroes from a position of legal inferiority to one of equality.  The legacy of years of slavery and of years of second-class citizenship in the wake of emancipation could not be so easily eliminated.

## II

The position of the Negro today in America is the tragic but inevitable consequence of centuries of unequal treatment. Measured by any benchmark of comfort or achievement, meaningful equality remains a distant dream for the Negro.

A Negro child today has a life expectancy which is shorter by more than five years than that of a white child.[2] The Negro child's mother is over three times more likely to die of complications in childbirth,[3] and the infant mortality rate for Negroes is nearly twice that for whites.[4] The median income of the Negro family is only 60% that of the median of a white family,[5] and the percentage of Negroes who live in families with incomes below the poverty line is nearly four times greater than that of whites.[6]

When the Negro child reaches working age, he finds that America offers him significantly less than it offers his white counterpart. For Negro adults, the unemployment rate is twice that of whites,[7] and the unemployment rate for Negro teenagers is nearly three times that of white teenagers.[8] A Negro male who completes four years of college can expect a median annual income of merely $110 more than a white male who has only a high school diploma.[9] Although Negroes

---

[2] U. S. Dept. of Commerce, Bureau of the Census, Statistical Abstract of the United States 65 (1977) (Table 94).

[3] *Id.*, at 70 (Table 102).

[4] *Ibid.*

[5] U. S. Dept. of Commerce, Bureau of the Census, Current Population Reports, Series P–60, No. 107, p. 7 (1977) (Table 1).

[6] Id., at 20 (Table 14).

[7] U. S. Dept. of Labor, Bureau of Labor Statistics, Employment and Earnings, January 1978, p. 170 (Table 44).

[8] *Ibid.*

[9] U. S. Dept. of Commerce, Bureau of the Census, Current Population Reports, Series P–60, No. 105, p. 198 (1977) (Table 47).

represent 11.5% of the population,[10] they are only 1.2% of the lawyers and judges, 2% of the physicians, 2.3% of the dentists, 1.1% of the engineers and 2.6% of the college and university professors.[11]

The relationship between those figures and the history of unequal treatment afforded to the Negro cannot be denied. At every point from birth to death the impact of the past is reflected in the still disfavored position of the Negro.

In light of the sorry history of discrimination and its devastating impact on the lives of Negroes, bringing the Negro into the mainstream of American life should be a state interest of the highest order. To fail to do so is to ensure that America will forever remain a divided society.

## III

I do not believe that the Fourteenth Amendment requires us to accept that fate. Neither its history nor our past cases lend any support to the conclusion that a university may not remedy the cumulative effects of society's discrimination by giving consideration to race in an effort to increase the number and percentage of Negro doctors.

## A

This Court long ago remarked that

> "in any fair and just construction of any section or phrase of these [Civil War] amendments, it is necessary to look to the purpose which we have said was the pervading spirit of them all, the evil which they were designed to remedy . . . ." *Slaughter-House Cases,* 16 Wall., at 72.

It is plain that the Fourteenth Amendment was not intended to prohibit measures designed to remedy the effects of the

---

[10] U. S. Dept. of Commerce, Bureau of the Census, *Statistical Abstract, supra,* at 25 (Table 24).

[11] *Id.,* at 407–408 (Table 662) (based on 1970 census).

Nation's past treatment of Negroes. The Congress that passed the Fourteenth Amendment is the same Congress that passed the 1866 Freedmen's Bureau Act, an Act that provided many of its benefits only to Negroes. Act of July 16, 1866, ch. 200, 14 Stat. 173; see *supra,* at 391. Although the Freedmen's Bureau legislation provided aid for refugees, thereby including white persons within some of the relief measures, 14 Stat. 174; see also Act of Mar. 3, 1865, ch. 90, 13 Stat. 507, the bill was regarded, to the dismay of many Congressmen, as "solely and entirely for the freedmen, and to the exclusion of all other persons . . . ." Cong. Globe, 39th Cong., 1st Sess., 544 (1866) (remarks of Rep. Taylor). See also *id.,* at 634–635 (remarks of Rep. Ritter); *id.,* at App. 78, 80–81 (remarks of Rep. Chanler). Indeed, the bill was bitterly opposed on the ground that it "undertakes to make the negro in some respects . . . superior . . . and gives them favors that the poor white boy in the North cannot get." *Id.,* at 401 (remarks of Sen. McDougall). See also *id.,* at 319 (remarks of Sen. Hendricks); *id.,* at 362 (remarks of Sen. Saulsbury); *id.,* at 397 (remarks of Sen. Willey); *id.,* at 544 (remarks of Rep. Taylor). The bill's supporters defended it—not by rebutting the claim of special treatment—but by pointing to the need for such treatment:

> "The very discrimination it makes between 'destitute and suffering' negroes, and destitute and suffering white paupers, proceeds upon the distinction that, in the omitted case, civil rights and immunities are already sufficiently protected by the possession of political power, the absence of which in the case provided for necessitates governmental protection." *Id.,* at App. 75 (remarks of Rep. Phelps).

Despite the objection to the special treatment the bill would provide for Negroes, it was passed by Congress. *Id.,* at 421, 688. President Johnson vetoed this bill and also a subsequent bill that contained some modifications; one of his prin-

cipal objections to both bills was that they gave special benefits to Negroes. 8 Messages and Papers of the Presidents 3596, 3599, 3620, 3623 (1897). Rejecting the concerns of the President and the bill's opponents, Congress overrode the President's second veto. Cong. Globe, 39th Cong., 1st Sess., 3842, 3850 (1866).

Since the Congress that considered and rejected the objections to the 1866 Freedmen's Bureau Act concerning special relief to Negroes also proposed the Fourteenth Amendment, it is inconceivable that the Fourteenth Amendment was intended to prohibit all race-conscious relief measures. It "would be a distortion of the policy manifested in that amendment, which was adopted to prevent state legislation designed to perpetuate discrimination on the basis of race or color," *Railway Mail Assn.* v. *Corsi,* 326 U. S. 88, 94 (1945), to hold that it barred state action to remedy the effects of that discrimination. Such a result would pervert the intent of the Framers by substituting abstract equality for the genuine equality the Amendment was intended to achieve.

### B

As has been demonstrated in our joint opinion, this Court's past cases establish the constitutionality of race-conscious remedial measures. Beginning with the school desegregation cases, we recognized that even absent a judicial or legislative finding of constitutional violation, a school board constitutionally could consider the race of students in making school-assignment decisions. See *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 16 (1971); *McDaniel* v. *Barresi,* 402 U. S. 39, 41 (1971). We noted, moreover, that a

> "flat prohibition against assignment of students for the purpose of creating a racial balance must inevitably conflict with the duty of school authorities to disestablish dual school systems. As we have held in *Swann,* the Constitution does not compel any particular degree of

racial balance or mixing, but when past and continuing constitutional violations are found, some ratios are likely to be useful as starting points in shaping a remedy. An absolute prohibition against use of such a device—even as a starting point—contravenes the implicit command of *Green* v. *County School Board,* 391 U. S. 430 (1968), that all reasonable methods be available to formulate an effective remedy." *Board of Education* v. *Swann,* 402 U. S. 43, 46 (1971).

As we have observed, "[a]ny other approach would freeze the status quo that is the very target of all desegregation processes." *McDaniel* v. *Barresi, supra,* at 41.

Only last Term, in *United Jewish Organizations* v. *Carey,* 430 U. S. 144 (1977), we upheld a New York reapportionment plan that was deliberately drawn on the basis of race to enhance the electoral power of Negroes and Puerto Ricans; the plan had the effect of diluting the electoral strength of the Hasidic Jewish community. We were willing in *UJO* to sanction the remedial use of a racial classification even though it disadvantaged otherwise "innocent" individuals. In another case last Term, *Califano* v. *Webster,* 430 U. S. 313 (1977), the Court upheld a provision in the Social Security laws that discriminated against men because its purpose was " 'the permissible one of redressing our society's longstanding disparate treatment of women.' " *Id.,* at 317, quoting *Califano* v. *Goldfarb,* 430 U. S. 199, 209 n. 8 (1977) (plurality opinion). We thus recognized the permissibility of remedying past societal discrimination through the use of otherwise disfavored classifications.

Nothing in those cases suggests that a university cannot similarly act to remedy past discrimination.[12] It is true that

---

[12] Indeed, the action of the University finds support in the regulations promulgated under Title VI by the Department of Health, Education, and Welfare and approved by the President, which authorize a federally funded institution to take affirmative steps to overcome past discrimination against

in both *UJO* and *Webster* the use of the disfavored classification was predicated on legislative or administrative action, but in neither case had those bodies made findings that there had been constitutional violations or that the specific individuals to be benefited had actually been the victims of discrimination. Rather, the classification in each of those cases was based on a determination that the group was in need of the remedy because of some type of past discrimination. There is thus ample support for the conclusion that a university can employ race-conscious measures to remedy past societal discrimination, without the need for a finding that those benefited were actually victims of that discrimination.

## IV

While I applaud the judgment of the Court that a university may consider race in its admissions process, it is more than a little ironic that, after several hundred years of class-based discrimination against Negroes, the Court is unwilling to hold that a class-based remedy for that discrimination is permissible. In declining to so hold, today's judgment ignores the fact that for several hundred years Negroes have been discriminated against, not as individuals, but rather solely because of the color of their skins. It is unnecessary in 20th-century America to have individual Negroes demonstrate that they have been victims of racial discrimination; the racism of our society has been so pervasive that none, regardless of wealth or position, has managed to escape its impact. The experience of Negroes in America has been different in kind, not just in degree, from that of other ethnic groups. It is not merely the history of slavery alone but also that a whole people were marked as inferior by the law. And that mark has endured. The dream of America as the great melting pot has

groups even where the institution was not guilty of prior discrimination. 45 CFR § 80.3 (b) (6) (ii) (1977).

not been realized for the Negro; because of his skin color he never even made it into the pot.

These differences in the experience of the Negro make it difficult for me to accept that Negroes cannot be afforded greater protection under the Fourteenth Amendment where it is necessary to remedy the effects of past discrimination. In the *Civil Rights Cases, supra,* the Court wrote that the Negro emerging from slavery must cease "to be the special favorite of the laws." 109 U. S., at 25; see *supra,* at 392. We cannot in light of the history of the last century yield to that view. Had the Court in that decision and others been willing to "do for human liberty and the fundamental rights of American citizenship, what it did . . . for the protection of slavery and the rights of the masters of fugitive slaves," 109 U. S., at 53 (Harlan, J., dissenting), we would not need now to permit the recognition of any "special wards."

Most importantly, had the Court been willing in 1896, in *Plessy* v. *Ferguson,* to hold that the Equal Protection Clause forbids differences in treatment based on race, we would not be faced with this dilemma in 1978. We must remember, however, that the principle that the "Constitution is color-blind" appeared only in the opinion of the lone dissenter. 163 U. S., at 559. The majority of the Court rejected the principle of color blindness, and for the next 60 years, from *Plessy* to *Brown* v. *Board of Education,* ours was a Nation where, *by law,* an individual could be given "special" treatment based on the color of his skin.

It is because of a legacy of unequal treatment that we now must permit the institutions of this society to give consideration to race in making decisions about who will hold the positions of influence, affluence, and prestige in America. For far too long, the doors to those positions have been shut to Negroes. If we are ever to become a fully integrated society, one in which the color of a person's skin will not determine the opportunities available to him or her, we must be willing

to take steps to open those doors. I do not believe that anyone can truly look into America's past and still find that a remedy for the effects of that past is impermissible.

It has been said that this case involves only the individual, Bakke, and this University. I doubt, however, that there is a computer capable of determining the number of persons and institutions that may be affected by the decision in this case. For example, we are told by the Attorney General of the United States that at least 27 federal agencies have adopted regulations requiring recipients of federal funds to take " 'affirmative action to overcome the effects of conditions which resulted in limiting participation . . . by persons of a particular race, color, or national origin.' " Supplemental Brief for United States as *Amicus Curiae* 16 (emphasis added). I cannot even guess the number of state and local governments that have set up affirmative-action programs, which may be affected by today's decision.

I fear that we have come full circle. After the Civil War our Government started several "affirmative action" programs. This Court in the *Civil Rights Cases* and *Plessy* v. *Ferguson* destroyed the movement toward complete equality. For almost a century no action was taken, and this nonaction was with the tacit approval of the courts. Then we had *Brown* v. *Board of Education* and the Civil Rights Acts of Congress, followed by numerous affirmative-action programs. *Now,* we have this Court again stepping in, this time to stop affirmative-action programs of the type used by the University of California.

MR. JUSTICE BLACKMUN.

I participate fully, of course, in the opinion, *ante,* p. 324, that bears the names of my Brothers BRENNAN, WHITE, MARSHALL, and myself. I add only some general observations that hold particular significance for me, and then a few comments on equal protection.

## I

At least until the early 1970's, apparently only a very small number, less than 2%, of the physicians, attorneys, and medical and law students in the United States were members of what we now refer to as minority groups. In addition, approximately three-fourths of our Negro physicians were trained at only two medical schools. If ways are not found to remedy that situation, the country can never achieve its professed goal of a society that is not race conscious.

I yield to no one in my earnest hope that the time will come when an "affirmative action" program is unnecessary and is, in truth, only a relic of the past. I would hope that we could reach this stage within a decade at the most. But the story of *Brown* v. *Board of Education,* 347 U. S. 483 (1954), decided almost a quarter of a century ago, suggests that that hope is a slim one. At some time, however, beyond any period of what some would claim is only transitional inequality, the United States must and will reach a stage of maturity where action along this line is no longer necessary. Then persons will be regarded as persons, and discrimination of the type we address today will be an ugly feature of history that is instructive but that is behind us.

The number of qualified, indeed highly qualified, applicants for admission to existing medical schools in the United States far exceeds the number of places available. Wholly apart from racial and ethnic considerations, therefore, the selection process inevitably results in the denial of admission to many *qualified* persons, indeed, to far more than the number of those who are granted admission. Obviously, it is a denial to the deserving. This inescapable fact is brought into sharp focus here because Allan Bakke is not himself charged with discrimination and yet is the one who is disadvantaged, and because the Medical School of the University of California at Davis itself is not charged with historical discrimination.

One theoretical solution to the need for more minority

members in higher education would be to enlarge our graduate schools. Then all who desired and were qualified could enter, and talk of discrimination would vanish. Unfortunately, this is neither feasible nor realistic. The vast resources that apparently would be required simply are not available. And the need for more professional graduates, in the strict numerical sense, perhaps has not been demonstrated at all.

There is no particular or real significance in the 84–16 division at Davis. The same theoretical, philosophical, social, legal, and constitutional considerations would necessarily apply to the case if Davis' special admissions program had focused on any lesser number, that is, on 12 or 8 or 4 places or, indeed, on only 1.

It is somewhat ironic to have us so deeply disturbed over a program where race is an element of consciousness, and yet to be aware of the fact, as we are, that institutions of higher learning, albeit more on the undergraduate than the graduate level, have given conceded preferences up to a point to those possessed of athletic skills, to the children of alumni, to the affluent who may bestow their largess on the institutions, and to those having connections with celebrities, the famous, and the powerful.

Programs of admission to institutions of higher learning are basically a responsibility for academicians and for administrators and the specialists they employ. The judiciary, in contrast, is ill-equipped and poorly trained for this. The administration and management of educational institutions are beyond the competence of judges and are within the special competence of educators, provided always that the educators perform within legal and constitutional bounds. For me, therefore, interference by the judiciary must be the rare exception and not the rule.

## II

I, of course, accept the propositions that (a) Fourteenth Amendment rights are personal; (b) racial and ethnic distinc-

tions where they are stereotypes are inherently suspect and call for exacting judicial scrutiny; (c) academic freedom is a special concern of the First Amendment; and (d) the Fourteenth Amendment has expanded beyond its original 1868 concept and now is recognized to have reached a point where, as MR. JUSTICE POWELL states, *ante,* at 293, quoting from the Court's opinion in *McDonald* v. *Santa Fe Trail Transp. Co.,* 427 U. S. 273, 296 (1976), it embraces a "broader principle."

This enlargement does not mean for me, however, that the Fourteenth Amendment has broken away from its moorings and its original intended purposes. Those original aims persist. And that, in a distinct sense, is what "affirmative action," in the face of proper facts, is all about. If this conflicts with idealistic equality, that tension is original Fourteenth Amendment tension, constitutionally conceived and constitutionally imposed, and it is part of the Amendment's very nature until complete equality is achieved in the area. In this sense, constitutional equal protection is a shield.

I emphasize in particular that the decided cases are not easily to be brushed aside. Many, of course, are not precisely on point, but neither are they off point. Racial factors have been given consideration in the school desegregation cases, in the employment cases, in *Lau* v. *Nichols,* 414 U. S. 563 (1974), and in *United Jewish Organizations* v. *Carey,* 430 U. S. 144 (1977). To be sure, some of these may be "distinguished" on the ground that victimization was directly present. But who is to say that victimization is not present for some members of today's minority groups, although it is of a lesser and perhaps different degree. The petitioners in *United Jewish Organizations* certainly complained bitterly of their reapportionment treatment, and I rather doubt that they regard the "remedy" there imposed as one that was "to improve" the group's ability to participate, as MR. JUSTICE POWELL describes it, *ante,* at 305. And surely in *Lau* v. *Nichols* we looked to ethnicity.

I am not convinced, as MR. JUSTICE POWELL seems to be, that the difference between the Davis program and the one employed by Harvard is very profound or constitutionally significant. The line between the two is a thin and indistinct one. In each, subjective application is at work. Because of my conviction that admission programs are primarily for the educators, I am willing to accept the representation that the Harvard program is one where good faith in its administration is practiced as well as professed. I agree that such a program, where race or ethnic background is only one of many factors, is a program better formulated than Davis' two-track system. The cynical, of course, may say that under a program such as Harvard's one may accomplish covertly what Davis concedes it does openly. I need not go that far, for despite its two-track aspect, the Davis program, for me, is within constitutional bounds, though perhaps barely so. It is surely free of stigma, and, as in *United Jewish Organizations,* I am not willing to infer a constitutional violation.

It is worth noting, perhaps, that governmental preference has not been a stranger to our legal life. We see it in veterans' preferences. We see it in the aid-to-the-handicapped programs. We see it in the progressive income tax. We see it in the Indian programs. We may excuse some of these on the ground that they have specific constitutional protection or, as with Indians, that those benefited are wards of the Government. Nevertheless, these preferences exist and may not be ignored. And in the admissions field, as I have indicated, educational institutions have always used geography, athletic ability, anticipated financial largess, alumni pressure, and other factors of that kind.

I add these only as additional components on the edges of the central question as to which I join my Brothers BRENNAN, WHITE, and MARSHALL in our more general approach. It is gratifying to know that the Court at least finds it constitutional for an academic institution to take race and ethnic background into consideration as one factor, among many, in

the administration of its admissions program. I presume that that factor always has been there, though perhaps not conceded or even admitted. It is a fact of life, however, and a part of the real world of which we are all a part. The sooner we get down the road toward accepting and being a part of the real world, and not shutting it out and away from us, the sooner will these difficulties vanish from the scene.

I suspect that it would be impossible to arrange an affirmative-action program in a racially neutral way and have it successful. To ask that this be so is to demand the impossible. In order to get beyond racism, we must first take account of race. There is no other way. And in order to treat some persons equally, we must treat them differently. We cannot—we dare not—let the Equal Protection Clause perpetuate racial supremacy.

So the ultimate question, as it was at the beginning of this litigation, is: Among the qualified, how does one choose?

A long time ago, as time is measured for this Nation, a Chief Justice, both wise and farsighted, said:

"In considering this question, then, we must never forget, that it is *a constitution* we are expounding." *McCulloch* v. *Maryland,* 4 Wheat. 316, 407 (1819) (emphasis in original).

In the same opinion, the Great Chief Justice further observed:

"Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *Id.,* at 421.

More recently, one destined to become a Justice of this Court observed:

"The great generalities of the constitution have a content and a significance that vary from age to age." B. Cardozo, The Nature of the Judicial Process 17 (1921).

And an educator who became a President of the United States said:

> "But the Constitution of the United States is not a mere lawyers' document: it is a vehicle of life, and its spirit is always the spirit of the age." W. Wilson, Constitutional Government in the United States 69 (1911).

These precepts of breadth and flexibility and ever-present modernity are basic to our constitutional law. Today, again, we are expounding a *Constitution*. The same principles that governed McCulloch's case in 1819 govern Bakke's case in 1978. There can be no other answer.

Mr. Justice Stevens, with whom The Chief Justice, Mr. Justice Stewart, and Mr. Justice Rehnquist join, concurring in the judgment in part and dissenting in part.

It is always important at the outset to focus precisely on the controversy before the Court.[1] It is particularly important to do so in this case because correct identification of the issues will determine whether it is necessary or appropriate to express any opinion about the legal status of any admissions program other than petitioner's.

# I

This is not a class action. The controversy is between two specific litigants. Allan Bakke challenged petitioner's special admissions program, claiming that it denied him a place in medical school because of his race in violation of the Federal and California Constitutions and of Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d *et seq.* The California Supreme Court upheld his challenge and ordered him admitted. If the

---

[1] Four Members of the Court have undertaken to announce the legal and constitutional effect of this Court's judgment. See opinion of Justices Brennan, White, Marshall, and Blackmun, *ante,* at 324–325. It is hardly necessary to state that only a majority can speak for the Court or determine what is the "central meaning" of any judgment of the Court.

state court was correct in its view that the University's special program was illegal, and that Bakke was therefore unlawfully excluded from the Medical School because of his race, we should affirm its judgment, regardless of our views about the legality of admissions programs that are not now before the Court.

The judgment as originally entered by the trial court contained four separate paragraphs, two of which are of critical importance.[2] Paragraph 3 declared that the University's special admissions program violated the Fourteenth Amendment, the State Constitution, and Title VI. The trial court did not order the University to admit Bakke because it concluded that Bakke had not shown that he would have been admitted if there had been no special program. Instead, in paragraph 2 of its judgment it ordered the University to consider Bakke's application for admission without regard to his race or the race of any other applicant. The order did not include any broad

---

[2] The judgment first entered by the trial court read, in its entirety, as follows:

"IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

"1. Defendant, the Regents of the University of California, have judgment against plaintiff, Allan Bakke, denying the mandatory injunction requested by plaintiff ordering his admission to the University of California at Davis Medical School;

"2. That plaintiff is entitled to have his application for admission to the medical school considered without regard to his race or the race of any other applicant, and defendants are hereby restrained and enjoined from considering plaintiff's race or the race of any other applicant in passing upon his application for admission;

"3. Cross-defendant Allan Bakke have judgment against cross-complainant, the Regents of the University of California, declaring that the special admissions program at the University of California at Davis Medical School violates the Fourteenth Amendment to the United States Constitution, Article 1, Section 21 of the California Constitution, and the Federal Civil Rights Act [42 U. S. C. § 2000d];

"4. That plaintiff have and recover his court costs incurred herein in the sum of $217.35." App. to Pet. for Cert. 120a.

prohibition against any use of race in the admissions process; its terms were clearly limited to the University's consideration of *Bakke's* application.[3]   Because the University has since been ordered to admit Bakke, paragraph 2 of the trial court's order no longer has any significance.

The California Supreme Court, in a holding that is not challenged, ruled that the trial court incorrectly placed the burden on Bakke of showing that he would have been admitted in the absence of discrimination.   The University then conceded "that it [could] not meet the burden of proving that the special admissions program did not result in Mr. Bakke's failure to be admitted." [4]   Accordingly, the California Supreme Court directed the trial court to enter judgment ordering Bakke's admission.[5]   Since that order superseded para-

---

[3] In  paragraph 2  the  trial  court  ordered  that  "plaintiff  [Bakke]  is entitled  to  have  *his*  application  for  admission  to  the  medical  school  considered  without  regard  to  *his*  race  or  the  race  of  any  other  applicant,  and defendants  are  hereby  restrained  and  enjoined  from  considering  *plaintiff's* race  or  the  race  of  any  other  applicant  in  passing  upon  *his*  application  for admission."   See  n. 2,  *supra*  (emphasis  added).   The  only  way  in  which this  order  can  be  broadly  read  as  prohibiting  any  use  of  race  in  the admissions  process,  apart  from  Bakke's  application,  is  if  the  final  "his" refers  to  "any  other  applicant."   But  the  consistent  use  of  the  pronoun throughout  the  paragraph  to  refer  to  Bakke  makes  such  a  reading  entirely unpersuasive,  as  does  the  failure  of  the  trial  court  to  suggest  that  it  was issuing  relief  to  applicants  who  were  not  parties  to  the  suit.

[4] Appendix B to Application for Stay A19–A20.

[5] 18 Cal. 3d 34, 64, 553 P. 2d 1152, 1172 (1976).   The judgment of the Supreme Court of the State of California affirms only paragraph 3 of the trial court's judgment.   The Supreme Court's judgment reads as follows:

"IT IS ORDERED, ADJUDGED, AND DECREED by the Court that the judgment of the Superior Court[,] County of Yolo[,] in the above-entitled cause, is hereby affirmed insofar as it determines that the special admission program is invalid; the judgment is reversed insofar as it denies Bakke an injunction ordering that he be admitted to the University, and the trial court is directed to enter judgment ordering Bakke to be admitted.

"Bakke shall recover his costs on these appeals."

graph 2 of the trial court's judgment, there is no outstanding injunction forbidding any consideration of racial criteria in processing applications.

It is therefore perfectly clear that the question whether race can ever be used as a factor in an admissions decision is not an issue in this case, and that discussion of that issue is inappropriate.[6]

## II

Both petitioner and respondent have asked us to determine the legality of the University's special admissions program by reference to the Constitution. Our settled practice, however, is to avoid the decision of a constitutional issue if a case can be fairly decided on a statutory ground. "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Co.* v. *McLaughlin,* 323 U. S. 101, 105.[7] The more important the issue, the more force

---

[6] "This Court . . . reviews judgments, not statements in opinions." *Black* v. *Cutter Laboratories,* 351 U. S. 292, 297.

[7] "From *Hayburn's Case,* 2 Dall. 409, to *Alma Motor Co.* v. *Timken-Detroit Axle Co.* [, 329 U. S. 129,] and the Hatch Act case [*United Public Workers* v. *Mitchell,* 330 U. S. 75] decided this term, this Court has followed a policy of strict necessity in disposing of constitutional issues. The earliest exemplifications, too well known for repeating the history here, arose in the Court's refusal to render advisory opinions and in applications of the related jurisdictional policy drawn from the case and controversy limitation. U. S. Const., Art. III. . . .

"The policy, however, has not been limited to jurisdictional determinations. For, in addition, 'the Court [has] developed, for its own governance in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision.' Thus, as those rules were listed in support of the statement quoted, constitutional issues affecting legislation will not be determined in friendly, nonadversary proceedings; in advance of the necessity of deciding them; in broader terms than are required by the precise facts to which the ruling is to be applied; if the record presents

there is to this doctrine.[8]  In this case, we are presented with a constitutional question of undoubted and unusual importance.  Since, however, a dispositive statutory claim was raised at the very inception of this case, and squarely decided in the portion of the trial court judgment affirmed by the California Supreme Court, it is our plain duty to confront it.  Only if petitioner should prevail on the statutory issue would it be necessary to decide whether the University's admissions program violated the Equal Protection Clause of the Fourteenth Amendment.

## III

Section 601 of the Civil Rights Act of 1964, 78 Stat. 252, 42 U. S. C. § 2000d, provides:

> "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

The University, through its special admissions policy, excluded Bakke from participation in its program of medical education because of his race.  The University also acknowledges that it was, and still is, receiving federal financial assistance.[9]  The plain language of the statute therefore requires affirmance of the judgment below.  A different result

---

some other ground upon which the case may be disposed of; at the instance of one who fails to show that he is injured by the statute's operation, or who has availed himself of its benefits; or if a construction of the statute is fairly possible by which the question may be avoided."  *Rescue Army* v. *Municipal Court,* 331 U. S. 549, 568–569 (footnotes omitted).  See also *Ashwander* v. *TVA,* 297 U. S. 288, 346–348 (Brandeis, J., concurring).

[8] The doctrine reflects both our respect for the Constitution as an enduring set of principles and the deference we owe to the Legislative and Executive Branches of Government in developing solutions to complex social problems.  See A. Bickel, The Least Dangerous Branch 131 (1962).

[9] Record 29.

cannot be justified unless that language misstates the actual intent of the Congress that enacted the statute or the statute is not enforceable in a private action. Neither conclusion is warranted.

Title VI is an integral part of the far-reaching Civil Rights Act of 1964. No doubt, when this legislation was being debated, Congress was not directly concerned with the legality of "reverse discrimination" or "affirmative action" programs. Its attention was focused on the problem at hand, the "glaring ... discrimination against Negroes which exists throughout our Nation," [10] and, with respect to Title VI, the federal funding of segregated facilities. [11] The genesis of the legislation, however, did not limit the breadth of the solution adopted. Just as Congress responded to the problem of employment discrimination by enacting a provision that protects all races, see *McDonald* v. *Santa Fe Trail Transp. Co.*, 427 U. S. 273, 279, [12] so, too, its answer to the problem of federal funding of segregated facilities stands as a broad prohibition against the exclusion of *any* individual from a federally funded program "on the ground of race." In the words of the House Report, Title VI stands for "the general principle that *no person* . . . be excluded from participation . . . on the ground of race, color, or national origin under any program or activity receiving Federal financial assistance." H. R. Rep. No. 914, 88th

---

[10] H. R. Rep. No. 914, 88th Cong., 1st Sess., pt. 1, p. 18 (1963).

[11] It is apparent from the legislative history that the immediate object of Title VI was to prevent federal funding of segregated facilities. See, *e. g.*, 110 Cong. Rec. 1521 (1964) (remarks of Rep. Celler); *id.*, at 6544 (remarks of Sen. Humphrey).

[12] In *McDonald* v. *Santa Fe Trail Transp. Co.*, the Court held that "Title VII prohibits racial discrimination against . . . white petitioners . . . upon the same standards as would be applicable were they Negroes . . . ." 427 U. S., at 280. Quoting from our earlier decision in *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 431, the Court reaffirmed the principle that the statute "prohibit[s] '[d]iscriminatory preference for *any* [racial] group, *minority* or *majority.*'" 427 U. S., at 279 (emphasis in original).

Cong., 1st Sess., pt. 1, p. 25 (1963) (emphasis added). This same broad view of Title VI and § 601 was echoed throughout the congressional debate and was stressed by every one of the major spokesmen for the Act.[13]

Petitioner contends, however, that exclusion of applicants on the basis of race does not violate Title VI if the exclusion carries with it no racial stigma. No such qualification or limitation of § 601's categorical prohibition of "exclusion" is justified by the statute or its history. The language of the entire section is perfectly clear; the words that follow "excluded from" do not modify or qualify the explicit outlawing of any exclusion on the stated grounds.

The legislative history reinforces this reading. The only suggestion that § 601 would allow exclusion of nonminority applicants came from opponents of the legislation and then only by way of a discussion of the meaning of the word "discrimination."[14] The opponents feared that the term "dis-

---

[13] See, e. g., 110 Cong. Rec. 1520 (1964) (remarks of Rep. Celler); id., at 5864 (remarks of Sen. Humphrey); id., at 6561 (remarks of Sen. Kuchel); id., at 7055 (remarks of Sen. Pastore). (Representative Celler and Senators Humphrey and Kuchel were the House and Senate floor managers for the entire Civil Rights Act, and Senator Pastore was the majority Senate floor manager for Title VI.)

[14] Representative Abernethy's comments were typical:

"Title VI has been aptly described as the most harsh and unprecedented proposal contained in the bill . . . .

"It is aimed toward eliminating discrimination in federally assisted programs. It contains no guideposts and no yardsticks as to what might constitute discrimination in carrying out federally aided programs and projects. . . .

.    .    .    .    .

"Presumably the college would have to have a 'racially balanced' staff from the dean's office to the cafeteria. . . .

"The effect of this title, if enacted into law, will interject race as a factor in every decision involving the selection of an individual . . . . The concept of 'racial imbalance' would hover like a black cloud over every transaction . . . ." Id., at 1619. See also, e. g., id., at 5611–5613 (remarks of Sen. Ervin); id., at 9083 (remarks of Sen. Gore).

crimination" would be read as mandating racial quotas and "racially balanced" colleges and universities, and they pressed for a specific definition of the term in order to avoid this possibility.[15] In response, the proponents of the legislation gave repeated assurances that the Act would be "colorblind" in its application.[16] Senator Humphrey, the Senate floor manager for the Act, expressed this position as follows:

> "[T]he word 'discrimination' has been used in many a court case. What it really means in the bill is a distinction in treatment . . . given to different individuals because of their different race, religion or national origin. . . .

> "The answer to this question [what was meant by 'discrimination'] is that if race is not a factor, we do not have to worry about discrimination because of race. . . . The Internal Revenue Code does not provide that colored people do not have to pay taxes, or that they can pay their taxes 6 months later than everyone else." 110 Cong. Rec. 5864 (1964).

> "[I]f we started to treat Americans as Americans, not as fat ones, thin ones, short ones, tall ones, brown ones, green ones, yellow ones, or white ones, but as Americans. If we did that we would not need to worry about discrimination." *Id.*, at 5866.

---

[15] *E. g., id.*, at 5863, 5874 (remarks of Sen. Eastland).

[16] See, *e. g., id.*, at 8346 (remarks of Sen. Proxmire) ("Taxes are collected from whites and Negroes, and they should be expended without discrimination"); *id.*, at 7055 (remarks of Sen. Pastore) ("[Title VI] will guarantee that the money collected by colorblind tax collectors will be distributed by Federal and State administrators who are equally colorblind"); and *id.*, at 6543 (remarks of Sen. Humphrey) ("'Simple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination'") (quoting from President Kennedy's Message to Congress, June 19, 1963)..

In giving answers such as these, it seems clear that the proponents of Title VI assumed that the Constitution itself required a colorblind standard on the part of government,[17] but that does not mean that the legislation only codifies an existing constitutional prohibition. The statutory prohibition against discrimination in federally funded projects contained in § 601 is more than a simple paraphrasing of what the Fifth or Fourteenth Amendment would require. The Act's proponents plainly considered Title VI consistent with their view of the Constitution and they sought to provide an effective weapon to implement that view.[18] As a distillation of what the supporters of the Act believed the Constitution demanded of State and Federal Governments, § 601 has independent force, with language and emphasis in addition to that found in the Constitution.[19]

---

[17] See, e. g., 110 Cong. Rec. 5253 (1964) (remarks of Sen. Humphrey); and id., at 7102 (remarks of Sen. Javits). The parallel between the prohibitions of Title VI and those of the Constitution was clearest with respect to the immediate goal of the Act—an end to federal funding of "separate but equal" facilities.

[18] "As in *Monroe* [v. *Pape*, 365 U. S. 167], we have no occasion here to 'reach the constitutional question whether Congress has the power to make municipalities liable for acts of its officers that violate the civil rights of individuals.' 365 U. S., at 191. For in interpreting the statute it is not our task to consider whether Congress was mistaken in 1871 in its view of the limits of its power over municipalities; rather, we must construe the statute in light of the impressions under which Congress did in fact act, see *Ries* v. *Lynskey*, 452 F. 2d, at 175." *Moor* v. *County of Alameda*, 411 U. S. 693, 709.

[19] Both Title VI and Title VII express Congress' belief that, in the long struggle to eliminate social prejudice and the effects of prejudice, the principle of *individual* equality, without regard to race or religion, was one on which there could be a "meeting of the minds" among all races and a common national purpose. See *Los Angeles Dept. of Water & Power* v. *Manhart*, 435 U. S. 702, 709 ("[T]he basic policy of the statute [Title VII] requires that we focus on fairness to individuals rather than fairness

As with other provisions of the Civil Rights Act, Congress' expression of its policy to end racial discrimination may independently proscribe conduct that the Constitution does not.[20] However, we need not decide the congruence—or lack of congruence—of the controlling statute and the Constitution

---

to classes"). This same principle of *individual* fairness is embodied in Title VI.

"The basic fairness of title VI is so clear that I find it difficult to understand why it should create any opposition. . . .

.     .     .     .     .

"Private prejudices, to be sure, cannot be eliminated overnight. However, there is one area where no room at all exists for private prejudices. That is the area of governmental conduct. As the first Mr. Justice Harlan said in his prophetic dissenting opinion in *Plessy* v. *Ferguson,* 163 U. S. 537, 559:

" 'Our Constitution is color-blind.'

"So—I say to Senators—must be our Government. . . .

"Title VI closes the gap between our purposes as a democracy and our prejudices as individuals. The cuts of prejudice need healing. The costs of prejudice need understanding. We cannot have hostility between two great parts of our people without tragic loss in our human values . . . .

"Title VI offers a place for the meeting of our minds as to Federal money." 110 Cong. Rec. 7063–7064 (1964) (remarks of Sen. Pastore).

Of course, one of the reasons marshaled in support of the conclusion that Title VI was "noncontroversial" was that its prohibition was already reflected in the law. See *ibid.* (remarks of Sen. Pell and Sen. Pastore).

[20] For example, private employers now under duties imposed by Title VII were wholly free from the restraints imposed by the Fifth and Fourteenth Amendments which are directed only to governmental action.

In *Lau* v. *Nichols,* 414 U. S. 563, the Government's brief stressed that "the applicability of Title VI . . . does not depend upon the outcome of the equal protection analysis. . . . [T]he statute independently proscribes the conduct challenged by petitioners and provides a discrete basis for injunctive relief." Brief for United States as *Amicus Curiae,* O. T. 1973, No. 72–6520, p. 15. The Court, in turn, rested its decision on Title VI. Mr. Justice Powell takes pains to distinguish *Lau* from the case at hand because the *Lau* decision "rested solely on the statute." *Ante,* at 304. See also *Washington* v. *Davis,* 426 U. S. 229, 238–239; *Allen* v. *State Board of Elections,* 393 U. S. 544, 588 (Harlan, J., concurring and dissenting).

since the meaning of the Title VI ban on exclusion is crystal clear: Race cannot be the basis of excluding anyone from participation in a federally funded program.

In short, nothing in the legislative history justifies the conclusion that the broad language of § 601 should not be given its natural meaning. We are dealing with a distinct statutory prohibition, enacted at a particular time with particular concerns in mind; neither its language nor any prior interpretation suggests that its place in the Civil Rights Act, won after long debate, is simply that of a constitutional appendage.[21] In unmistakable terms the Act prohibits the exclusion of individuals from federally funded programs because of their race.[22] As succinctly phrased during the Senate debate, under Title VI it is not "permissible to say 'yes' to one person; but to say 'no' to another person, only because of the color of his skin." [23]

Belatedly, however, petitioner argues that Title VI cannot be enforced by a private litigant. The claim is unpersuasive in the context of this case. Bakke requested injunctive and declaratory relief under Title VI; petitioner itself then joined

---

[21] As explained by Senator Humphrey, § 601 expresses a principle imbedded in the constitutional and moral understanding of the times.

"The purpose of title VI is to make sure that funds of the United States are not used to support racial discrimination. *In many instances* the practices of segregation or discrimination, which title VI seeks to end, are unconstitutional. . . . *In all cases,* such discrimination is contrary to national policy, and to the moral sense of the Nation. Thus, title VI is simply designed to insure that Federal funds are spent in accordance with the Constitution and the moral sense of the Nation." 110 Cong. Rec. 6544 (1964) (emphasis added).

[22] Petitioner's attempt to rely on regulations issued by HEW for a contrary reading of the statute is unpersuasive. Where no discriminatory policy was in effect, HEW's example of permissible "affirmative action" refers to "special recruitment policies." 45 CFR § 80.5 (j) (1977). This regulation, which was adopted in 1973, sheds no light on the legality of the admissions program that excluded Bakke in this case.

[23] 110 Cong. Rec. 6047 (1964) (remarks of Sen. Pastore).

issue on the question of the legality of its program under Title VI by asking for a declaratory judgment that it was in compliance with the statute.[24] Its view during state-court litigation was that a private cause of action does exist under Title VI. Because petitioner questions the availability of a private cause of action for the first time in this Court, the question is not properly before us. See *McGoldrick* v. *Compagnie Generale Transatlantique,* 309 U. S. 430, 434, Even if it were, petitioner's original assumption is in accord with the federal courts' consistent interpretation of the Act. To date, the courts, including this Court, have unanimously concluded or assumed that a private action may be maintained under Title VI.[25] The United States has taken the same position; in its *amicus curiae* brief directed to this specific issue, it concluded that such a remedy is clearly available,[26]

[24] Record 30–31.

[25] See, *e. g., Lau* v. *Nichols, supra; Bossier Parish School Board* v. *Lemon,* 370 F. 2d 847 (CA5 1967), cert. denied, 388 U. S. 911; *Uzzell* v. *Friday,* 547 F. 2d 801 (CA4 1977), opinion on rehearing en banc, 558 F. 2d 727, cert. pending, No. 77–635; *Serna* v. *Portales,* 499 F. 2d 1147 (CA10 1974); cf. *Chambers* v. *Omaha Public School District,* 536 F. 2d 222, 225 n. 2 (CA8 1976) (indicating doubt over whether a *money judgment* can be obtained under Title VI). Indeed, the Government's brief in *Lau* v. *Nichols, supra,* succinctly expressed this common assumption: "It is settled that petitioners . . . have standing to enforce Section 601 . . . ." Brief for United States as *Amicus Curiae* in *Lau* v. *Nichols,* O. T. 1973, No. 72–6520, p. 13 n. 5.

[26] Supplemental Brief for United States as *Amicus Curiae* 24–34. The Government's supplemental brief also suggests that there may be a difference between a private cause of action brought to end a particular discriminatory practice and such an action brought to cut off federal funds. *Id.,* at 28–30. Section 601 is specifically addressed to personal rights, while § 602—the fund cutoff provision—establishes "an elaborate mechanism for *governmental* enforcement by federal agencies." Supplemental Brief, *supra,* at 28 (emphasis added). Arguably, private enforcement of this "elaborate mechanism" would not fit within the congressional scheme, see separate opinion of MR. JUSTICE WHITE, *ante,* at 380–383. But Bakke did not seek to cut off the University's federal funding; he sought admission

and Congress has repeatedly enacted legislation predicated on the assumption that Title VI may be enforced in a private action.[27] The conclusion that an individual may maintain a private cause of action is amply supported in the legislative history of Title VI itself.[28] In short, a fair consideration of

to medical school. The difference between these two courses of action is clear and significant. As the Government itself states:

"[T]he grant of an injunction or a declaratory judgment in a private action would not be inconsistent with the administrative program established by Section 602 . . . . A declaratory judgment or injunction against future discrimination would not raise the possibility that funds would be terminated, and it would not involve bringing the forces of the Executive Branch to bear on state programs; it therefore would not implicate the concern that led to the limitations contained in Section 602." Supplemental Brief, *supra*, at 30 n. 25.

The notion that a private action seeking injunctive or declaratory judgment relief is inconsistent with a federal statute that authorizes termination of funds has clearly been rejected by this Court in prior cases. See *Rosado* v. *Wyman*, 397 U. S. 397, 420.

[27] See 29 U. S. C. § 794 (1976 ed.) (the Rehabilitation Act of 1973) (in particular, the legislative history discussed in *Lloyd* v. *Regional Transportation Authority*, 548 F. 2d 1277, 1285–1286 (CA7 1977)); 20 U. S. C. § 1617 (1976 ed.) (attorney fees under the Emergency School Aid Act); and 31 U. S. C. § 1244 (1976 ed.) (private action under the Financial Assistance Act). Of course, none of these subsequent legislative enactments is necessarily reliable evidence of Congress' intent in 1964 in enacting Title VI, and the legislation was not intended to change the existing status of Title VI.

[28] Framing the analysis in terms of the four-part *Cort* v. *Ash* test, see 422 U. S. 66, 78, it is clear that all four parts of the test are satisfied. (1) Bakke's status as a potential beneficiary of a federally funded program definitely brings him within the " 'class for whose *especial* benefit the statute was enacted,' " *ibid*. (emphasis in original). (2) A cause of action based on race discrimination has not been "traditionally relegated to state law." *Ibid*. (3) While a few excerpts from the voluminous legislative history suggest that Congress did not intend to create a private cause of action, see opinion of MR. JUSTICE POWELL, *ante*, at 283 n. 18, an examination of the entire legislative history makes it clear that Congress had no intention to foreclose a private right of action. (4) There is ample evidence that Congress considered private causes of action to be consistent

petitioner's tardy attack on the propriety of Bakke's suit under Title VI requires that it be rejected.

The University's special admissions program violated Title VI of the Civil Rights Act of 1964 by excluding Bakke from the Medical School because of his race. It is therefore our duty to affirm the judgment ordering Bakke admitted to the University.

Accordingly, I concur in the Court's judgment insofar as it affirms the judgment of the Supreme Court of California. To the extent that it purports to do anything else, I respectfully dissent.

---

with, if not essential to, the legislative scheme. See, *e. g.,* remarks of Senator Ribicoff:

"We come then to the crux of the dispute—how this right [to participate in federally funded programs without discrimination] should be protected. And even this issue becomes clear upon the most elementary analysis. If Federal funds are to be dispensed on a nondiscriminatory basis, the only possible remedies must fall into one of two categories: First, action to end discrimination; or second, action to end the payment of funds. Obviously action to end discrimination is preferable since that reaches the objective of extending the funds on a nondiscriminatory basis. But if the discrimination persists and cannot be effectively terminated, how else can the principle of nondiscrimination be vindicated except by nonpayment of funds?" 110 Cong. Rec. 7065 (1964). See also *id.,* at 5090, 6543, 6544 (remarks of Sen. Humphrey); *id.,* at 7103, 12719 (remarks of Sen. Javits); *id.,* at 7062, 7063 (remarks of Sen. Pastore).

The congressional debates thus show a clear understanding that the principle embodied in § 601 involves *personal* federal rights that administrative procedures would not, for the most part, be able to protect. The analogy to the Voting Rights Act of 1965, 42 U. S. C. § 1973 *et seq.* (1970 ed. and Supp. V), is clear. Both that Act and Title VI are broadly phrased in terms of personal rights ("no person shall be denied . . ."); both Acts were drafted with broad remedial purposes in mind; and the effectiveness of both Acts would be "severely hampered" without the existence of a private remedy to supplement administrative procedures. See *Allen* v. *State Bd. of Elections,* 393 U. S. 544, 556. In *Allen,* of course, this Court found a private right of action under the Voting Rights Act.